UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x

THE CITY OF NEW YORK,

                                    Plaintiff,

          -against-                                    Case No. 25 cv_____

PUFF BAR, EVO BRANDS, LLC, PVG2, LLC d/b/a
PUFF BAR, MIDWEST GOODS INC. d/b/a MIDWEST
DISTRIBUTION ILLINOIS, 10 DAYS, INC. d/b/a POD
JUICE, SAFA GOODS LLC, SV3, LLC d/b/a MI-ONE
BRANDS, MYLÉ VAPE INC., MVH I, INC.,

                                    Defendants.

-------------------------------------------------------------------x

## **COMPLAINT**

PRELIMINARY STATEMENT ......................................................................... 1

JURISDICTION AND VENUE ........................................................................ 5

PARTIES ........................................................................................................ 6

FACTUAL ALLEGATIONS ............................................................................ 7

I.  Old Tactics, New Products, Same Problems:  Defendants Have
    Openly Marketed and Sold Illegal and Dangerous Flavored
    Vapor Products.......................................................................................... 7

    A.  Defendants Make the Tobacco Industry's Strategies Their Own. ............... 9

        1.  The Rise of E-Cigarettes. ...................................................................13

        2.  Puff Bar Emerges and Creates the Marketing Playbook for Disposable E-
            Cigarettes. ........................................................................................16

    B.  Today's Disposable E-cigarettes, which Defendants Control in New York, are
        Dangerous and Designed to Be Irresistible to Youth................................. 18

II. Ignoring the Guardrails: Every Sale of Defendants' E-cigarettes
    Violates the Law and Creates, Maintains, or Contributes
    to a Public Health Crisis That New York City Struggles to Contain. ............. 27

    A.  Defendants Actively Subvert Evidence-Based Federal, State, and Local Laws......... 28

        1.  Defendants Violate the Federal Prevent All Cigarette
            Trafficking ("PACT") Act. ..................................................................29

        2.  Defendants Violate Multiple Provisions of New York's Public Health Law
            Regarding the Marketing and Sale of E-Cigarettes. ...............................33

            a.    Each Defendant Has Violated New York's Flavor Ban
                  (N.Y. Pub. Health L. § 1399-mm-1)........................................... 35

            b.    Each Defendant Has Violated New York's Ban on Shipping
                  (N.Y. Pub. Health L. § 1399-*ll*). ............................................... 36

            c.    Certain Defendants Have Violated New York's
                  Required Ingredient Disclosures
                  (N.Y. Pub. Health L. § 1701)..................................................... 38

i

d.      Each Defendant Has Violated New York City Law. ............................... 41

3.   Each Defendant Has Violated the Federal Food, Drug, and
Cosmetic Act ("FD&C Act") and FDA Regulations.............................................41

B.  The Flavored Vapor Product Supply Chain Involves International and Interstate
Commerce and Defendants Substantially Control New York's Supply.................... 44

III. Each Defendant Has Persistently and Illegally Marketed, Sold, and Shipped Flavored
Vapor Products into New York........................................................................ 47

A.  The Puff Defendants –
*The First Mega-Popular Disposable Vape* .............................................. 49

D.  Midwest Goods –
*A Leading Distributor with a Big Media Focus* ....................................... 65

E.  Pod Juice –
*A Manufacturer and Distributor of Highly Potent e-cigarettes*................................. 81

F.  Safa Goods –
*A One-Stop Shop for Vape Sellers with a Nationwide Distribution Network*............. 89

G.  Mi-One –
*A Brand, Distributor, and Conspiracist*........................................................ 94

H.  Mylé –
*A Favored Brand and Distributor with Swag* .......................................... 102

IV. The Price Paid by the City:  Defendants' Flavored Vapor Products Have Harmed New
York City and Will Continue To Do So If Unabated. ................................................... 111

A.  Too Many City Youth Are Vaping Today Because of the
Defendants-Controlled Market for disposable e-cigarettes, Despite a
Steep Decline in the Use of Tobacco Products......................................... 111

B.  Defendants' disposable e-cigarettes Are Negatively Affecting New York
Adolescents' Health and Wellbeing........................................................... 115

C.  Defendants Must Abate the Harm They Have Caused,
Contributed to, or Maintained................................................................... 117

V. CLAIMS FOR RELIEF ............................................................... 122

AS AND FOR A FIRST CAUSE OF ACTION
Violations of the PACT Act, 15 U.S.C. § 376a
    *Delivery Sales*
(*Against All Defendants Except EVO Brands and MVH I*)............................ 122

AS AND FOR A SECOND CAUSE OF ACTION
Violations of the PACT Act, 15 U.S.C. § 376
    *Registration & Reporting*
(*Against All Defendants Except Evo Brands, and MVH I*) ........................... 126

AS AND FOR A THIRD CAUSE OF ACTION
Violations of The PACT Act, 18 U.S.C. § 1716e
    *Nonmailable Products*
(*Against All Defendants Except Evo Brands* and *MVH I*) ........................... 128

AS AND FOR A FOURTH CAUSE OF ACTION
Violation of N.Y.C. Administrative Code § 17-715
(*Against All Defendants*)........................................................... 129

AS AND FOR A FIFTH CAUSE OF ACTION
Violation of N.Y. Pub. Hlth. L. § 1399-*ll*
(*Against All Defendants*)........................................................... 130

AS AND FOR A SIXTH CAUSE OF ACTION
Common-Law Public Nuisance
(*Against All Defendants*)........................................................... 131

VI.   PRAYER FOR RELIEF ............................................................ 132

Plaintiff, the City of New York (the "City"), through its attorney Muriel Goode Trufant, Corporation Counsel of the City of New York, respectfully alleges, with knowledge of its own actions and on information and belief as to the actions of others, as follows:

## PRELIMINARY STATEMENT

1.      New York City is grappling with a public health crisis, caused by e-cigarettes,[1] particularly flavored, disposable e-cigarettes.[2]  In 2018, HHS Secretary Alex Azar warned that e-cigarettes "threaten to engulf a new generation in nicotine addiction,"[3] and Surgeon General Jerome Adams declared e-cigarette use among youth an "epidemic" and "an unprecedented challenge."[4]  Since then, too many children, as young as middle schoolers, have reported being exposed to e-cigarettes.  Nationally, about 9.6% of eighth graders, 15.4% of tenth graders, and 21.0% of twelfth graders report e-cigarette use in the past 12 months.[5]

2.      More than 85% of American underage users who use e-cigarettes choose flavored e-cigarettes.  "One particular feature of e-cigarette products appears to drive … youth demand: the panoply of e-liquid flavors. … One nearly decade-old estimate found that there were 7,700 unique

---

[1] The term "electronic nicotine delivery system," often abbreviated as "ENDS," refers to a variety of devices—"vapes," "vaporizers," "vape pens," "hookah pens," "electronic cigarettes," "e-cigars," and "e-pipes," among others—which vaporize nicotine-containing solutions ("e-liquids") that deliver nicotine when inhaled by the user.

[2] Defined *infra* n.9.

[3] *Results from 2018 National Youth Tobacco Survey* (Nov. 15, 2018), *available at* https://www.fda.gov/news-events/press-announcements/results-2018-national-youth-tobacco-survey-show-dramatic-increase-e-cigarette-use-among-youth-over (last visited Feb. 15, 2025).

[4] Alicia Ault, *Youth Vaping an Epidemic, US Surgeon General Declares* (Dec. 18, 2018), *available at* https://www.medscape.com/viewarticle/906733?form=fpf (last visited Feb. 15, 2025).

[5] Miech, R. A., Johnston, L. D., Patrick, M. E., & O'Malley, P. M., *National Survey Results on Drug Use, 1975–2024: Overview and key findings for secondary school students* (Dec. 2024) Ann Arbor, MI: Institute for Social Research, University of Michigan, *available at* https://monitoringthefuture.org/wp-content/uploads/2024/12/mtf2025.pdf (last visited Feb. 11, 2025) (Monitoring the Future national survey results on drug use, 1975–2024: Overview and detailed results for secondary school students, Monitoring the Future Monograph Series.).

e-liquid flavors, including … fruit, candy, and dessert flavors that were appealing to non-smokers. The kaleidoscope of flavor options adds to the allure of e-cigarettes and has thus contributed to the booming demand for such products among young Americans." *FDA v. Wages & White Lion Invs., L.L.C.*, 2025 U.S. LEXIS 1368, *18-19 (Apr. 2, 2025).[6]

3.      More than half of youthful e-cigarette users now use easy-to-use, cheap, disposable e-cigarettes.  Underage users start e-cigarette use and then cannot stop if addiction has set in, even when most of them want to: 67.4% of students who were still using e-cigarettes in 2020 reported trying to quit in the preceding year.[7] New York youth have unfortunately followed this national trend, and the epidemic continues to harm the City.  E-cigarettes have become the most frequently used nicotine product among New York City high schoolers, with 18.7% of high school students using them in 2022.[8]

4.      Much of this epidemic rests at the feet of each Defendant's illegal and/or fraudulent conduct, which, *inter alia*, targets underage users and spreads misinformation concerning the legality and safety of the e-cigarettes they distribute throughout the City in massive quantities. Defendants have convinced the public that e-cigarettes are casual fun and deliberately develop their products to lure impressionable adolescents with flavors, like "Strawberry Donut," "Tropical Rainbow Blast," "Cotton Candy," "Cake," "Orange Soda," "Banana Taffy," "Baja Slushie," "Iced Watermelon," "Pink Lemonade," and "OMG Blow Pop." Defendants promote destructive  trends like e-cigarette "tricks" that involve inhaling fifteen (15) disposable e-cigarettes simultaneously.

---

[6] *Citing* the 2016 *Surgeon General's Report*

[7] https://www.cdc.gov/tobacco/e-cigarettes/youth.html (last visited Feb. 11, 2025).

[8] https://www.health.ny.gov/prevention/tobacco_control/reports/statshots/volume15/n1_youth_tobacco_use.pdf. (last visited Feb. 11, 2025).  Current use is defined as having used an e-cigarette at least once in the past 30 days. *See id.*

Defendants publish e-magazines and blogs that falsely report, *inter alia*, that e-cigarette use offers a path to "Healthier Lifestyles." Defendants compete in the development of the most potent products and latest technological gimmicks, like Bluetooth connectivity, speakers, and games, to assure that once e-cigarette use begins, users will find it extraordinarily difficult to quit. By these means and as further described below, each Defendant for their own financial benefit has created and exploited misapprehensions around the safety and legality of e-cigarettes.

5.      While misrepresenting the known dangers of their products, Defendants have created a market for e-cigarettes, particularly disposable e-cigarettes, and staked out lucrative shares of that soaring market for low-cost, easily concealable, and ubiquitously available products that deliver varying concentrations of nicotine. Some Defendants fail to provide the required ingredient disclosures for the highly toxic e-cigarettes they deliver directly to consumers despite federal, state, and local prohibitions. All the Defendants are major distributors of e-cigarettes in New York and other states. All have engaged in reprehensible, illegal conduct that is aimed at addicting youth to their products. All are liable.

6.      New York City and State have the Nation's most comprehensive regulatory frameworks for tobacco and nicotine in the country. The two jurisdictions have effectively banned e-cigarettes, and the e-cigarette-branded swag, social events promoting e-cigarettes, and discounts used to promote sales. New York State and City has invested heavily in anti-e-cigarette media initiatives like "Drop the Vape" and "Reality Check," and in surveys and assessments that continuously and meaningfully address the crisis. At every turn, each Defendant's commercial conduct in the State undercuts New York's efforts to regulate the e-cigarette industry.

7.      Among other conduct, Defendants use illegal shipping methods to supply retailers

concentrated around public middle and high schools. GPS data reviewed by the State and the City demonstrate that more than 80% of the retail customers of certain Defendants are located within 1.5 miles of a school, with a median distance from a middle or high school of 0.75 miles. By first dodging all of New York's regulatory safeguards and making the products both as cheap as possible (but consistent with outsized profits) and abundantly available, each Defendant cashes in without regard to the lasting harm they cause.

8.      Defendants' strategies succeed at the cost of our middle and high schoolers' health, in the form the substantially increased risk of impaired cognitive development, executive functioning, inhibitory control, memory and attention, and serious health mental or emotional disorders all known to be caused by chronic nicotine use.

9.      The present lawsuit is intended to halt Defendants' illegal and fraudulent business practices, to abate the continuing harm Defendants cause, and to hold Defendants accountable in law and equity for the damage inflicted on the City. Each Defendant has engaged in three categories of misconduct giving rise to the City's claims:

        a.  Each Defendant has followed the tobacco industry's classic marketing strategies of attracting New York's youth by (i) marketing their disposable e-cigarettes, in flavors, colors, and themes designed to attract children, including fruity and candy flavors and cartoon characters, and (ii) using social media influencers and social media marketing campaigns intended to reach underage customers with the false premise that e-cigarettes are harmless fun rather than dangerous and illegal.

        b.  Each Defendant has repeatedly violated at least one provision of the federal Prevent All Cigarette Trafficking Act of 2009 ("PACT Act"), by (i) conducting non-compliant delivery sales; (ii) using the United States Postal Service ("USPS") to ship flavored e-cigarette products; and/or (iii) failing to maintain detailed records and submit reporting to New York City and other regulators.

        c.  Each Defendant has repeatedly violated New York's Public Health Law, by (i) ignoring New York's complete retail ban on flavored e-cigarette products; (ii)

4

      failing to make any of the legally required disclosures concerning harmful ingredients in e-cigarettes; (iii)  shipping flavored e-cigarette products to New York City customers; and/or (iv) using illegal discounts to maximize their reach and sales.

    d.    Each Defendant has repeatedly violated New York City's Administrative Code ("N.Y.C. Ad. Code") by ignoring New York City's complete ban on sales or offers to sell or possess flavored e-cigarettes.

10.    Defendants are accordingly liable to the City for (i) violations of the federal PACT Act; (ii) violations of   N.Y. Pub. Hlth. L. § 1399-*ll*; (iii) violations of New York City Administrative Code § 17-715; and (iv) common law public nuisance.

11.    The City seeks a permanent injunction prohibiting Defendants from i) selling e-cigarettes to any New York City individuals, retailers, or entities, ii) requiring Defendants to issue public corrective statements regarding their false and misleading public statements and omissions; and iii) and ordering disgorgement, damages, civil penalties, punitive damages, costs, and the joint and several endowment of an abatement fund to eliminate the public nuisance that Defendants cause, create, or contribute to.

12.    Although each Defendant's conduct has uniquely contributed to the City's crisis, the common thread among all Defendants is their control of the supply chain, and hence the availability, price, and promotion of the major brands of e-cigarettes, especially disposable e-cigarettes, that have been sold illegally throughout the City over the past five years.

## JURISDICTION AND VENUE

13.    Subject-matter jurisdiction over this action exists pursuant to 15 U.S.C. § 375 and 28 U.S.C. §§ 1331, 1367.

14.    This Court has personal jurisdiction over each Defendant because each Defendant transacts business within this state, contracts to supply goods in this state, has committed and

continues to commit tortious acts within this state, and/or has committed and continues to commit tortious acts outside New York causing injury to persons or property within the state.

15.     Venue is proper pursuant to 28 U.S.C. § 1391(b)(2), as a substantial part of the events giving rise to the claims asserted occurred in this District, including Defendants' shipments and/or sales of e-cigarettes to businesses and individuals in the Southern District of New York .

## PARTIES

### I.     PLAINTIFF

16.     Plaintiff the City of New York is a municipal corporation formed under the laws of the State of New York with authority to bring statutory actions under  the PACT Act, 15 U.S.C. § 375 et seq., New York Public Health Law ("N.Y. Pub. Health L.") § 1399-*ll*, and at common law.

### II.     DEFENDANTS

17.     Defendant Puff BAR [Inc.] is a corporation formed under the laws of the State of California with its principal place of business in Glendale, California.

18.     Defendant EVO Brands, LLC ("EVO Brands") is a Delaware limited liability company with its principal place of business in Los Angeles, California.

19.     Defendant PVG2, LLC ("PVG2"), d/b/a, "Puff Bar" is a Delaware limited liability company with its principal place of business in Los Angeles, California,.

20.     Defendant Midwest Goods Inc. d/b/a Midwest Distribution ILLINOIS ("Midwest Goods") is a corporation formed under the laws of the State of Illinois with a principal place of business in Bensenville, Illinois. Midwest Goods also operates as Midwest Distribution.

21.     Defendant 10 Days, Inc. d/b/a Pod Juice ("Pod Juice") is a California corporation incorporated in 2017, with its principal place of business in Agoura Hills, California.  10 Days,

Inc. has used the fictitious name "Pod Juice" in doing business.

22.    Defendant Safa Goods LLC ("Safa Goods") is a Florida limited liability company with its principal place of business in Port Charlotte, Florida.  Safa Goods was founded in April 2018, by Haitham Shriteh and Ahmed Shriteh.

23.    Defendant SV3, LLC d/b/a Mi-One Brands ("Mi-One") is an Arizona limited liability company with its principal place of business in Phoenix, Arizona that has used the fictitious names "Mi-Pod" and "Mi-One Brands" in doing business.

24.    Defendant MYLÉ Vape Inc. ("Mylé") is an active New York domestic corporation also registered in New Jersey and Florida with a principal place of business in Ridgefield, New Jersey, or Jamaica, New York, during the Relevant Time Period.  Mylé was incorporated in New York in 2017.

25.    Defendant MVH I, Inc. ("MVH I") is an active New York domestic corporation with its principal place of business in Ridgefield, New Jersey. MVH I was incorporated in 2018.

## **FACTUAL ALLEGATIONS**

**I.    OLD TACTICS, NEW PRODUCTS, SAME PROBLEMS:  DEFENDANTS HAVE OPENLY MARKETED AND SOLD ILLEGAL AND DANGEROUS VAPOR PRODUCTS.**

26.    Defendants have marketed and sold e-cigarettes into New York City from at least January 1, 2020, through the present (the "Relevant Time Period"), in sales that violate applicable federal, state and City statutes, including the PACT Act, New York State and City's flavor bans and the State ban on shipping e-cigarettes. *See, e.g.*, N.Y. Pub. Health L. §§ 1399-mm-1(3), 1399-*ll*(1-a).

27.    Each Defendant markets and distributes into New York City some of the most

nationally popular e-cigarettes, and exerts control over certain popular brands' advertising, marketing, social media presence, price, product trends, and/or availability. Defendants who market themselves as "master distributors" collectively dictate nearly every detail of a substantial segment of the e-cigarette market in New York through their close ties with international, principally Chinese, manufacturers. Defendants partner with manufacturers in China to direct the development and marketing of new flavors, and benefit from custom designed and manufactured products, specialized packaging, and heavily discounted pricing, providing Defendants with control of or influence over the entire scope of product marketing for particular e-cigarette brands. Some Defendants own and distribute their own branded products and enjoy marketing control from manufacture to retail sale over those products. Defendants such as Mi-One not only control their own supply but also manipulate the price of disposable e-cigarettes more broadly through tactics like "Daily Deals," and offers like, "Save $10+ on Disposable 10 Packs" and "Save $30 on Orders over $200."

28.    Most Defendants import their products from manufacturers in China, although Defendant Pod Juice, at least, manufactures illegal products domestically. Regardless of a product's origin, each Defendant occupies in the most crucial step in the supply chain, essentially receiving from China certain brands and flavors, at certain prices and routing them to particular regions of the country through regional sub-distributor and retailer networks. But for Defendants' distribution networks, Defendants' products—none of which are authorized for marketing or sale in the U.S. by the Food and Drug Administration ("FDA") — would be ubiquitous in stores, hidden back rooms, or shipped to residences in New York.

29.    Each Defendant's contributions to the New York e-cigarette market through social

media posts, branding schemes, marketing partnerships, and sales tactics have created a level of market saturation impossible to miss or ignore, particularly by young and impressionable minds. The wide range of brands, media outlets (including social media), "swag," and promotional events have created brands that make each Defendant's products familiar, available, and sought after by City youth. Defendants' collective exposure has misled New York City's youth into the belief that e-cigarettes are legal and safe, and drawn underage users to seek out disposable e-cigarettes[9] from peers, to venture into e-cigarette retailers, and to emulate Defendants' dangerous e-cigarette tricks.

30.    None of the foregoing would be possible without Defendants' utter disregard for the federal, state and local laws regulating the shipment, delivery, and sale of e-cigarettes.

## A. Defendants Make the Tobacco Industry's Strategies Their Own.

31.    For decades, the tobacco industry made billions of dollars through aggressive film, television, and print marketing campaigns that actively misled the public about cigarettes' health dangers. Big tobacco created the false impression that cigarettes were safe and fun, leaving millions of Americans addicted to nicotine and causing millions of deaths from cancer and lung and cardiovascular disease to the point where members of the tobacco industry were found liable for a nationwide racketeering conspiracy. *See, e.g.*, *USA v. Philip Morris, Inc.*, 449 F. Supp. 2d 1 (D.D.C. 2006).

32.    In its decades-long pursuit of profits, the tobacco industry actively concealed the harmful effects of combustible cigarettes and instead promoted the benefits of smoking. Beginning

---

[9] Herein defined as, "a variety of Flavored E-Cigarette which comes with a fully charged battery and is pre-filled with e-liquid, and which is used to the depletion of the e-liquid, whereupon the entire device is discarded, and therefore intended for single-use." However, the City notes that these purportedly disposable products contain batteries for which there is no environmentally safe method for disposal.

9

in the 1980s, the tobacco industry sought to extend its reach into the youth market by developing new, fruity flavors with matching bright advertisements attractive to young, impressionable consumers from whom the addictive, poisonous effects of cigarettes were also concealed.

33.     When the true dangers of smoking cigarettes came to light, the tobacco industry faced decades of litigation over its advertising practices, culminating in the 1998 Master Settlement Agreement ("MSA") between 52 States and U.S. localities, including New York City, and the tobacco majors. The MSA prohibits the major cigarette companies from marketing and advertising their products to adolescents, specifying prohibited acts intended to combat youth smoking, such as banning the use of cartoon characters, and billboards near schools. The MSA also requires the tobacco companies to make annual payments to the States in perpetuity, for health care costs incurred by the States in paying to treat smoking-related illnesses.

34.     The marketing campaigns of the tobacco industry were thus constrained or eliminated moderated through legislation, regulation and especially litigation by all levels of government. Following the lawsuits, regulators enacted additional restrictions, municipalities prohibited smoking in many public areas, and public health advocates engaged in widespread campaigns to re-educate the public—youth in particular—about smoking's dangers.  Government efforts to abate the crisis the caused by the tobacco industry included the imposition of steep taxes, the evidence-based most effective means to discourage tobacco use.

35.     Decades of public health efforts yielded a dramatic fall in cigarette smoking among teenagers and adults. In the U.S., 28% of young people smoked cigarettes in 1996.[10] By 2014, only

_____

[10]  Adolescents and Tobacco: Trends (Sept. 23, 2016) (previously visited Oct. 9, 2019), *formerly at* https://www.hhs.gov/ash/oah/adolescent-development/substance-use/drugs/tobacco/trends/index.html.

2.5% of middle school students and 9.2% of high school students reported current (past 30-days) cigarette use.[11]  In 2024, rates sank still lower,  with 1.1% of middle school students and  1.7% of high school students reporting current combustible cigarette use.[12]

36.    These Defendants have recommenced the cycle of harm by resurrecting the Big Tobacco's playbook: hide the harm and create a market through appealing cartoon characters, fruit and candy flavors and attractive "influencers."  Each Defendant engages in the very same reprehensible conduct used by the tobacco industry to cause the same type of harm, now with newer, potentially more destructive products.  Defendants advertising campaigns target youth at adolescents' favored gathering places  – social media and the internet.  U.S. marketing representatives and master distributors market their products on Instagram, through trendy filter effects, interactive avatar engagement, very young-looking models, bright, saturated colors, and a QR code to a contest promotion :

---

[11] Arrazola R, Singh T, Corey C, *et al.*, *Tobacco Use Among Middle and High School Students – United States, 2011-2014*, MMWR Morb Mortal Wkly Rep 2015, *available at* https://www.cdc.gov/mmwr/preview/mmwrhtml/mm6414a3.htm (last visited Feb. 4, 2025).

[12] Jamal A, Park-Lee E, Birdsey J, et al., Tobacco Product Use Among Middle and High School Students — National Youth Tobacco Survey, United States, 2024. MMWR Morb Mortal Wkly Rep, DOI: http://dx.doi.org/10.15585/mmwr.mm7341a2 [hereinafter "2024 E-Cigarette Use Among Middle and High School Students"].

11



37.     Defendants systematically develop new, fruity, and sweet flavors to go with their matching, bright advertisements to attract young, impressionable consumers, who are unaware of the addictive, poisonous effects of e-cigarettes. Defendants create the false impression that e-cigarettes are safe and fun, exposing adolescents to high concentrations of nicotine, potential addiction, and attendant injuries to health.

38.     Defendants' conduct in creating a youth e-cigarette epidemic is unwinding the decades of work combatting youth cigarette use, which successfully resulted in a dramatic reduction in youth smoking rates, and unraveling the progress achieved in improving the City's public health and wellbeing.

12

### 1. The Rise of E-cigarettes

39.     E-cigarette marketing is designed to dupe the public into believing that combustible cigarettes are a bad thing of the past, but that modern, evolved e-cigarettes are a safe and healthy step forward.  This is a myth.

40.     An e-cigarette is a battery-powered device that heats a nicotine solution, or "e-liquid," which converts the solution into an aerosol or vapor that the user inhales. E-cigarettes are commonly known as "vapes" and sometimes referred to as electronic nicotine delivery systems ("ENDS"). E-liquid is commonly referred to as "e-juice", "vape juice," or "vape liquid."

41.     E-liquids contain different concentrations of natural nicotine, *i.e*., extracted from tobacco, or more commonly synthetic nicotine, dissolved in water, propylene glycol, vegetable glycerin, usually some flavorings, and other chemicals.[13]  Propylene glycol and vegetable glycerin, are humectants,  substances that attract and retain moisture, used in e-liquids to yield the mists that simulate the combustion-generated tobacco smoke of a conventional cigarette. E-liquids can be formulated to produce a vapor tasting like tobacco, but the vast majority (and most of those at issue in this action) are artificially flavored to impart candy, fruit, or dessert flavors.

42.     There are three main categories of e-cigarette devices, all of which generally operate in the same manner:

> a.  Pre-filled e-cigarettes use a disposable pod or cartridge that is pre-filled with e-liquid, which is inserted into a rechargeable battery unit. Once the pod or cartridge is empty, the user replaces only that disposable element with a new one. Replacement cartridges and pods are packaged and sold separately but the unit as a whole is intended for re-use. These devices have a higher upfront cost than disposables.

---

[13]  https://www.ncbi.nlm.nih.gov/books/NBK507184/ (last visited Feb. 4, 2025); https://www.lung.org/quit-smoking/e-cigarettes-vaping/whats-in-an-e-cigarette (last visited Feb. 4, 2025).

b. Refillable e-cigarettes have an empty tank, chamber, or pod that the user manually fills with e-liquid. They are rechargeable, customizable, and intended for reuse. The e-liquid is packaged and sold separately. These devices have a higher upfront cost than disposables.

c. Disposable e-cigarettes, or disposable e-cigarettes, come with a fully charged battery and are pre-filled with e-liquid. They require no set up and are ready to use straight out of the box. They may be rechargeable but are intended to be discarded after the e-liquid is used up. These devices are the cheapest and sometimes smallest type of e-cigarette. Popular brands include Hyde, Puff Bar, Elf Bar, and Geek Bar, all of which are sold by certain Defendants.

43.     Disposable e-cigarettes are the product primarily responsible for the post-JUUL-era harms described below.  However, every type of e-cigarette and every e-liquid that is not authorized by the FDA, which includes all of those that impart fruity, candy, or dessert-like flavors, are the subject of this action.

44.     The different types of e-cigarette devices vary in the amount of maintenance required, the method of filling with e-liquid, and the volume of e-liquid they can hold. All e-cigarettes generally operate in the same way, however, with the user's suction activating a battery that heats a metal coil immersed in the e-liquid to produce a nicotine-infused vapor inhaled by the user.

45.     The vast majority of e-cigarettes contain nicotine, and, on  information and belief, a large percentage of e-cigarettes that purport to be nicotine-free contain at least trace amounts, or more, of nicotine.

46.     Nicotine is a highly addictive chemical with known adverse health effects, particularly for vulnerable populations such as pregnant people, developing fetuses, and youth.[14]

---

[14] Flavored e-cigarettes are not only dangerous because of the nicotine they contain, although the addictive qualities and health impact of nicotine itself should not be understated.  Flavored e-cigarettes, even those that purport to be "nicotine-free," contain many compounds that are unsafe to be inhaled.

47.     Though some form of e-cigarette has been available in the U.S. since around 2007, the widespread introduction of nicotine salts, which reduce the alkalinity or pH levels of nicotine-containing e-liquids and consequently the harshness of the inhaled vapor, allows users to comfortably inhale higher doses of nicotine.  The popularity of the JUUL device, which introduced e-liquids containing nicotine salts, launched e-cigarettes into the mainstream.

48.     Unbridled by pre-existing tobacco regulations, JUUL – itself a product of Big Tobacco member Altria, launched in 2015 and adopted the tobacco industry's youth-marketing techniques with a sleek, pervasive ad campaign that included bright and colorful images of attractive young people and created a false impression that its products were harmless, thereby launching a new generation of nicotine addicts.

49.     The most prevalent JUUL product was an e-cigarette with pre-filled, disposable pods, *see supra* ¶ 42 (a).  JUUL produced bright, colorful ads and fruity, sweet-tasting JUUL e-liquid pods in such flavors as mango and mint, attracting young users. The highly successful JUUL strategy made the device the bestselling e-cigarette on the market by 2017.  Not to be duped by Big Tobacco again, JUUL soon faced hundreds of nationwide claims that JUUL had  marketed to youth, promoted nicotine use, and failed to warn users of nicotine addiction. In 2019, as part of a multi-state action, New York State sued JUUL for contributing to the rise of youth e-cigarette use through deceptive and misleading e-cigarette marketing. New York City's Department of Education joined with a similar suit on behalf of the City.

50.     On January 2, 2020, the FDA issued guidance prohibiting all sales of unauthorized

flavored cartridge-based e-cigarettes, effective on February 6, 2020.[15] When that guidance was issued, no vapor product had been authorized by the FDA, and all e-cigarettes then on the market, including the e-cigarettes sold by Defendants at that time, were illegally marketed and subject to FDA enforcement.[16] Beginning January 2, 2020, there was no ambiguity that flavored e-cigarettes were illegal in the U.S.[17]

51.    Rather than follow JUUL's removal of all but its tobacco and menthol-flavored products from the market and the halt to its youth-marketing campaign, Defendants surged into space created by JUUL's departure by marketing their own brands of flavored e-cigarettes, going one better than JUUL by the offer of disposable, hence cheaper, devices.

### 2. Puff Bar Emerges and Creates the Marketing Playbook for Disposable E-cigarettes.

52.    Defendants Puff Bar, Evo Brands, and PVG2 (together, the "Puff Defendants") moved swiftly to fill the void left by JUUL.  JUUL was a relatively expensive, reusable e-cigarette with pre-filled disposable pods. Puff Bar exploited the demand for convenience and low price by offering a significantly cheaper, non-refillable, e-cigarette to be discarded after the nicotine solution was consumed.

---

[15] FDA finalizes enforcement policy on unauthorized flavored cartridge-based e-cigarettes that appeal to children, including fruit and mint, *available at* https://www.fda.gov/news-events/press-announcements/fda-finalizes-enforcement-policy-unauthorized-flavored-cartridge-based-e-cigarettes-appeal-children (last visited Feb. 4, 2025).

[16] To search ENDS products that received an FDA marketing authorization order, *see* https://www.accessdata.fda.gov/scripts/searchtobacco/ (last visited Feb. 4, 2025).

[17] Although the focus of FDA's guidance, effective on February 6, 2020, was on large cartridge-based e-cigarette manufacturers, such as JUUL, it also stressed that producers of non-cartridge-based ENDS (or fully disposable products) also have an obligation to take adequate measures to prevent youth access. Enforcement Priorities for Electronic Nicotine Delivery Systems (ENDS) and Other Deemed Products on the Market Without Premarket Authorization Guidance for Industry, (Revised Apr. 2020) USDHHS, FDA, & CTP, *available at* https://www.fda.gov/media/133880/download (last visited Feb. 4, 2025); https://www.federalregister.gov/documents/2020/04/30/2020-09164/enforcement-priorities-for-electronic-nicotine-delivery-systems-and-other-deemed-products-on-the (last visited Feb. 4, 2025).

16

53.     Puff Bar launched in 2019 with a design that looked similar to a JUUL device, and, like JUUL, came in a variety of flavors, including pina colada, pink lemonade, watermelon, and a blend called "O.M.G."  Youthful users  predictably switched in droves from JUUL to Puff Bar. By spring 2020, Puff Bar sales exceeded $3 million a week,[18] and by 2021, it was the most popular brand of e-cigarette among middle school and high school students.[19]

54.     By Puff Bar's own admission, its success was so swift and comprehensive that all disposable e-cigarettes came to be dubbed "Puff Bars," much as Xerox or Kleenex are brand names that are so widely used and recognized that they become generic references defining the entire product category.

55.     Lawmakers and public health advocates took notice of Puff Bar's targeted marketing to youth, youth-friendly flavors, and deceptive claims that Puff Bar aided quitting and were a healthier alternative to conventional cigarettes and urged the FDA to take action.

56.     The FDA issued a warning letter to Puff Bar demanding removal of its products from the market.[20] Puff Bar briefly halted sales in July 2020, as a result of that public scrutiny, but quickly circumvented the FDA by introducing in February 2021,  a line of products using synthetic, rather than tobacco-derived, nicotine reasoning that FDA's jurisdiction was limited to tobacco-

---

[18] Sheila Kaplan, *Lawmakers Say Puff Bar Used Pandemic to Market to Teens*, N.Y. TIMES (June 2, 2022), *available at* https://www.nytimes.com/2020/06/02/health/puff-bar-teens.html (last visited Feb. 19, 2025).

[19] Park-Lee E, Ren C, Sawdey MD, *et al*., *Notes from the Field:* E-Cigarette Use Among Middle and High School Students — National Youth Tobacco Survey, United States, 2021. MMWR Morb Mortal Wkly Rep 2021, DOI: http://dx.doi.org/10.15585/mmwr.mm7039a4 [hereinafter "2021 E-Cigarette Use Among Middle and High School Students"] (last visited Feb. 4, 2025).

[20] Letter from Ann Simoneau, Dir., Off. of Compliance & Enf't, Ctr. for Tobacco Prods., U.S. Food & Drug Admin., to Umais Abubaker, Puff Bar (July 20, 2020), *available at* https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/cool-clouds-distribution-inc-dba-puff-bar-608526-07202020 (last visited Feb. 4, 2025).

17

derived nicotine. By 2022, Puff Bar continued to be the most popular e-cigarette brand among middle school and high school students.[21]

57.     Puff Bar remained a focus for Congressional and FDA action. On March 15, 2022, President Biden signed the Consolidated Appropriations Act, which expressly authorized the FDA to regulate synthetic nicotine products, ending any purported ambiguity that Puff Bar had exploited.[22] Puff Bar chose not to obtain premarket authorization even for its synthetic nicotine products and continued those sales.

58.     The present Defendants have followed the Puff Bar model by creating disposable e-cigarettes in a variety of flavors, contriving and maintaining a business based on Puff Bar's harmful innovation.   Each Defendant continues to develop disposable e-cigarettes with increasingly higher concentrations of nicotine, increasingly larger volumes of e-liquid and new youth-friendly flavors presented through vibrant colorful campaigns, packaging, and marketing.

> **B.  Today's Disposable E-cigarettes, Which Defendants Control in New York, are Dangerous and Designed to Be Irresistible to Youth.**

59.     The disposable e-cigarettes at the heart of this dispute are a subcategory of e-cigarettes, *see supra* ¶ 40(c).  In step with the increasingly growing market, disposable e-cigarettes

---

[21] Cooper M, Park-Lee E, Ren C, Cornelius M, Jamal A, Cullen KA., *Notes from the Field*: E-cigarette Use Among Middle and High School Students — United States, 2022. MMWR Morb Mortal Wkly Rep 2022, DOI: http://dx.doi.org/10.15585/mmwr.mm7140a3 [hereinafter "2022 E-cigarette Use Among Middle and High School Students"] (last visited Feb. 4, 2025).

[22] Consolidated Appropriations Act, 2022, Pub. L. No. 117-103, div. P, tit. 1, subtitle B, § 111, 136 Stat. 49, 789–90 (2022); Press Release, Ctr. for Tobacco Prods., U.S. Food & Drug Admin., New Law Clarifies FDA Authority to Regulate Synthetic Nicotine (Mar. 18, 2022), https://www.fda.gov/tobacco-products/ctp-newsroom/new-law-clarifies-fda-authority-regulate-synthetic-nicotine#:~:text=As%20a%20result%2C%20the%20Federal,source%2C%20which%20includes%20synthetic%20nicotine (last visited Feb. 4, 2025).

have become bigger, cheaper, more concentrated and more dangerous than ever before.

60.    Increases in nicotine concentration and e-liquid volume have led to significant increases in e-cigarette potency. The average nicotine concentration in e-cigarettes in the U.S. has increased from slightly over 20 mg of nicotine, or 2.10%, in 2013, to over 40 mg of nicotine, or 4.34%, by 2018.[23]    By March 2022, 80.9% of the e-cigarettes sold in the U. S. contained greater than or equal to 50 mg of nicotine or 5% nicotine solutions, as did 90% of disposable e-cigarettes and 96.1% of flavored e-cigarettes.[24]    Sales of e-cigarettes with nicotine concentrations in excess of 5% nicotine increased from 5% in 2017 to 81% in 2022.  Sales of disposable e-cigarettes with nicotine concentrations in excess of 5% nicotine rose from none in 2017 to in excess of  90% in 2022.[25]  By  contrast, e-cigarettes  with less than 1% nicotine, including zero-nicotine products, account for less than 0.1% of sales.[26]

61.    High nicotine e-cigarettes have increased in both market share and sales volume, accompanied by unchanged or lower prices, while lower nicotine e-cigarette prices have increased, a price structure obviously designed to drive users to higher nicotine products as the cheaper option.  Between 2017 and 2022, the price of e-cigarette products with nicotine strengths from 1-2% increased from $10.40 to $29.20.  E-cigarettes with far higher nicotine strengths – 4-5% –

---

[23]https://truthinitiative.org/research-resources/emerging-tobacco-products/high-nicotine-e-cigarettes-dominate-market-sales#:~:text=Sales%20of%20e%2Dcigarettes%20with,a%20nearly%2015%2Dfold%20increase (last visited Feb. 4, 2025).

[24] *Monitoring E-Cigarette Trends in the United States* (Truth Initiative & CDC Foundation), *available at* https://tobaccomonitoring.org/wp-content/uploads/2024/11/2024MonitoringE-CigaretteTrendsUS-1.pdf, 25 (last visited Feb. 4, 2025).

[25] *Id.*

[26] *Id.*

dropped in price from $20 to $12.80.[27]   For every product with nicotine concentrations of 1-2% nicotine, a user could purchase two products with nicotine concentrations of  4-5%.   Each Defendant's e-cigarette offerings marketed and/or sold into New York are structured to create an economic incentive to channel users to higher nicotine products, with young people especially sensitive to price.

62.    Nicotine strength has increased in parallel with increased e-liquid volumes in individual e-cigarettes.  JUUL pods sold in the U.S. in 2018 contained less than 1 ml. of e-liquid at 5% nicotine strength.[28] A single disposable e-cigarette currently has a capacity of 10 ml of e-liquid at the same 5% nicotine strength, equivalent in nicotine content to more than 10 packs of traditional cigarettes.[29]

63.    E-cigarettes are advertised and priced by the approximate number of "puffs" – inhales – needed to deplete the e-liquid. The greater the e-liquid volume, the greater the number of "puffs." A disposable Geek Bar Pulse contains 16 ml. of a  5% nicotine e-liquid and boasts 15,000 puffs in "Regular" mode. The Greek Bar Pulse Strawberry Banana illustrates the high concentration of nicotine packed into a single disposable vape:[30]

---

[27] *Id.*

[28] Jessica L. Barrington-Trimis, Ph.D., and Adam M. Leventhal, Ph.D., *Adolescents' Use of "Pod Mod" E-Cigarettes - Urgent Concerns*, 379(12) NEW ENGLAND J. MED. 1099, 1100 (2018), *available at* https://pmc.ncbi.nlm.nih.gov/articles/PMC7489756/ (last visited Feb. 19, 2025).

[29]  Jonathan P. Winickoff, *et al.*, *Vaping in Youth*, Published online Aug. 7, 2024, *available at* https://jamanetwork.com/journals/jama/article-abstract/2822166 (citing Prochaska JJ, Vogel EA, Benowitz N, Nicotine delivery and cigarette equivalents from vaping a JUUL pod. *Tobacco Control*. 2022;31:e88-e93, *available at* https://doi.org/10.1136/tobaccocontrol-2020-056367) (last visited Feb. 19, 2025).

[30]  https://www.pricepointny.com/products/geek-bar-pulse-strawberry-banana/ (last visited April 6, 2025).



**GENERAL INFORMATION**

Introducing the Geek Bar Pulse, a cutting-edge product from the trusted vape brand "Geek Bar." With its innovative adjustable airflow feature, you have the freedom to customize your vaping experience according to your preferences. In "Regular" mode, you can enjoy an impressive 15,000 puffs, while switching to "Pulse" mode will still provide you with up to 7,500 puffs.

**Key Features**

- Regular Mode Max Puffs: 15000
- Pulse Max Puffs: 7500
- Nicotine Strength: 5% (50mg)
- Prefilled Capacity: 16mL
- Battery Capacity: 650mAh
- Charging Port: USB Type-C
- Operation: Draw-Activation
- 2 Power Modes - Regular / Pulse
- Integrated Dual Mesh Coil
- Display Screen
- Battery Level Indicator
- E-Liquid Level Indicator

64.     Even the simplest e-cigarettes on the market are more dangerous in comparison with their predecessors.   A study of the chemical composition and toxicity of Puff Bar disposable e-cigarettes revealed that the chemicals inhaled through a Puff Bar are toxic to a degree that is not yet fully understood:

> Product manufacturers are increasing the youth-attracting synthetic coolant content of [e-cigarettes], while the inhalation risks remain unknown. This practice, in effect, represents a large, uncontrolled experiment in the lungs of youth and other consumers and highlights the need for regulation to protect public health.[31]

65.     The  concentrations of particular chemicals in Puff Bar's e-liquid exceed levels that known to "adversely affect[] cell growth and morphology,"[32] resulting in negative health outcomes over time.  Although some of the flavoring chemicals in Puff Bar's e-liquid exist in other consumer

---

[31] Omaiye EE, Luo W, McWhirter KJ, Pankow JF, Talbot P. *Disposable Puff Bar Electronic Cigarettes: Chemical Composition and Toxicity of E-liquids and a Synthetic Coolant,* CHEM RES TOXICOL. 2022 Aug. 15;35(8):1344-1358. doi:     10.1021/acs.chemrestox.1c00423     (July     18,     2022),     *available     at* https://pmc.ncbi.nlm.nih.gov/articles/PMC9382667/#sec2 (last visited Feb. 19, 2025).

[32] *Id.*

products, they are present at far lower concentrations than in Puff Bar e-cigarettes. Although certain flavorings may be deemed generally safe when consumer orally, inhalation into the lungs presents an uncharted form of exposure.

66.    A 2022 study of e-cigarette chemical composition and toxicology concluded that Puff Bar's e-cigarettes—and all similar competing brands—are more dangerous than JUUL products: Puff Bar's e-liquid had far higher concentrations of synthetic coolants than those in JUUL.[33] The high levels of nicotine, flavor chemicals, and synthetic coolants exceeding those in other consumer products present a host of unknowns about the safety of Puff Bar products.

67.    The 2022 study is noteworthy because, although Defendants' e-liquids consistently provide "ice," fruit, candy, and similarly sweet flavors that may contain similar ingredients, no Defendant has made the required ingredient disclosures and sells products for which no disclosure has been made, in violation of New York law.

68.    The explosive increase in the use of e-cigarettes among youth within the past ten years is attributable to many marketing factors utilized by Defendants. Each Defendant has employed both the tried and true marketing strategies of Big Tobacco – pervasive advertising campaigns using bright and colorful images of attractive young people to create the false impression that e-cigarettes are harmless fun  – while adding their own techniques unique to e-cigarettes, such as emphasis on the ability to conceal e-cigarette use from parents and school officials, and the wide variety of fruit, dessert and candy flavors, such as Iced Grape Bomb and Lemon Mint.

---

[33] *Id.*

69.     E-cigarettes have added new technologies that were unavailable for combustible cigarettes.  The currently available brand Geek Bar Pulse, sold into New York during the Relevant Time Period by Mi-One and Midwest Goods, includes "smart" e-cigarettes, *i.e.*, devices that incorporate digital screens, interactive notifications, and power level/usage indicators. The Geek Bar Pulse boasts "a space capsule-inspired full-screen design with captivating LED lighting effects . . . [whereby] users can effortlessly access . . . battery status, remaining e-liquid, and the active mode, enhancing the vaping journey."  The North Connect Pro Disposable Vape marketed and promoted by Defendant Midwest Goods embellishes a device with 5% nicotine strength and a staggering 40,000 puffs with Bluetooth connectivity, a built-in speaker, three video games, and over 15 downloadable apps:[34]



70.     Disposable e-cigarettes carry the hallmarks of a nicotine-containing product that is a risk to youth, including e-cigarettes packaged to look like drink containers, school supplies, or

---

[34]     *Formerly    at*    https://www.midwestgoods.com/north-connect-pro-40k-puffs-20ml-disposable-device-with-bluetooth-connections-engraved-grip-texture-display-of-5-msrp-25-00-each/.

toys – to the point where the package must be labeled "Not a toy" – and equipped with miniature video games or illustrated with cartoon characters.  Defendants' products and conduct meet the factors articulated by the FDA and supported by scientific studies that signal promotion to minors:[35]

    a.  Products marketed with labeling and/or advertising that resemble youth-friendly foods and drinks or resemble other non-ENDS products that are often marketed and/or appealing to youth. This includes, for example, labeling and/or advertising that results in the product resembling juice boxes, candy, or youth-friendly cereal;

    b.  Products marketed directly to minors by touting the ease of concealment from parents, teachers, or other adults;

    c.  Products marketed with cartoon or animated characters that depict or resemble popular children's characters; and/or

    d.  Products marketed through paid social media influencers or popular children's characters using minors or people who portray minors on children's shows.

71.    Nicotine use by youth in any form is unsafe. Nicotine poses unique dangers to youth through its established interference with the normal course of brain development that continues until about age twenty-five.  Nicotine use during adolescence can harm impulse and attention control, cognition, learning, and mood, injuries exacerbated by the ever-increasing nicotine concentrations marketed by the e-cigarette industry.

72.    Some Defendants have been deliberate in aggressive marketing strategies that conspicuously target adolescents.  At least 12 popular TikTok accounts offer or promote "discreet shipping" that uses packaging that hides the e-cigarette products inside,[36] allowing youth to evade

---

[35] USDHSS, FDA, & CTP, *supra* n.17.

[36] Pearson G, Davidson DL, Schillo B, *et al.* 'Discreet shipping' on TikTok enables selling of e-cigarettes to youth, Tobacco Control Published Online First: January 8, 2024, *available at* https://doi.org/10.1136/tc-2023-058315 (last visited Feb. 19, 2025).

detection of their e-cigarette use.

73.    As a result of these successful efforts and campaigns, there are alarming signs of nicotine use and addiction among youth.

74.    In 2024, 14% or 3,870,000 middle and high school students reported ever using e-cigarettes, and 3.5% or 410,000 of middle school and 7.8% or 1,210,000 of high school students reported using e-cigarettes within the past 30 days.[37] More than 1 in 4 (26.3%) of current youth e-cigarette users reported using an e-cigarette product daily.[38] More than 1 in 3 (38.4%) youth e-cigarette users reported using e-cigarettes in at least 20 of the last 30 days.[39] More than half (55.6%) of youth who are current e-cigarette users reported using disposable e-cigarettes, followed by prefilled or refillable pods or cartridges (15.6%) and tanks or mod systems (7.0%).[40]

75.    More than 8 out of 10 current e-cigarette users (87.6%) used flavored e-cigarettes, with fruit flavors being the most popular, followed by candy, desserts, or other sweets, mint, and menthol.[41] Over half (54.6%) of students currently using e-cigarettes reported using flavors with "ice" or "iced" in the name (such as "blueberry ice" or "strawberry ice," sold by each Defendant).[42] Fruity and sweet flavors are undeniably attractive to youth: "[A]mong youth age 12 to 17 who reported using an ENDS product, 93.2 percent reported that their first ENDS use was with a

---

[37] 2024 E-Cigarette Use Among Middle and High School Students, *supra* n.12.

[38] Park-Lee, Jamal, Cowan, et al. *Notes from the Field:* E-Cigarette and Nicotine Pouch Use Among Middle and High School Students — United States, 2024, MMWR Morb Mortal Wkly Rep 2024;73:774–778; *see also* https://www.fda.gov/tobacco-products/youth-and-tobacco/results-annual-national-youth-tobacco-survey (last visited Feb. 14, 2025) (summarizing *Notes from the Field*).

[39] *Id.*

[40] *Id.* A tank or mod system is an e-cigarette device where the tank holds the e-liquid and heating coil, and the mod powers the coil. These systems are highly customizable and involve a higher upfront cost.

[41] *Id.*

[42] *Id.*

flavored ENDS product."[43]

76.    The Centers for Disease Control and Prevention ("CDC") monitors e-cigarette sale trends based on scanner sales data from convenience stores, gas stations, and retail store chains. During the six month period ending on June 16, 2024, there were 6,287 e-cigarette products sold in the U.S., of which 92.8% were disposable e-cigarettes.[44] E-cigarettes with pre-filled cartridges or pods made up 41.8% of sales in traditional retail outlets; disposable e-cigarettes made up the majority at 58.1%.[45] On information and belief, these numbers likely understate the proportion of disposable e-cigarette sales because the CDC does not sample either online sales, where an estimated 20% of e-cigarette sales occur, or e-cigarette shop sales.[46]

77.    The disposable e-cigarette market that Puff Bar brought mainstream continues to grow, evolve, and innovate. Defendants named herein sell a significant majority of the now-leading brands into New York City, significantly interfering with public health.

## II.    IGNORING THE GUARDRAILS: EVERY SALE OF DEFENDANTS' E-CIGARETTES VIOLATES THE LAW AND CREATES, MAINTAINS, OR CONTRIBUTES TO A PUBLIC HEALTH CRISIS THAT NEW YORK CITY STRUGGLES TO CONTAIN..

78.    New York City and State have created a statutory framework of proven guardrails

---

[43] USDHSS, FDA, & CTP, *supra* n.17.

[44] https://assets.tobaccofreekids.org/factsheets/0379.pdf (last visited Feb. 4, 2025) (citing CDC Foundation & Information Resources, Inc., "Monitoring U.S. E-Cigarette Sales: National Trends," https://www.cdcfoundation.org/programs/monitoring-e-cigarette-use-among-youth. Data from Information Resources, Inc. (IRI) (which includes e-cigarette sales data from convenience stores, gas stations and other retail store chains; sales from the internet and tobacco-specialty stores, including e-cigarette shops, are not included)).

[45] *Id.*

[46] Fatma Romeh M Ali, Elizabeth L Seaman, Elisha Crane, Barbara Schillo, Brian A King, *Trends in US E-cigarette Sales and Prices by Nicotine Strength, Overall and by Product and Flavor Type, 2017–2022*, Nicotine & Tobacco Research, Volume 25, Issue 5, May 2023, 1052–1056, *available at* https://academic.oup.com/ntr/article/25/5/1052/6965257 (last visited Feb. 4, 2025).

to prevent the harms caused by e-cigarettes. These laws, together with New York's Clean Indoor Air Act, the ban on sales of tobacco or e-cigarettes in any retail establishment with a pharmacy, and among the highest tax on cigarettes and e-cigarettes, establish New York State and City as national leaders in tobacco and nicotine control.

79.    New York City and State have affirmatively acted to protect the public from Defendants' conduct, but Defendants continue to operate unabated and undermine the State and City laws and policies.

80.    According to New York State Department of Health ("NYSDOH") data available to date, youth and young adults are the primary users of e-cigarettes. E-cigarettes are the most commonly used nicotine product by high school students in New York City.[47]

81.    Among other strategies, New York's flavor ban, codified at N.Y. Pub. Health L. § 1399-mm-1, has been shown to reduce the proliferation of these dangerous, high-nicotine products. Flavored e-cigarette sales decreased by 79.1% following implementation of New York's statewide flavored e-cigarettes ban in May 2020,[48]  a reduction in sales by a flavor ban also seen in California's 67.7% annual sales reduction after that state's ban went into effect.[49]

82.    New York's position on the dangers of e-cigarettes accords with mainstream public health teachings. In 2018, former-HHS Secretary Alex Azar and former Surgeon General Jerome Adams recognized the dangers of e-cigarette use among youth and the urgency of the issue.[50] The

---

[47] *See* https://www.health.ny.gov/prevention/tobacco_control/campaign/e-cigarettes/ (last visited Feb. 10, 2025).

[48] https://tobaccomonitoring.org/wp-content/uploads/2024/11/2024MonitoringE-CigaretteTrendsUS-1.pdf         (last visited Feb. 11, 2025).

[49] *Id.*

[50] Alicia Ault, *Youth Vaping an Epidemic, US Surgeon General Declares*, (Dec. 18, 2018) *available at* https://www.medscape.com/viewarticle/906733?form=fpf. (last visited Feb. 11, 2025).

CDC has also advised that youth use of nicotine products in any form is unsafe, and that preventing youth use of the products is "critical to reducing tobacco use" among that group.[51]

83.    Disposable e-cigarettes dominate the current illicit market.  E-cigarettes in non-tobacco flavors, including flavors named with attractive fruit or candy names, as well as mint and dessert flavors, made up to 80.6% of all e-cigarette sales in 2023.[52]  By their collective efforts, each Defendant has contributed significantly to the high sales of e-cigarettes, particularly disposable e-cigarettes, in New York City.

84.    Each Defendant's conduct has been repeated, ongoing, and continuous through the Relevant Time Period, and the harm and public nuisance caused, maintained, or contributed to by each Defendant through their sales of disposable e-cigarettes, in particular, persists.

### A.  Defendants Actively Subvert Evidence-Based Federal, State, and Local Laws.

85.    New York City and State have relied on evidence-based public health laws long-proven to reduce nicotine addiction.  As described below, each Defendant has profited by ignoring these laws.

### 1.  Defendants Violate the Federal Prevent All Cigarette Trafficking ("PACT") Act.

86.    The Prevent All Cigarette Trafficking ("PACT") Act enacted by Congress in 2010 is intended, *inter alia*, to reduce youth access to online sales of cigarettes by requiring remote sellers of nicotine products to comply with the same laws applicable to brick-and-mortar tobacco

---

[51]https://www.cdc.gov/tobacco/php/data-statistics/youth-data-tobacco/?CDC_AAref_Val=https://www.cdc.gov/tobacco/data_statistics/fact_sheets/youth_data/tobacco_use/index.htm (last visited Feb. 10, 2025).

[52] *See supra* n. 48.

retailers, and to thwart cigarette traffickers from profiting from illegal sales.[53] Congress supplemented the PACT Act with the Preventing Online Sales of E-cigarettes to Children Act in December 2020, extending to e-cigarettes the same online sales requirements in effect for conventional cigarettes by amending the PACT Act's definition of cigarettes to include e-cigarettes and all components of electronic nicotine delivery systems as of Effective March 27, 2021.[54, 55]

87.     To achieve its goals of reducing youth access to online sales of e-cigarettes and preventing commercial actors from profiting from illegal sales of e-cigarettes, the PACT Act makes e-cigarettes nonmailable, prohibiting their deposit in or transport through the mails, except between legally operating businesses.[56]

88.     Each Defendant (except EVO Brands and MVH I) is a "person" under the PACT Act engaged in the sale, transfer, and shipment for profit of e-cigarettes in interstate commerce.

89.     During the Relevant Time Period, each Defendant (except EVO Brands and MVH I) directly advertised and/or offered the sale, transfer, and shipment of e-cigarettes in interstate

---

[53] Prevent All Cigarette Trafficking Act of 2009, 156 Cong. Rec. H1526-01, Congressional Record, House of Representatives, Proceedings and Debates of the 111th Congress, Second Session, March 17, 2010, 2010 WL 956208, at *H1526.

[54] Preventing Online Sales of E-Cigarettes to Children Act, Pub. L. 116-260, Div. FF, Title VI, § 601, Dec. 27, 2020, 134 Stat. 3136.

[55] The PACT Act's references to "cigarette" includes "electronic nicotine delivery systems" ("ENDS"), which is defined as "any electronic device that, through an aerosolized solution, delivers nicotine, flavor, or any other substance to the user inhaling from the device," and includes e-cigarettes, e-cigarette pens, advanced refillable personal vaporizers, and "any component, liquid, part, or accessory of a device . . . without regard to whether the component, liquid, part, or accessory is sold separately from the device." 15 U.S.C. §§ 375(2) and 375(7). The term ENDS under the PACT Act does not include any product approved by the FDA for sale as a "tobacco cessation product" or for "any other therapeutic purpose." 15 U.S.C. § 375(7)(C). The definition of flavored e-cigarettes is incorporated within the PACT Act definition of ENDS.

[56] 18 U.S.C. § 1716E(a); 15 U.S.C. § 375(2)(A)(ii)(II).

commerce.

90.    During the Relevant Time Period, each Defendant (except EVO Brands, and MVH I) sold, transferred, and shipped for profit e-cigarettes into New York in interstate commerce.

91.    Each Defendant (except EVO Brands and MVH I) is a "delivery seller" under the PACT Act, 15 U.S.C. § 375(6), and has made many "delivery sales" as defined in 15 U.S.C. § 375(5)(A)-(B) into New York City.

92.    Although the PACT Act permits sales of e-cigarettes to "legally operating businesses," Defendants sales to distributors, wholesalers, and retailers in New York City do not meet that definition. Each Defendant (except EVO Brands, MVH I, and Mylé) and the persons to whom they sell committed so many violations of federal, state and local law that none of them are "legally operating businesses" within the meaning of that term.

93.    Each Defendant's (except EVO Brands and MVH I) sales and shipments of e-cigarettes have therefore been to "consumers," as defined under the PACT Act, because the sales and shipments were to individual consumers and/or unlawfully operating distributors, wholesalers, or retailers located in New York.[57]

94.    During the Relevant Time Period, each Defendant (except EVO Brands and MVH I) sold and shipped e-cigarettes as defined by the PACT Act into and/or within New York City and should have but did not comply with the PACT Act, including the PACT Act's prohibition on shipping e-cigarettes through the mails.

95.    For a substantial portion of the Relevant Time Period, each Defendant (except EVO

---

[57] 15 U.S.C. § 375(4).

Brands and MVH I) maintained at least one website accessible to New York City residents that advertised, sold, and offered for sale and delivery e-cigarettes to consumers. The sales to consumers are "delivery sales" within the meaning of the PACT Act because buyers place orders for e-cigarettes remotely, whether through a Defendant's website, by phone, messaging service, email, or other remote means, that are then transported and delivered to the buyers. Neither the Defendant nor the buyer are in one another's physical presence at the time of the order and/or delivery.

96.     As a delivery seller, each Defendant (except EVO Brands and MVH I) must comply with specific shipping, packaging, age verification, recordkeeping, tax collection, and State, local, and tribal laws generally applicable to sales of e-cigarettes "as if the delivery sales occurred entirely within [New York City]"[58]:

a.   For every shipping package containing e-cigarettes, the delivery seller shall include on the bill of lading, if any, and on the outside of the shipping package, on the same surface of the delivery address, the following statement: "CIGARETTES/NICOTINE/ SMOKELESS TOBACCO: FEDERAL LAW REQUIRES THE PAYMENT OF ALL APPLICABLE EXCISE TAXES, AND COMPLIANCE WITH APPLICABLE LICENSING AND TAX-STAMPING OBLIGATIONS."[59]

b.   No delivery seller may sell, offer for sale, deliver, or cause to be delivered in any single sale or single delivery any flavored e-cigarette "weighing more than 10 pounds."[60]

c.   No delivery seller may sell, deliver, or cause to be delivered e-cigarettes to a person under the minimum age required for the legal sale or purchase of such products, as determined by the applicable law at the place of delivery.[61] The minimum legal age in New York for the purchase of e-cigarettes is 21 years-of-

---

[58] 15 U.S.C. § 376a(a).

[59] 15 U.S.C. § 376a(b)(1).

[60] 15 U.S.C. § 376a(b)(3).

[61] 15 U.S.C. § 376a(b)(4)(A)(i)-(ii).

age.[62] Delivery sellers must also use a mailing or shipping method that requires the purchaser or an adult who is at least 21 years-of-age to sign to accept delivery of the shipping container at the delivery address, and provide proof in the form of a valid, government-issued identification bearing a photograph of the individual, of the person's legal age.[63]

d.  No delivery seller shall accept a delivery sale order without obtaining the person's full name, birth date, and residential address, and independently verifying the information provided and that the person is at least 21 years-of-age.[64]

e.  Every delivery seller must maintain a detailed record of every delivery sale.[65]

f.  Every delivery seller must comply with all State, local, tribal, and other laws applicable to the sale of e-cigarettes.[66]

97.     Defendants are delivery sellers under the PACT Act and required during the Relevant Time Period to comply with all the above PACT Act requirements.  Defendants ignored those obligations.  Specifically:

a.  As detailed below, each Defendant (except EVO Brands, MVH I, and Mylé) shipped e-cigarettes into or within New York City using the USPS in violation of the PACT Act § 1716E(a).

b.  Within the Relevant Time Period, each Defendant (except EVO Brands and MVH I) sold and shipped e-cigarettes to unlicensed or illegally operating distributors and/or retailers in New York. At no time during the purchase or delivery were Defendants in the physical presence of those consumers.

c.  Each Defendant (except EVO Brands, and MVH I) has either failed entirely or substantially to submit required PACT Act reports to the City's tobacco tax administrator and Office of the Corporation Counsel.

d.  Conduct that violates any other provision of the law applicable to the sale of

---

[62] N.Y. Pub. Health L. § 1399-cc.

[63] 15 U.S.C. § 376a(b)(4).

[64] 15 U.S.C. § 376a(b)(4)(A)(iii).

[65] 15 U.S.C. § 376a(c)(1).

[66] 15 U.S.C. § 376a(a)(3).

tobacco or e-cigarettes independently violates the PACT Act. Defendants were required to but failed to comply with N.Y.C. Ad. Code § 17-715 prohibiting sales of flavored e-cigarettes and required to but failed to comply with N.Y. Pub. Hlth. L. §1399-*ll* prohibiting the shipment of e-cigarettes to any person in New York who is not a licensed e-cigarette retailer, an export warehouse proprietor or customs bonded warehouse operator, or the U.S. government.

## 2. Defendants Violate Multiple Provisions of New York's Public Health Law Regarding the Marketing and Sale of E-cigarettes.

98.     Defendants' conduct in shipping or causing to be shipped e-cigarettes into and within New York City is illegal under state and City law.

99.     New York's Public Health Law regulates the sale of e-cigarettes in New York State and City and is intended to protect the public from the dangers of nicotine addiction and reduce access to e-cigarettes by youth.[67] Several provisions of the Public Health Law operate to protect New York's youth in particular, including:

  a.  *Age Restriction, N.Y. Pub. Health L. § 1399-cc* – New York law restricts youth access to tobacco products, liquid nicotine, and e-cigarettes. Since November 2019, New York law has prohibited these products to individuals under the age of 21.[68] These age restrictions apply to all e-cigarettes, including e-cigarettes, sold by each Defendant;

  b.  *Ban on Swag and Event Promotions, N.Y. Pub. Health L. § 1399-bb-1* – New York law restricts e-cigarette branded swag. Effective January 1, 2024, New York prohibits any manufacturer or distributor of e-cigarettes from marketing, licensing, distributing, selling, or causing to be marketed, licensed, distributed, or sold any item (other than electronic cigarettes and its component parts) or service which bears the brand name or other indicia of product identification of

---

[67] The term "Flavored E-Cigarette" is slightly more expansive than the definition of "vapor products" under New York's Public Health Law.  Most notably, "vapor products" does not include any device that does not contain pre-filled flavored e-juice or e-liquid. N.Y. Pub. Health L. § 1399-aa(17). However, this limitation under the Public Health Law pertains to a fraction of the products at issue.

[68] New York defines "liquid nicotine", "electronic liquid", or "e-liquid" as "a liquid composed of nicotine and other chemicals, and which is sold as a product that may be used in an electronic cigarette." N.Y. Pub. Health L. § 1399-cc(1)(e). New York's definition of "electronic cigarette" or "e-cigarette" is broadly defined as "an electronic device that delivers vapor which is inhaled by an individual user, and shall include any refill, cartridge and any other component of such device" and encompasses the PACT Act definition of ENDS. N.Y. Pub. Health L. § 1399-aa(13).

the brand. Moreover, no manufacturer, distributor, or retailer may sponsor any athletic, musical, or other social or cultural event, using any e-cigarette branding; and

c. *Ban on Discounts, N.Y. Pub. Health L. § 1399-bb* – New York law restricts the giveaway of e-cigarettes, and with limited exceptions not relevant here, New York law prohibits any retail dealer from selling or offering for sale e-cigarettes at a discounted price, including but not limited to barring the acceptance of coupons, vouchers, or rebates. Two-for-one promotions and rewards programs in which consumers earn points for purchases which can be redeemed for discounts or free items are prohibited under New York law.[69]

100.    New York requires all persons who want to sell or offer for sale e-cigarettes in New York to be a "retail dealer."[70]

101.    As detailed below, for a substantial amount of the Relevant Time Period, all Defendants have engaged in e-cigarette sales that directly violate three pertinent provisions of the N.Y. Pub. Health L.:

a. Flavor Ban, N.Y. Pub. Health L. § 1399-mm-1 (all Defendants);

b. Shipping Ban, N.Y. Pub. Health L. § 1399-*ll* (all Defendants, except EVO Brands and MVH I); and

c. Ingredient Disclosures, N.Y. Pub. Health L. § 1701 (all Defendants).

102.    Defendants Midwest Goods, POD Juice, Safa Goods, and Mi-One also violate a fourth pertinent provision, namely the ban on discounted and/or free e-cigarettes, N.Y. Pub. Health

---

[69] The NYSDOH has issued guidance relating to N.Y. Pub. Health L. § 1399-bb, directed to "Tobacco and Vapor Product Manufacturers, Wholesalers, Distributors, and Retailers Regarding New Price Reduction Instrument Restrictions," thereby including each Defendant. The NYSDOH explained that the intent of the new restrictions was "to limit measures that ease the accessibility of tobacco and vapor products, particularly to vulnerable populations including younger individuals and others who have not developed an addiction to nicotine."

[70] N.Y. Pub. Health L. § 1399 *et seq.*; N.Y. Tax L. § 1183. A "retail dealer" is a person licensed by the Commissioner of the DTF to sell cigarettes, tobacco products, or vapor products. N.Y. Pub. Health L. § 1399-aa(16). Related, a "vapor products dealer" is a person licensed by the Commissioner of DTF to sell vapor products in New York State. N.Y. Pub. Health L. § 1399-aa(18).

L. § 1399-bb).

### a. Each Defendant Has Violated New York's Flavor Ban (N.Y. Pub. Health L. § 1399-mm-1).

103.    Effective May 18, 2020, New York prohibited the sale at retail of any non-tobacco flavored vapor product.[71]

104.    To ensure the industry had notice of New York's flavor ban, NYSDOH issued a guidance document directed to "Vapor Product Manufacturers, Wholesalers, Distributors, and Retailers," thereby including each Defendant.  In that guidance, the NYSDOH explained that the flavor ban arose from the growing need to protect vulnerable communities, including youth:

> The availability of flavors is largely responsible for the dramatic increase in the use of e-cigarettes by youth and is a principal reason that youth initiate and maintain e-cigarette use. The intent of this amendment is to stem this increase and prevent a potentially life-long addiction to nicotine in young people and other vulnerable populations.[72]

105.    Each Defendant has flatly ignored N.Y. Pub. Health L. § 1399-mm-1 by selling flavored products.  Each and every sale to a New York retailer is illegal by operation of New York's flavor ban, as well as by the PACT Act, which requires compliance with state laws applicable to tobacco.

106.    A New York e-cigarette retailer can be licensed and operate lawfully only by selling e-cigarettes authorized by the FDA. Therefore, each and every sale of e-cigarettes manufactured by each Defendant that lack FDA authorization violates that licensing scheme and is illegal.

---

[71] N.Y. Pub. Health L. § 1399-mm-1. The retail flavor ban does not apply to any flavored vapor product that the FDA has authorized to be marketed under 21 U.S.C. § 387j(c) *et seq*.

[72] https://www.health.ny.gov/prevention/tobacco_control/docs/flavored_vape_product_restrictions_guidance.pdf (last visited Feb. 10, 2025).

107.    As set forth below, the Puff Defendants and Pod Juice violated New York's flavor ban by directly operating as a retailer who completed substantial direct retail sales of e-cigarettes, including e-cigarettes, to individuals.

### b.    Each Defendant Has Violated New York's Ban on Shipping (N.Y. Pub. Health L. § 1399-ll).

108.    The shipment of e-cigarettes is illegal in New York, unless the shipment is to a licensed e-cigarettes dealer, an export warehouse proprietor or customs bonded warehouse operator, or an officer, employee or agent of the government.[73]

109.    New York law also requires that anyone shipping e-cigarettes to any New York recipient to ship the products in the manufacturer's original container or wrapping, or in a container or wrapping plainly and visibly marked with the words "vapor products."[74]

110.    The NYSDOH issued a corresponding guidance document, directed to "Vapor Product Manufacturers, Wholesalers, Distributors, and Retailers Regarding New Shipping Restrictions," thereby including each Defendant.[75]

111.    In that guidance, the NYSDOH stated that "[t]he intent of these amendments is to prevent consumers, and particularly individuals under the age of 21, circumventing restrictions on vapor product sales by purchasing products online and via telephone."[76]

112.    During the Relevant Time Period, each Defendant (except EVO Brands and MVH I) shipped or caused to be shipped flavored e-cigarettes to one or more New York retailers that

---

[73] N.Y. Pub. Health L. § 1399-ll(1-a).

[74] N.Y. Pub. Health L. § 1399-ll(3).

[75]    https://www.health.ny.gov/prevention/tobacco_control/docs/vape_product_shipping_ban_guidance.pdf    (last visited Feb. 13, 2025).

[76] *Id*.

either lacked a valid certificate of registration or that was acting outside the scope of their licensure by purchasing and selling flavored e-cigarettes, who thereby were not licensed e-cigarettes dealers to whom vapor shipments could be made consistent with N.Y. Pub. Health L. § 1399-*ll*.

113.    During the Relevant Time Period, each Defendant (except EVO Brands and MVH I) has shipped or caused to be shipped flavored e-cigarettes to persons, including distributors and wholesalers, who were not licensed retailers, export warehouse proprietors or operators of a customs bonded warehouse, or the U.S. government.

114.    Because each such shipment violates New York's ban on the shipping of e-cigarettes, each Defendant (except EVO Brands and MVH I) violated N.Y. Pub. Health L. § 1399-*ll*.

### c.  Certain Defendants Have Violated New York's Required Ingredient Disclosures (N.Y. Pub. Health L. § 1701).

115.    New York law requires manufacturers of e-cigarettes distributed, sold, or offered for sale in New York at retail or wholesale to furnish to the Commissioner of Health, for public record, and to post on such manufacturer's website, detailed information regarding the manufacturer's e-cigarettes.[77]

116.    The law defines "manufacturer" as: "any person, firm, association, partnership, limited liability company, or corporation which produces, prepares, formulates, or compounds a vapor product or e-cigarette, or whose brand name is affixed to such product"; or if such product is imported into the U.S., "the importer or first domestic distributor of such product if the entity

---

[77] N.Y. Pub. Health L. § 1701; N.Y. Comp. Codes R. & Regs. tit. 10, §§ 1006.1(a)-(b), 1006.2(a) (2022).

that manufacturers such product or whose brand name is affixed to such product does not have a presence in the United States."[78]

117.    Effective July 1, 2020, for each vapor product (including e-liquids), the information to be disclosed must include, *inter alia*, each vapor product ingredient and the nature and extent of investigations and research performed by or for the manufacturer concerning the effects on human health of the product or its ingredients.

118.    Manufacturers have been required to furnish the required information since on or before January 1, 2021, and every two years thereafter.[79]   Manufacturers are also required to furnish the required information prior to the sale of any new vapor product or e-cigarette or when such a product's formulation has been changed meaningfully.

119.    For each e-cigarette, the information to be disclosed must include, *inter alia*, any toxic metal, including but not limited to lead, manganese, nickel, chromium, or zinc, that is a constituent of any heating element in the e-cigarette;  each byproduct that may be introduced into the vapor produced during normal use of the e-cigarette; and the nature and extent of investigations and research performed by or for the manufacturer, or that the manufacturer is aware of, concerning the effects on human health of the heating  element or its by-products.

120.    The NYSDOH issued a detailed guidance that spelled out the law's requirements, including this chart for ease of reference:[80]

---

[78] N.Y. Pub. Health L. § 1700(7) ; N.Y. COMP. CODES R. & REGS. tit. 10, § 1006.1(g) (2022).

[79] N.Y. Pub. Health L. § 1701(2); N.Y. COMP. CODES R. & REGS. tit. 10, § 1006.4 (2022).

[80] https://www.healt h.ny.gov/prevention/tobacco_control/docs/vape%20_product_ disclosure_guidance.pdf (last visited Feb. 13, 2025).

| Vaping Products | | |
|---|---|---|
| **Ingredients** | **Chemicals of Concern** | **Health-related Research** |
| For each product:<br>• All intentionally added ingredients,<br>• Known by-products or contaminants that are ≥0.5% by weight, and<br>• Known by-products or contaminants that have been identified as chemicals of concern, regardless of content by weight. | For each product that contains a chemical of concern:<br>• A statement that the ingredient is a chemical of concern.<br>• An evaluation of the availability of potential alternatives and potential hazards of the alternatives. | A summary of the nature and extent of investigations and research on human health effects of the product or its ingredients. |
| **E-Cigarette Devices** | | |
| **Toxic Metals** | **Alternatives Evaluation** | **Health-related Research** |
| For each product:<br>• Identify if the heating element contains a toxic metal such as aluminum, antimony, arsenic, cadmium, cobalt, chromium, copper, iron, lead, manganese, nickel, selenium, tin, or zinc. | For each product that contains a toxic metal:<br>• An evaluation of the availability of potential alternatives and potential hazards of the alternatives for the toxic metal. | A summary of the nature and extent of investigations and research on human health effects of the product or its ingredients or components. |
| **Vapor Produced During Normal Use of Products** | | |
| **By-products** | **Chemicals of Concern** | **Health-related Research** |
| For each product:<br>• A list of by-products, including metals, known by the manufacturer to be in the vapor produced during consumption of the vapor product. | For each product that produces a chemical of concern in the vapor:<br>• A statement that the by-product is a chemical of concern.<br>• An evaluation of the availability of potential alternatives and potential hazards of the alternatives. | A summary of the nature and extent of investigations and research on human health effects of the vapor produced by the product. |

121.    The NYSDOH guidance clarified the required ingredient disclosures and specified an NYSDOH email address created for the receipt of the disclosures.

122.    Defendants Pod Juice, Mi-One, and Mylé "produce[], prepare[], formulate[], or compound[] a vapor product or e-cigarette" and are accordingly expressly required to provide disclosures.  Each of them has failed to do so.

123.    Defendant Magellan, as the trademark holder for the Hyde and Raz brand names, and as importer for other brands, is expressly required to make the disclosures. Magellan has failed to do so.

124.    Defendant Midwest Goods, as "the importer or first domestic distributor" of many products, is likewise expressly required to make the disclosures. Midwest Goods has failed to do so.

125.    EVO Brands is the trademark holder of Puff brand names, and PVG2 and Puff Bar

39

are affiliates of EVO Brands that operate with EVO Brands as a common enterprise to sell and distribute Puff brand disposable e-cigarettes. PVG2 is the "first domestic distributor" of Puff brand products. The Puff Defendants are therefore expressly required to make the disclosures but have failed to do so.

126.    MVH I is the trademark holder of the Mylé brand. Mylé Vape and MVH I are affiliates and operate as a common enterprise to sell and distribute Mylé brand products. Because Mylé Vape is the "first domestic distributor" of its branded products, Mylé Vape and MVH I is each expressly required to make the disclosures.  The MYLÉ Defendants have failed to do so.

127.    Defendant Safa Goods was at times during the Relevant Time Period the trademark holder of the "Raz" brand name, and the "first distributor" of Raz brand products, and the "importer or first domestic distributor" of other products that is expressly required to make the disclosures. Safa Goods has failed to do so.

128.    Each Defendant has failed to make the required ingredient disclosures concerning any vapor product or e-cigarette they have distributed, sold, or offered for sale in New York during the Relevant Time Period.

129.    To date, none of the above Defendants has ever submitted the required disclosures to the NYSDOH, or any other correspondence to the NYSDOH email address established for the purpose of accepting the required information.

130.    Each non-manufacturing Defendant knowingly and deliberately distributed, sold, and offered for sale e-cigarettes and e-cigarettes for which no disclosure was made. These Defendants engaged in the distribution, sale and offer for sale of e-cigarettes and e-cigarettes that violate N.Y. Public Health Law § 1701, and engaged in that business because each sought to, and

40

did in fact, conceal the harmful effects of the products that they distributed, sold and offered for sale, receiving financial gain for their conduct.

### d. Each Defendant Has Violated New York City Law.

131.    New York City prohibits all sales, offers to sell, and possession with intent to sell or offer for sale all flavored e-cigarettes.[81]  Each Defendant's sale and delivery of e-cigarettes to a purchaser in New York City violates New York City's flavor ban.

### 3. Each Defendant Has Violated the Federal Food, Drug, and Cosmetic Act ("FD&C Act") and FDA Regulations.

132.    In 2016, the FDA issued its "Deeming Rule," exercising authority under the Tobacco Control Act to declare e-cigarettes to be "tobacco products" that require marketing authorization by the Agency.[82]

133.    Under the Deeming Rule, the FDA requires all e-cigarette manufacturers and importers to seek marketing authorization before offering their products for sale in the U.S. Under federal law, no new tobacco product—including e-cigarettes containing synthetic nicotine or natural nicotine derived from tobacco—can be legally marketed or sold in the U.S. before receiving a premarket authorization order by the FDA.[83]

134.    Some e-cigarette manufacturers have complied, submitting detailed scientific and other product information to the FDA and have received a premarketing authorization order. As Brian King, Director of FDA's Center for Tobacco Products explained in a recent announcement,

---

[81] N.Y.C. Admin. Code § 17-715.

[82] Deeming Tobacco Products to be Subject to the Federal Food, Drug and Cosmetic Act, as amended by the Family Smoking Prevention and Tobacco Control Act; Restrictions on the Sale and Distribution of Tobacco Products and Required Warning Statements for Tobacco Products, 81 Fed. Reg. 28,974, 28,976 (May 10, 2016).

[83] See 21 U.S.C. § 387j.

those approvals further establish "that authorization of an e-cigarette product is possible when sufficient scientific evidence has been submitted to the agency to justify it."[84]  The FDA maintains a web page listing all e-cigarette products that have applied for and been granted a premarket authorization order.[85] The agency has repeatedly explained that "these [listed products] are the *only* e-cigarette products that currently may be lawfully marketed and sold in the United States, and those manufacturing, importing, selling, or distributing e-cigarettes without the required premarket authorization risk enforcement."[86]

135.    To date, the FDA has authorized 34 brands of e-cigarettes to be sold in the U.S.[87] The FDA has not granted a premarket authorization order to any manufacturer or importer for an e-cigarette product in any flavor other than tobacco or menthol.[88]  No e-cigarette brand marketed and sold by any Defendant has been granted the FDA's required premarket authorization order.

136.    Certain Defendants attempt to evade the required premarketing authorization order by marketing their e-cigarettes with confusing and purposefully misleading statements, such as "FDA-compliant," one effort by which Defendant Pod Juice, for example, misleads the public.

137.    The FDA has sent warning letters to dozens of manufacturers, distributors, and

---

[84] U.S. Food & Drug Administration, Press Release, *FDA Authorizes Marketing of Four Menthol-Flavored E-Cigarette Products After Extensive Scientific Review*, *available at* https://www.fda.gov/news-events/press-announcements/fda-authorizes-marketing-four-menthol-flavored-e-cigarette-products-after-extensive-scientific#:~:text=Following%20an%20extensive%20scientific%20review%2C%20the%20U.S.%20Food,through%20the%20premarket%20tobacco%20product%20application%20%28PMTA%29%20pathway (last visited Feb. 14, 2025).

[85] U.S. Food & Drug Administration, *Searchable Tobacco Products Database*, product category "e-cigarette," *available at* https://www.accessdata.fda.gov/scripts/searchtobacco/ (last visited Feb. 10, 2025).

[86]    https://www.fda.gov/tobacco-products/ctp-newsroom/fda-authorizes-marketing-vuse-alto-tobacco-flavored-e-cigarette-pods-and-accompanying-power-unit (last visited Feb. 14, 2025) (emphasis added).

[87] https://digitalmedia.hhs.gov/tobacco/hosted/E-Cigarettes-Authorized-FDA-JAN2025.pdf (last visited Feb. 14, 2025).

[88] *Id*.

retailers for selling and/or distributing e-cigarettes without a premarket authorization order, including Defendants Midwest Goods, the Puff Defendants, Pod Juice, Safa Goods, Mi-One, and Mylé. Many of the e-cigarettes sold and offered for sale by each of these Defendants also have been separately identified as an illegal product in FDA warning letters to wholesalers or retailers.

138. Defendants have ignored the FDA's warnings and continued to flood New York City with unauthorized e-cigarettes and flavored disposable e-cigarettes in particular.

139. While the City does not seek relief under the FD&C Act or FDA regulations, those laws provide notice to each Defendant that their commercial conduct is illegal and harmful and Defendants' violations evidence Defendants' liability under the PACT Act and for creation of a public nuisance.

### B. The Flavored Vapor Product Supply Chain Involves International and Interstate Commerce and Defendants Substantially Control New York's Supply.

140. Industry sales data reveals that there are now more than 5,800 unique disposable e-cigarettes currently being sold in the U.S.[89] Defendants collectively control which of these products appear in New York City's e-cigarette shops, smoke shops, and at the doorstep of New York City residences.

141. The major manufacturers of e-cigarettes are principally located in China. From January 2022 to January 2025, at least $10 billion of Chinese-made e-cigarette products – not counting fraudulently-labeled imports – was exported into the U.S., with an all-time monthly high

---

[89] U.S. Senate, Permanent Subcommittee on Investigations, *The Youth Vaping Epidemic: Federal Regulation of E-cigarettes and the Rise of JUUL and Puff Bar* (Feb. 29, 2024), 2, *available at* https://permanent.fdlp.gov/websites/www.senate.gov/pdf-archive/2024-02-29-PSI-E-cig-Report-Final.pdf [hereinafter "2024 Senate Report on the Rise of JUUL and Puff Bar"] (last visited Feb. 4, 2025).

of $405 million in January 2025.

142.    E-cigarette manufacturers frequently evade federal import restrictions on flavored nicotine devices through the use of false documentation misidentifying the product or understating the amount or value of the goods, thereby reducing taxes, duties and fees and evading import prohibitions. Comparing shipment volumes collected by the United States Customs and Border Patrol with the actual volume of flavored e-cigarettes available nationwide establishes that the Chinese manufacturers of flavored e-cigarettes have vastly underreported their United States sales, defrauding the federal government of millions of dollars in import duties.

143.    Several recent joint actions by the FDA and U.S. Customs and Border Protection ("CBP") have resulted in the seizure of approximately over 3 million units of unauthorized e-cigarette products, with an estimated retail value of $77 million. The seized e-cigarettes all originated from China and were being sent to wholesalers or distributors for wider distribution throughout the U.S.[90]

144.    E-cigarettes manufactured abroad arrive in New York through U.S. importers and distributors who contract directly with overseas manufacturers and arrange for the products to be shipped to the U.S.  The manufacturers ship their products directly or more commonly through freight-forwarding agencies to the U.S. distributors, including Defendants. Once in the U.S., these products enter the domestic supply chain through those distributors, including each Defendant.

145.    Defendants tout themselves as "master distributors" of certain e-cigarettes and

---

[90]    https://www.cbp.gov/newsroom/local-media-release/53700-electronic-nicotine-delivery-systems-seized-chicago-cbp (seizure of 53,700 ENDS devices with a manufacturer's suggested retail price of over $1.08 million) (last visited Feb. 10, 2025); https://www.fda.gov/news-events/press-announcements/76-million-illegal-e-cigarettes-seized-joint-federal-operation (seizure of approximately 3 million e-cigarette products with an estimated retail value of $76 million) (last visited Feb. 10, 2025).

receive preferential and exclusive rights to market and distribute the products. They then sell the products to smaller sub-distributors, wholesalers and/or retailers operating brick and mortar facilities in New York City, or online stores that who in turn sell the products to New York City consumers, including City youth.

146.    For example, Defendants Midwest Goods and Safa Goods are U.S. partners of the popular e-cigarette brand Geekvape, manufactured in Shenzhen, China. Defendant Midwest Goods has purchased Geekvapes directly from China for distribution in the U.S. No Geekvape product has been granted a premarket authorization order from the FDA allowing its marketing and sale in the U.S..

147.    Defendant Safa Goods boasts on its website that it is a master distributor of several e-cigarette brands, including such popular brands as Lost Mary, Off-Stamp, and Raz, none of which hold premarket authorization orders from the FDA.

148.    Defendant Midwest Goods entered into a Master Distribution Agreement with Pastel Cartel and American Vape Company, companies that own and/or sell the popular e-cigarette brand Esco Bar, which was later the subject of a May 15, 2023, FDA import alert for lacking FDA marketing authorization and hence illegal to sell in the U.S.  The import alert placed Esco Bar products on the red list, which allows the CBP to detain the products without physical examination at the time of entry to prevent distribution of the illegal products in the U.S.  Although never authorized for U.S. sale, even after the import alert, Midwest Goods nevertheless entered into an agreement to promote the illegal Esco Bar products, stimulate demand for the products, and maximize their sales in the U.S., including New York City.

149.    Based on their supply chain operations and placement within that chain, each

Defendant has the both the power to prevent sales of e-cigarettes in New York City and the responsibilities under federal, state, and local laws to do so, but instead promote and engage in those sales.

150.    Defendants deliberately violate the law. Several Defendants have already been the subject of litigation and/or investigations regarding the import and distribution of these illegal products. For example, the Puff Defendants,[91] and Mi-One were embroiled in recent litigation before the United States District Court of the Southern District of California and/or International Trade Commission stemming from complaints filed by manufacturers NJOY and R.J. Reynolds arising out of the manufacture, import, marketing, distribution, and sale of unlawful e-cigarettes.[92] Nonetheless, the Puff Defendants, and Mi-One maintain their illicit position in the market.

### III.    EACH DEFENDANT HAS PERSISTENTLY AND ILLEGALLY MARKETED, SOLD, AND SHIPPED FLAVORED E-CIGARETTES INTO NEW YORK CITY

151.    Despite the illegality of their conduct, each Defendant has intentionally and repeatedly marketed, sold, and shipped e-cigarettes into New York City throughout the Relevant Time Period.

152.    New York City has enacted a complete ban on flavored e-cigarettes. Every single

---

[91] In April 2024, the Puff Bar Defendants entered a stipulation resolving the ITC investigation in which they agreed to forever cease and desist from manufacturing, advertising, marketing, distributing, selling, offering to sell, importing, and exporting Puff Bar brand products not authorized for market or sale in the U.S.  *See In the Matter of Certain Disposable Vaporizer Devices and Components and Packaging Thereof*, United States International Trade Commission Investigation No. 337-TA-1381, Documents 817799-2153214 (Agreement with PVG2) and 817800-2153276 (Agreement with EVO Brands).

[92] *NJOY, LLC v. Imiracle (HK) Limited, et al.*, Docket No. 24-cv-397 in the United States District Court for the Southern District of California (SV3 LLC d/b/a Mi-One Brands is a defendant); *In the Matter of Certain Disposable Vaporizer Devices and Components and Packaging Thereof*, United States International Trade Commission Investigation No. 337-TA-1381 (investigation commenced against, *inter alia*, EVO Brands, PVG2, Magellan, Ecto World d/b/a Demand Vape, Price Point, and Mi-One); *In the Matter of Certain Disposable Vaporizer Devices and Components Thereof*, United States International Trade Commission Investigation No. 337-TA-1410 (investigation commenced against, *inter alia*, SV3, LLC d/b/a/ Mi-One and Price Point Distributors Inc. d/b/a Price Point NY).

sale of a flavored e-cigarette into New York City to whomever made is illegal, in violation of the City Administrative Code § 17-715, N.Y. Public Health Law § 1399-*ll*, and the PACT Act. Each such sale constitutes a "delivery sale" under the PACT Act and failed to conform to any of the requirements for such sales. All the Defendants have made such sales.

153.    Defendants' common marketing strategies have misled New York customers into believing that e-cigarettes are legal and harmless.  As described in more detail below, during the Relevant Time Period, each Defendant not only maximized their individual market share, but also put the overall market for e-cigarettes into overdrive in New York, including by:

   a.   publishing statements on their respective websites (including product-specific statements or blog or other postings concerning e-cigarettes generally) that represented to anyone accessing the website that such products were legal, safe, and fun;

   b.   engaging influencers for promotional purposes to reach the broadest audiences possible on social media;[93]

   c.   utilizing bright, vibrant color schemes, and/or animation or cartoon themes for brand development and packaging;[94]

   d.   advertising their products on social media;[95] and/or

   e.   supporting e-cigarette tricks and other alternative e-cigarette use behaviors among adolescents.[96]

---

[93] *See* https://www.cdc.gov/tobacco/e-cigarettes/why-youth-vape.html (last visited Feb. 10, 2025) ("[A]bout three in four (74%) students who used social media had seen e-cigarette–related posts or content.").

[94] Lauren I. Labrecque & George R. Milne, *Exciting red and competent blue: the importance of color in marketing*, Received: 17 June 2010 / Accepted: 14 December 2010 # Academy of Marketing Science 2011.

[95] Yang Q, Clendennen SL, Marti CN, Loukas A., *Associations between social media engagement and young adults' subsequent onset of ENDS dependence symptoms one year later*, Addict Behav. 2024 Oct, Epub 2024 Jun 18, *available at* https://pubmed.ncbi.nlm.nih.gov/38908051/ (last visited Feb. 15, 2025) ("Findings suggest that engaging with tobacco information on SM [social media], regardless of its valence, serves as a risk factor for the development of subsequent dependence symptoms among young adult ever ENDS users.").

[96] Kong G, Morean ME, Bold KW, Wu R, Bhatti H, Simon P, Krishnan-Sarin S., *Dripping and vape tricks: Alternative e-cigarette use behaviors among adolescents*, Addict Behav. 2020 Aug, Epub 2020 Mar 21, *available at*

154.    Each Defendant has openly operated in contempt of the law. For example, in a WhatsApp conversation, dated March 28, 2023, between hundreds of stakeholders in the industry, including Defendants Safa, Mylé, and Mi-One, New York's flavor ban was discussed.  A text writer informed recipients that New York prohibits the sales of the very products from which Defendants continue to profit but theorized (incorrectly) that the risk was borne solely by retailers, encouraging the distributor-stakeholders to continue business as usual.

155.    Each Defendant has thus caused, contributed to, or maintained the massive influx into and sale of e-cigarettes, particularly disposable e-cigarettes, in New York City.

### A.  The Puff Defendants – *The First Mega-Popular Disposable Vape*

156.    EVO Brands is the trademark holder of the "Puff" brand of disposable e-cigarettes, and a family of marks consisting of or incorporating the term "Puff" and/or its distinctive cloud design, including the brands Puff BAR, Puff Plus, Puff Glow, and Puff Flow. EVO Brands has pending trademark applications for the brands Puff Max, Puff XXL, and Puff Ultra.

157.    EVO Brands licenses the Puff brands to PVG2.

158.    PVG2 is the operating entity that distributes disposable e-cigarettes bearing the Puff brands.

159.    Puff Bar has owned and operated the Puff Bar main website, https://puffbar.com/, for a substantial segment of the Relevant Time Period.  On information and belief, starting in or around February 21, 2021, PVG2 has also maintained https://puffbar.com/, through which both Puff Bar and PVG2 advertised, sold, and offered for sale Puff brand disposable e-cigarettes.

---

https://pubmed.ncbi.nlm.nih.gov/32222561/ (last visited Feb. 15, 2025).

160.    Accordingly, EVO Brands, PVG2, and Puff Bar (together, the "Puff Defendants") are affiliates that operate a common enterprise to sell Puff brand disposable e-cigarettes to distributors, wholesalers, retailers, and/or individual residents in New York City.

161.    The Puff Defendants have been a major distributor of their branded e-cigarettes, including disposable e-cigarettes, and have marketed, sold, and shipped a substantial number of products into New York City during the Relevant Time Period.

162.    The Puff Defendants' substantial sales into New York City include sales and shipments to e-cigarette distributors, wholesalers, retailers, and individuals throughout the Relevant Time Period.

163.    Some examples of the Puff brands' flavors are:

    a.  Watermelon Slush

    b.  Black Cherry Ice

    c.  Pink Lemonade

    d.  O.M.G

    e.  Strawberry Donut

164.    The Puff Defendants, including through their predecessor corporate forms, have offered Puff brand disposable e-cigarettes for sale since at least August 2019.

165.    The Puff Defendants have advertised and promoted Puff brand disposable e-cigarettes in various media, including through social media, various websites, and industry-leading trade shows to maximize their reach.

166.    The Puff brand and its distinctive Cloud logo were and continue to be widely

recognized, and in 2020-2021, Puff Bar was the most popular flavored e-cigarette in the U.S.[97]

167.    As described above, the Puff Defendants moved swiftly to fill the void left by JUUL. Puff Bar quickly became the first mainstream non-cartridge based disposable flavored e-cigarette widely used and recognized by youth.

168.    Puff Bar launched in 2019 with a design that looked similar to a sleek JUUL device, which could fit easily in one's pocket, and like JUUL, came in a variety of child-friendly flavors such as strawberry, pink lemonade, watermelon, and a blend called "O.M.G."[98]



169.    In the words of Puff Bar co-CEO and co-Founder Patrick Beltran, Puff Bar was even easier to use than JUUL because "you can't get any simpler than just you taking this product

---

[97] *See supra* n.1919, 21.

[98] Image obtained from Stanford Research into the Impact of Tobacco Advertising Database ("SRITA Database"), https://tobacco.stanford.edu/disposable/img41371/ (last visited Feb. 14, 2025).

out of the packaging, putting it to your mouth and just using it."[99]

170.    The Puff Defendants marketed the ease of use of their then-novel disposable e-cigarettes and boasted that the Puff Bar was the equivalent of 20 cigarettes:[100]



171.    Youth predictably switched in droves from the JUUL products to Puff Bar.  By

[99] The Forked Road, *Interview with Puff Bar's Patrick Beltran*, at 09:53 (Nov. 29, 2021), *available at* https://www.youtube.com/watch?v=H3bOPTBG0rI (last visited Feb. 4, 2025).

[100] Image obtained from SRITA Database, https://tobacco.stanford.edu/disposable/img41405/ (last visited Feb. 4, 2025); *see also Lara v. Puff Bar, Nick Minas, Patrick Beltran, Cool Clouds Distribution, et al.*, Docket No. 20-cv-8030, District Court for District of New Jersey, Doc. 59, Puff Bar Defendants' Answer to Second Amended Complaint, ¶ 114.

Spring 2020, Puff Bar sales reached over $3 million a week.

172.    On July 20, 2020, the FDA issued a warning letter concerning Puff Bar disposable e-cigarettes, identifying that those on the website https://puffbar.com had not received the required FDA marketing authorization and therefore could not be marketed or sold in the U.S.[101] In fact, none of the Puff disposable e-cigarettes complied with the FD&C Act and the FDA implementing regulations and could not be permissibly marketed or sold in the U.S. This included Puff brand disposable e-cigarettes advertised "on any other websites (including e-commerce, social networking, or search engine websites), in any other media. . . and in any retail establishments."[102] The FDA directed that Puff brand disposable e-cigarettes be removed from the market.

173.    The Puff Defendants, including through their predecessor corporate forms, halted U.S. sales temporarily in late 2020 after the FDA warning letter. However, after a brief hiatus, they circumvented FDA regulations to reemerge in the U.S. market in early 2021, using a synthetic nicotine formulation in their Puff brand disposable e-cigarettes. The reformulation did nothing to remedy the Puff Defendants' illegal conduct or diminish their popularity among youth.

174.    By 2021, Puff Bar was the most popular brand of flavored e-cigarette among middle school and high school students.[103] The 2021 National Youth Tobacco Survey found that 26.1% high school current e-cigarette users reported using Puff Bar, and that 30.3% of middle school

---

[101] Letter from Ann Simoneau, U.S. Food & Drug Administration, Press Release (July 20, 2020), *FDA Notifies Companies, Including Puff Bar, to Remove Flavored Disposable E-Cigarettes and Youth-Appealing E-Liquids from Market for Not Having Required Authorization*, https://www.fda.gov/news-events/press-announcements/fda-notifies-companies-including-puff-bar-remove-flavored-disposable-e-cigarettes-and-youth (last visited Feb. 4, 2025). Cool Clouds Distribution, Inc. d/b/a Puff Bar, was a predecessor corporate form of the Puff Defendants.

[102] *Id*.

[103] Kaplan, *supra* n.18; 2021 E-Cigarette Use Among Middle and High School Students, *supra* n.19.

current e-cigarette users reported using Puff Bar.[104]

175.    At all times, the Puff Defendants were aware of the rise in youth e-cigarette use, and the popularity of Puff brand disposable vape among youth.[105]

176.    Puff Bar remained the most popular e-cigarette used by youth in 2022. The 2022 National Youth Tobacco Survey found that "[a]mong current e-cigarette users, Puff Bar was the most commonly reported brand used in the past 30 days by both middle and high school students (29.7%), followed by Vuse (23.6%). Among current e-cigarette users, 14.5% reported that the brand they usually used was Puff Bar, followed by Vuse (12.5%)."[106]

177.    The Puff Defendants continued to advertise, market, sell and offer for sale Puff brand disposable e-cigarettes in a variety of youth-appealing flavors, including non-traditional flavors such as Banana Ice, Lychee Ice, and Cool Mint even after the FDA expressly applied its authority to regulate synthetic nicotine, therefore explicitly closing a purported regulatory gap.

178.    The non-traditional, sweet, and enticing flavors were critical to the Puff Defendants' business model because exotic flavors drove revenue significantly more than tobacco flavored products.[107] As Puff Defendants' co-CEO Patrick Beltran told the United States Senate Permanent Subcommittee on Investigations ("Senate Subcommittee"), "Puff Bar's portfolio of flavors was 'definitely' a business enabler that drove company revenue, explaining that if sales were restricted to tobacco flavor, the company 'would definitely take even more of a decline' than

---

[104] 2021 E-Cigarette Use Among Middle and High School Students, *supra* n.19. "Among high school current e-cigarette users, 26.1% reported that their usual brand was Puff Bar, followed by Vuse (10.8%) . . . Among middle school current users, 30.3% reported that their first brand was Puff Bar, and 22.5% reported JUUL."

[105] 2024 Senate Report on the Rise of JUUL and Puff Bar, *supra* n.89, at 107.

[106] 2022 E-cigarette Use Among Middle and High School Students, *supra* n.22, at 1283-85.

[107] 2024 Senate Report on the Rise of JUUL and Puff Bar, *supra* n.89, at 119.

it already had."[108]

179.    For that reason, the Puff Defendants doubled down on their illicit conduct and continued to offer new and "more unique blends of flavors," all while "fail[ing] to conduct any studies or surveys regarding user preference for these flavors, including the potential appeal of these flavors to youth and young adults."[109]

180.    Internal sales figures provided to the Senate Subcommittee showed that Puff Plus-Banana Ice, Puff Plus-Cool Mint, Puff Flow-Cool Mint, Puff Flow-Aloe Grape, and Puff Plus-Lush "accounted for $1.4 million in sales – over 26 percent of the $5.3 million total [Puff] sales in 2021."[110] Internal sales figures also showed that "Puff Plus-Banana Ice, Puff Plus-Cool Mint, Puff Plus-Lush, Puff Plus-Strawberry Banana, and Puff Plus-Blueberry Ice were the top-selling products and flavors, totaling over 275,100 units – 28 percent of the nearly 959,500 total [Puff] units sold" in 2021.[111]

181.    In contrast, "Puff Flow-Menthol, Puff Plus-Menthol, and Puff Bar-Tobacco products contributed $228,896 in sales and over 33,000 units sold – only 4% of total sales and 3% of total [Puff] units sold."[112]

182.    The Puff Defendants knew that their flavors appealed to youth and young adults— indeed, they bet on it. Although the Puff Defendants disingenuously claimed that their flavors also helped smokers transition away from combustible cigarettes, they "never studied the impact of

---

[108] *Id.*

[109] *Id.* at 120.

[110] *Id.* at 121.

[111] *Supra* n.89, at 121.

[112] *Supra* n.89, at 121.

[their] products on user cessation of combustible cigarettes."[113]

183.    On October 6, 2022, the FDA issued a second warning letter to the Puff Defendants for selling on the website https://puffbar.com disposable e-cigarettes that were not authorized by the FDA to be marketed and sold in the U.S.[114]

184.    The FDA again directed the Puff Defendants to remove their Puff brand disposable e-cigarettes from the market. The Puff Defendants were required to ensure that any Puff brand disposable vape that did not comply with the FD&C Act and the FDA implementing regulations was not marketed or sold in the U.S. This included Puff brand disposable e-cigarettes advertised on the website https://puffbar.com, "on any other websites (including e-commerce, social networking, or search engine websites), in any other media in which . . . [Puff Defendants] advertise, and in any retail establishments."[115]

185.    FDA review of https://puffbar.com and additional information documented the supply chain by which Puff brand disposable e-cigarettes were channeled to individuals:[116]

> EVO Brands, LLC and PVG2, LLC receive and deliver ENDS products without a marketing authorization order. Specifically, PVG2, LLC receives the products, including those listed below, from a foreign manufacturer and distributes those products in the United States to some or all of the retailers listed on https://puffbar.com. EVO Brands, LLC and/or PVG2, LLC owns and operates the website https://puffbar.com, which lists the products below for sale, identifies retailers that sell those products, and directs

---

[113] *Supra* n.89, at 123-24.

[114] Letter from Ann Simoneau, Dir., Off. of Compliance & Enforcement, Center of Tobacco Products, U.S. Food & Drug Admin., to Nicholas Minas Alfaro, Patrick Beltran, EVO Brands, LLC and PVG2, LLC (Oct. 6, 2022), *available at* https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/evo-brands-llc-and-pvg2-llc-dba-puff-bar-643091-10062022 (last visited Feb. 14, 2025).

[115] *Id.*

[116] *Id.*

consumers to those retailers. Such retailers . . . are found in
the "Store Locator" tab of https://puffbar.com.

186.    On information and belief, Puff brand disposable e-cigarettes not only continued to be marketed and sold in the U.S. after the 2022 FDA Warning Letter, but all the while—dating from its inception, through its first and second Warning Letters—the Puff Defendants marketed, distributed, and shipped their products into New York City.

187.    On July 27, 2023, the FDA issued yet another warning letter, this time to ABS Distribution Inc., a distributor of Puff brand disposable e-cigarettes, for selling and/or distributing Puff brand disposable e-cigarettes that were not authorized by the FDA to be marketed and sold in the U.S.[117]  Again, the Puff Defendants were not deterred and continued sales in the U.S. directly and through other distributors, including to New York City.

188.    On information and belief, during the Relevant Time Period, the Puff Defendants, including through their predecessor corporate forms, marketed, sold, and shipped disposable e-cigarettes to New York City distributors, wholesalers, retailers and/or individuals and/or used https://puffbar.com to direct New York individuals to retail stores located in New York to purchase disposable e-cigarettes.

189.    The Puff Defendants have always deliberately marketed Puff Bar disposable e-cigarettes specifically to youth. The Puff Defendants have long known that the Puff Bar products were extraordinarily attractive and popular with underage users and knew that Puff Bar related

---

[117] Letter from Ann Simoneau, Dir., Off. of Compliance & Enforcement, Center of Tobacco Products, U.S. Food & Drug Admin., to Amanpreet S. Kohl and ABS Distribution Inc. (July 27, 2023), *available at* https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/abs-distribution-inc-660030-07272023 (last visited Feb. 14, 2025).

content was "extremely popular" on social medial platforms such as Instagram and TikTok.[118]

190.    The Puff Defendants deliberately marketed their products to youth, by using the sweet and fruity flavors known to appeal to youth, by using colorful, animation-themed campaigns, and by taking advantage of user-generated social media content as a core marketing channel. Indeed, many clearly youth-targeted Instagram posts, such as the below posts, included "#puffbar" and/or "#puff" hash tags:[119]



---

[118] 2024 Senate Report on the Rise of JUUL and Puff Bar, *supra* n.89, at 132.

[119] Images obtained from SRITA Database, https://tobacco-img.stanford.edu/wp-content/uploads/disposables/puff-bar-main/puff-bar-instagram/ig_50.jpg (last visited Feb. 4, 2025); https://tobacco-img.stanford.edu/wp-content/uploads/disposables/puff-bar-main/puff-bar-instagram/ig_20.jpg (last visited Feb. 4, 2025); https://tobacco-img.stanford.edu/wp-content/uploads/disposables/puff-bar-main/puff-bar-instagram/ig_22.jpg (last visited Feb. 4, 2025).





191.    The Puff Defendants told the Senate Subcommittee that "the '#PuffBar' and '#Puff'

58

hashtags each had over 900 million impressions for a total of one billion impressions."[120] In the words of its co-CEO Patrick Beltran, "'to have a billion impressions of your brand, without you having to pay for it' is 'like any company's dream.'"[121]

192.    The Puff Defendants, including through their predecessor corporate forms, were aware of and approved dangerous social media challenges, notoriously popular among underage and risk-prone children. For example, the Puff Defendants indirectly marketed their products through a "Puff Bar Challenge" in which users attempt in under one minute as many inhales as possible from a Puff Bar. Username "Nate420" with 369,000 subscribers, posted a YouTube video on February 23, 2020, of himself taking the Puff Bar Challenge, showing Nate420 collapsing on the floor following the e-cigarette trick.[122] As of February 4, 2025, the video has been viewed 94,929 times.

193.    Below is a picture of another similar video posted by username "happycloudsatx," which includes the "#puffbar" hashtag, in which a user appears to be taking the Puff Bar Challenge by smoking 15 Puff Bars at once. This video was also posted on the Happy Clouds Smoke Shop Facebook page, likewise including the "#puffbar" hashtag:[123]

---

[120] 2024 Senate Report on the Rise of JUUL and Puff Bar, *supra* n.89, at 132.

[121] *Id*.

[122] Nate420, *Puff Bar Challenge*, YouTube (Feb. 23, 2020), https://www.youtube.com/watch?v=-X4pg7_kgq8 (last visited Feb. 14, 2025).

[123] Image obtained from SRITA Database, https://tobacco-img.stanford.edu/wp-content/uploads/disposables/puff-bar-main/puff-bar-instagram/ig_27.jpg (last visited Feb. 4, 2025); Happy Clouds Smoke Shop, *15 Puff Bar Challenge*, Facebook (Jan. 30, 2020), https://www.facebook.com/happycloudsatx/videos/official-puffbarofficial-puff-bar-challenge%EF%B8%8F-15-puff-bar-challenge-by-notwenyase/171012460887955/ (last visited Feb. 4, 2025).



194.    The Puff Defendants also benefited from two "solo break" email marketing campaigns distributed by their predecessor corporate forms during the Covid-19 pandemic in 2020. As seen below, the ads marketed directly to youth with its reference to escaping "parental texts" and an image of a young-looking woman blowing a cloud of vapor:[124]

---

[124] 2024 Senate Report on the Rise of JUUL and Puff Bar, *supra* n.89, at 127-28.




195.    The current co-CEOs of Puff Bar were responsible for promoting Puff Bar products at the time and sent out the "solo break" email campaigns on behalf of the Puff Defendants and their former corporations.[125]

196.    These marketing campaigns achieved their desired effect—brand notoriety, and by the time Puff Defendants relaunched their products in 2021, they no longer needed to rely on traditional marketing efforts. The Puff brand became synonymous with disposable e-cigarettes, and as Patrick Beltran told the Senate Subcommittee, "from a brand perspective, 'that notoriety is

---

[125] *Id.* at 127.

great.'"[126]

197.    The Puff Defendants knew that there were few barriers to underage purchases of Puff Bar disposable e-cigarettes in retail stores. The co-CEOs admitted to the Senate Subcommittee that, "throughout 2021, the company received messages from parents stating their children were able to purchase Puff Bar products from retail stores."[127] The Puff Defendants admitted to the Senate Subcommittee that they "didn't have a good strategy" on how to handle underage sales by retailers.[128] That failure was by design.

198.    During the Relevant Time Period, Puff Bar disposable e-cigarettes were available for sale in New York City retail shops and sold and/or offered for sale to New York City consumers.[129]

199.    The Puff Defendants, including through their predecessor corporate forms, have used and continue to use confusing and inaccurate messaging as a powerful marketing tool to attract customers who were trying to learn about or purchase disposable e-cigarettes.

200.    The Puff Defendants, including through their predecessor corporate forms, have made claims regarding the purported health benefits of their products despite not having obtained

---

[126] *Id.* at 130.

[127] *Id.* at 136-37.

[128] *Id.* at 137.

[129] Parents Against Vaping e-cigarettes ("PAVe"), a nonprofit national advocacy and education organization that fights the e-cigarette industry's attempts to market addictive nicotine products to youth submitted a declaration and spreadsheet in support of New York City's motion for a preliminary injunction in the City's action against several Flavored E-Cigarette manufacturers and distributors, including Defendants Magellan and Ecto World. *See* Exhibit A to the Declaration of Meredith Berkman, ECF Doc. 43-1, *The City of New York v. Magellan Technology, Inc., et al.*, Docket No. 23-cv-5880 (S.D.N.Y. 2023). PAVe conducted visits to retail stores throughout New York City in 2023 to document the proliferation of New York City retailers selling flavored e-cigarettes that are illegal under New York State and City laws. The spreadsheet showed the results of the store visits and includes the name of the retail store, whether the store was a licensed vapor products retailer, and identified examples of the Flavored E-Cigarette brands available at each store. Puff brand disposable e-cigarettes were available for sale at several retail stores.

FDA approval to make such modified risk claims.

201.    The Puff Bar website at one time stated that "Puff Bar was founded with three core values in mind: simplicity, value, and offering a healthier alternative to cigarettes."[130]

202.    The Puff Bar website also at one time made the following representations regarding its e-cigarettes:[131]

> a.  Made from medical-grade soaked cotton with 5% salt nicotine and flavoring, the Puff Bar heats liquid to produce vapor without burning carcinogens.
>
> b.  Smoking isn't cheap, so we want a product that motivates you not just for health reasons.
>
> c.  Value is important because smoking cigarettes is not cheap habit. Making the switch shouldn't only be a health-conscious decision but a budget-friendly one as well.
>
> d.  Quit smoking today with Puff Bar. Over 24 options to choose from. Traditional cigarettes contain a laundry list of chemicals that are proven harmful. There is still more research to be done on the negative effects of vaping, but we believe it is the healthier alternative and adults should have that choice. **Plus** you won't smell like an ash tray.

203.    The Puff Defendants were not authorized to make these deceptive and unfounded claims, which outstated the benefits of smoking their products and concealed the harms.

204.    According to the 2024 Senate Report on the Rise of JUUL and Puff Bar, the Puff Defendants ceased all marketing and sales of its nicotine disposable e-cigarettes following the 2022 FDA Warning Letter to Puff Defendants and have since pivoted to marketing and selling purportedly zero-nicotine disposable vape and cannabis products.[132]

---

[130] Puff Bar Defendants Answer to Second Amended Complaint, ¶ 52, ECF Doc. 59, *Lara v. Puff Bar, et al.*, Docket No. 20-cv-8030 (D.N.J. 2020).

[131] Letter from Ann Simoneau, *supra* n.20.

[132] 2024 Senate Report on the Rise of JUUL and Puff Bar, *supra* n.89, at 142.

205.    However, the Puff Defendants' website, as of November 2023, raises doubt on whether the Puff Defendants' purportedly nicotine-free products are completely free of nicotine. The Puff Defendants have made confusing and conflicting claims regarding their zero-nicotine disposable e-cigarettes. At times during the Relevant Time Period, Puff Defendants described their zero-nicotine disposable e-cigarettes as being "nicotine free" but also having "5% nicotine" on the very same screen in which the products were offered for sale.

206.    In any event, so-called zero-nicotine disposable e-cigarettes are harmful. Among other reasons, multiple studies and tests have demonstrated that e-cigarettes marketed as having zero-nicotine have at least trace amounts or in fact significant quantities of nicotine, in addition to other toxic chemicals.[133]

207.    As of December 17, 2024, the Puff Defendants continued to market and in fact sold into New York a strawberry flavored zero-nicotine disposable vape purchased from their website, https://puffbar.com, demonstrating that sales from their website continue.

208.    Thus, in addition to being the creators of the disposable vape craze among youth, and continuing to push a product that is the model for each of the other Defendant's disposable vape products, the Puff Defendants targeted adolescents throughout the Relevant Time Period by, *inter alia*, (i) using flavors, bright colors, and themes that were deliberately designed to attract children, including fruity and candy flavors, (ii) innovating the flavored e-cigarette devices into

---

[133] *See, e.g.*, Goniewicz ML, Gupta R, Lee YH, Reinhardt S, Kim S, Kim B, Kosmider L, Sobczak A. *Nicotine levels in electronic cigarette refill solutions: A comparative analysis of products from the U.S., Korea, and Poland*. Int J Drug Policy. 2015 Jun;26(6):583-8. doi: 10.1016/j.drugpo.2015.01.020. Epub 2015 Feb. 7, *available at* https://pmc.ncbi.nlm.nih.gov/articles/PMC4457636/ (last visited Feb. 4, 2024); https://www.theguardian.com/society/2023/sep/23/nicotine-free-vapes-sold-on-amazon-found-to-contain-nicotine (last visited Feb. 4, 2025); https://www.ascendantny.com/no-nicotine-vape/#:~:text=No%2Dnicotine%20vapes%20are%20electronic,been%20found%20to%20contain%20nicotine (last visited Feb. 14, 2025).

the ubiquitous, small, cheap, ready-to-use disposable e-cigarettes that have become known to be easily concealable from parents and other adults, and (iii) utilizing social media to gain brand recognition to market and reach underage customers with their false premise-that e-cigarettes are harmless fun when in fact they are dangerous and illegal.

209.    By their commercial conduct throughout the Relevant Time Period, the Puff Defendants repeatedly violated the PACT Act by, *inter alia*, upon information and belief, failing to maintain detailed records and submit reporting to New York City and other regulators. Also, the Puff Defendants also repeatedly violated the New York City Administrative Code and New York's Public Health Law, by, *inter alia*, (i) ignoring New York City's complete ban on flavored e-cigarette products, (ii) failing to make any of the legally required disclosures concerning their products' harmful ingredients, and (iii)  shipping their flavored e-cigarette products to their New York City customers.

210.    Without Puff Bar's earlier influence and marketing, none of the other Defendants would have been able to position themselves as currently successful players in the e-cigarette market.

211.    To date, no Puff brand disposable vape has received FDA authorization to be marketed or sold in the U.S.

### B.  Midwest Goods – *A Leading Distributor with a Big Media Focus*

212.    Midwest Goods Inc. is a major distributor of e-cigarettes, including disposable e-cigarettes, which marketed, sold, and shipped a substantial number of products into New York City during the Relevant Time Period.

213.    Midwest's substantial sales into New York include sales and shipments to e-

65

cigarette distributors, wholesalers, and retailers throughout the Relevant Time Period.

214.    Some examples of the Midwest Goods' enticing products are:

a.   Pillow Talk Ice Control in Sour Watermelon Gummies

b.   Off-Stamp X Cube Powered by Lost Mary with interactive animation in Bangin Watermelon

c.   Lucid Boost in Watermelon Bubblegum Ice

d.   Juice Head in Rainbow Swirl

e.   South Connect in Grape Blow Pop

f.   Geek Bar Pulse X in Orange Fcuking Fab

g.   Chris Brown CB15K in Apple Gummies

h.   Iron Mike Tyson in Cake

i.   Death Row Vapes in Candy

j.   RODMAN by Aloha Sun in Allstar Blue Razz Ice

k.   Gumi Bar in Strawberry Ice Cream

215.    Due to growth in operations and staff, Midwest Goods moved into their current 85,000 square foot facility, located in Bensenville, Illinois, in 2019. That facility includes a purchasing and customer service center and is filled with over 60,000 different products, mostly comprised of e-cigarettes. Most, if not all, of the e-cigarettes sold or offered for sale were first marketed after 2016. The vast majority of Midwest Goods' cache of e-cigarettes have not received premarket authorization by the FDA to be marketed and sold in the U.S.

216.    Midwest Goods markets and offers e-cigarettes via (i) its website, at www.midwestgoods.com, (ii) an online monthly digital publication, called "ejuice Magazine," that it regularly maintains, *available at* https://ejuicemagazine.com/, together with a corresponding

blog, called "Vape Life Blog," hosted on the same domain, (iii) an active YouTube channel, at https://www.youtube.com/@midwestgoodsinc/videos, which, as of February 6, 2025, has 880 subscribers, and (iv) an active Instagram account, under the username "midwestgoodsinc" with 21,200 followers as of January 10, 2025.

217.    Midwest Goods is widely regarded as a top e-cigarette distributor in the U.S. and boasts on its website that they are the "#1 Distributor for Vape & Smoke." And its business is growing.  Between 2018 and 2024, the number of Midwest Goods' customers increased from approximately 7,500 to approximately 12,000 buyers.  On information and belief, that upward trend is consistent with its growth in business with New York City customers.

218.    By their website alone, Midwest Goods has far reach.  In December 2024 alone, upon information and belief, www.midwestgoods.com had over 102,000 visitors.

219.    Midwest Goods has used its media tools, including its website and Vape Life Blog, to reach as broad an audience as possible with the false message that e-cigarette use is harmless fun.  Routinely, Midwest Goods uses its channels to overstate the benefits of e-cigarette use and falsely misrepresent or conceal the harms, a powerful marketing tool to attract customers who are trying to learn about or purchase e-cigarettes.

220.    For example, Midwest Goods published a Vape Life Blog post, dated August 19, 2021, titled "State AGs Pressure FDA to Reject Flavored Vape PMTAs," decrying the letter sent by the Attorneys General of 31 states, including New York, to then FDA Acting Commissioner Janet Woodcock calling on the FDA to ban flavored e-cigarettes and restrict advertising and

marketing.[134] Noting that New York already has a flavor ban, the post complains that the letter is the latest example of federal and state officials and "anti-e-cigarette special interest groups" pressuring the FDA, stating, "[i]n recent months, the federal agency has been called before a U.S. House committee hearing, received pushy letters from U.S. senators, been subjected to pressure campaigns from the Campaign for Tobacco-Free Kids and American Lung Association and harassed by a form letter campaign from an anti-e-cigarette parent group.[135]  Most alarming, the Midwest Goods blog accuses the Attorneys General of spreading misinformation:[136]

> The AGs repeat the unproven claim that nicotine 'has particularly harmful effects on the developing brain.'

Rather, it is Midwest Goods' misstatement that is dangerous and contrary to the substantial scientific and medical evidence on the especially harmful effects of nicotine on adolescents.

221.    Midwest Goods operates with a misleading veil of legitimacy. Midwest Goods' website includes quick links for "Shipping Information," "Update Business License," "USPS Form," and "Tax Information," all of which are link headings designed to convince website visitors that the business complies with all federal and state laws. The "Shipping Information" link provides shipping carrier information and states that Midwest Goods uses USPS Ground services to ship products to the U.S. 48 states. It omits, however, that under federal law, e-cigarettes are nonmailable, unless between "legally operating businesses," and prohibited to be deposited in or carried through the USPS.[137] Again, flavored e-cigarettes are banned in New York City, and any

---

[134]  Vape Life Blog, August 19, 2021, *State AGs Pressure FDA to Reject Flavored Vape PMTAs*, https://ejuicemagazine.com/state-ags-pressure-fda-to-reject-flavored-vape-pmtas/ (last visited Feb. 6, 2025).

[135] *Id.*

[136] *Id.*

[137] *See* 18 U.S.C. § 1716E.

business that sells and ships e-cigarettes to a business in New York City, and any New York City business that places an order for the products are not legally operating businesses.

222.    Midwest Goods' website contains more conflicting and misleading information. The Midwest Goods website includes the broad disclaimer that "[t]he purchaser/retailer is responsible for ensuring that any products purchased are legal within their municipal, or state laws prior to sale of the products."[138]  In fact, beyond the fact that Midwest Goods omits the issue of responsibility under federal law, it is Midwest Goods that is responsible for ensuring that any products purchased are legal, as this action will establish.

223.    Midwest Goods requires its customers to be a "valid retail business," and that MidwestGoods.com "reserves the right to cancel any orders that are found to be placed by non-qualified accounts."[139] But that statement does not reflect Midwest Goods' practice. Rather, Midwest Goods knows that e-cigarettes are banned in New York City, and any retail business in New York City that was selling e-cigarettes was not lawfully operating and not a "valid retail business," but it continued to enjoy remarkable profits from its prolific sales to those illegally operating establishments nonetheless.  The Midwest Goods website requires its customers to submit their business license for Midwest Goods to keep on file to show USPS that their customers are "lawfully acting businesses," all the while knowing that those businesses do not act lawfully.[140] Midwest Goods collects business licenses from New York City entities, is aware of New York

---

[138] https://www.midwestgoods.com/terms-condition/ (last visited Feb. 6, 2025).

[139] *Id.*

[140]https://www.midwestgoods.com/update-business-information-questionnaire/?utm_source=Website&utm_medium=Link&utm_campaign=Pact+Act+Form/ (last visited  Feb.  6, 2025).

City's flavor ban, purports to confirm that each entity is "lawfully acting," but nonetheless has routinely sold e-cigarettes into New York City throughout the Relevant Time Period.

224.   Midwest Goods' website also presents incomplete information regarding state requirements and laws concerning e-cigarettes. The website identifies those states for which it "collects and remits taxes," but does not identify the states which outright prohibit the sale of e-cigarettes advertised on its website.[141]  The website fails to mention that flavored e-cigarettes are prohibited in New York City and State.

225.   Through its virtual magazine, https://ejuicemagazine.com/, which is not age-gated, and its Vape Life Blog, Midwest Goods (i) promotes the e-cigarettes it sells, including brands endorsed by celebrities, such as singer Chris Brown and the former boxer Mike Tyson, (ii) reports on e-cigarette-related domestic and international news, including FDA regulatory process developments, enforcement actions involving e-cigarettes, and proposed and enacted flavor bans in states and localities across the U.S., and (iii) encourages action against restrictions on e-cigarette sales, all while failing to accurately disclose the risks and harms associated with e-cigarette use.

226.   Through its YouTube outlet, Midwest Goods communicates with the public. Its YouTube channel includes over a hundred videos, many of which are not age-gated, and mostly promote e-cigarettes, including the now popular smart e-cigarettes that incorporate technologies such as digital screens, interactive notifications, games, and power level/usage indicators. Midwest Goods posted a video on October 29, 2024, that promotes the North Connect Pro disposable vape, featuring Bluetooth connectivity, a built-in speaker, 5% nicotine strength, three games, and over

---

[141] https://www.midwestgoods.com/tax-information/ (last visited Feb. 14, 2025).

15 downloadable apps, all with a e-liquid capacity of a staggering 40,000 puffs:[142]



227.   Midwest Goods has been particularly focused on becoming a major source of flavored e-cigarette for purchasers of the devices. These efforts have driven both Midwest Goods' success and the public's exposure to e-cigarette marketing.

228.   Through partnerships and exclusive master distribution agreements, Midwest Goods also creates the market for certain e-cigarettes. Midwest Goods is one of the U.S. global

---

[142]   *Formerly   at*   https://www.midwestgoods.com/north-connect-pro-40k-puffs-20ml-disposable-device-with-bluetooth-connections-engraved-grip-texture-display-of-5-msrp-25-00-each/ (last visited Jan. 10, 2025).

partners of flavored e-cigarette China-based manufacturer Geekvape.[143] On information and belief, as a U.S. global partner of Geekvape, Midwest Goods imports or causes to be imported from China Geekvape brand e-cigarettes for sale in the U.S. On information and belief, Geekvape does not have a presence in the U.S., making Midwest Goods the importer or first domestic distributor of Geek Bar products and hence the manufacturer for purposes of New York's Public Health Law § 1700 *et seq*.

229.    Midwest Goods helps create and directs the flavored e-cigarette market through digital marketing agreements to develop and implement marketing plans and programs for specific products. Midwest Goods has entered into digital marketing agreements with flavored e-cigarette brands Fifty Bar, Monster Vape, Coastal Clouds Co., and Shenzhen Woody Vapes Technology Co.  In this way, the marketing for each of these brands is controlled and executed by Midwest Goods.

230.    Midwest Goods also creates and fills the demand for certain e-cigarettes as the exclusive master distributor. On September 30, 2023, Midwest Goods entered into an Exclusive Master Distributor agreement with GT Wholesale, Inc., a New York-based wholesaler against which the City already has a pending action, and Aroma King US LLC, a manufacturer of disposable e-cigarettes which, *inter alia*, has a license to use the Bugatti luxury brand name. Under the terms of the agreement, Midwest Goods and GT Wholesale were the exclusive distributors of Bugatti-branded disposable e-cigarettes within the territory defined under the agreement. As exclusive distributors, they had the right to appoint sub-distributors within the territory and the

---

[143] https://us.geekvape.com/partners.html (last visited Feb. 6, 2025).

sole right to determine the sales price of the Bugatti e-cigarettes. They were contractually required to purchase the Bugatti-branded e-cigarettes solely from Aroma King, to maximize the sales of the product, to promote the interests of Aroma King and Bugatti-branded e-cigarettes, and to ensure adequate supply of the Bugatti e-cigarettes.

231.    As an exclusive master distributor of Bugatti-branded e-cigarettes, Midwest Goods marketed, sold, and shipped a substantial number of Bugatti disposable e-cigarettes to distributors and retailers in New York City during the Relevant Time Period—all while exclusively controlling the marketing, price, and availability of the products. On information and belief, Midwest Goods fulfilled and shipped no less than $167,000 worth of Bugatti disposable e-cigarettes between September 2023 and March 2024 alone into New York State:

  a.  On November 30, 2023, Midwest Goods fulfilled and shipped an order of Bugatti disposable e-cigarettes totaling $27,000 to GT Wholesale.

  b.  On March 8, 2024, Midwest Goods fulfilled and shipped an order of Bugatti disposable e-cigarettes totaling $11,200 to GT Wholesale.

  c.  In September 2023 and October 2023, Midwest Goods shipped four orders of Bugatti disposable e-cigarettes to Vape More, a New York distributor and retailer.

232.    Several of the flavored e-cigarette brands Midwest Goods previously or currently offers for sale on its website or prominently featured in its ejuice Magazine have received FDA warning letters, but Midwest Goods continues to profit from such sales. Based on Midwest Goods' website offerings, the overwhelming majority, if not all, of the e-cigarettes marketed and sold by Midwest Goods have not been authorized by the FDA to be marketed and sold in the U.S.

233.    Many of Midwest Goods' e-cigarettes have youth-appealing flavors, such as OG Tropical Blue, Strawberry Banana, Blue Razz Ice, Strawberry Watermelon, Frozen Peach, Pina

73

Colada, and Mix Berries, and, as noted above, integrate cutting-edge youth-attractive technologies.

234.    During the Relevant Time Period, Midwest Goods has sold and shipped into New York City some of the most popular e-cigarettes, including but not limited to disposable e-cigarettes brands Hyde, Geek Bar, Lost Mary, Raz, Mylé, Pod Juice, Esco Bar, Air Bar, and Elf Bar.

235.    Midwest Goods has intentionally and repeatedly marketed, sold, and shipped e-cigarettes into New York City throughout the Relevant Time Period, making millions of dollars in sales of e-cigarettes to distributors, wholesalers, and retailers located in New York City—none of whom could have been legally operating because of New York City's statutory and regulatory prohibitions.

236.    Between January 2021 and August 2024, Midwest Goods shipped orders totaling $11,258,790.86 to New York retailers, many of which are in New York City. On information and belief, most of the products shipped to New York retailers were e-cigarettes prohibited for sale under the PACT Act, New York State law, and other local laws.

237.    Between January 2021 and August 2024, Midwest Goods shipped orders totaling $35,924,407.36 to New York distributor, many of which are in New York City. On information and belief, most of the products shipped to New York distributors were e-cigarettes prohibited for sale under the PACT Act, New York State law, and other local laws.

238.    Midwest Goods has made a significant profit from its illegal New York City business.  During the Relevant Time Period, Midwest Goods shipped e-cigarettes to GT Import & Wholesale Inc., Kayla Wholesale, Pioneer Imports LLC, Urban Smoke Distributors, Vape More Inc., G&A Dist. Inc. I, and Mahant Krupa 56 LLC/Empire Smoke Distributors. Each of these

businesses is a current defendant in litigation commenced by the City regarding the illegal sale and shipment of e-cigarettes in violation of the PACT Act, N.Y. Pub. Health L. § 1399-*ll*, and the New York City Administrative Code § 17-715.[144] Midwest Goods routinely supplied illegally operating downstream entities for its own financial benefit—sales that exceed $16 million to these 7 illegally operating buyers alone:

    a.  Between 2022 and 2024, Midwest Goods sold and shipped products totaling $10,111,451.74 to GT Import & Wholesale Inc. alone, a defendant in the City suit.  On information and belief, most of the products Midwest Goods sold and shipped were e-cigarettes.

    b.  Between 2021 and 2024, Midwest Goods sold and shipped products totaling $3,929,616.65 to City-based Kayla Wholesale alone. On information and belief, most of the products Midwest Goods sold and shipped were e-cigarettes.

    c.  Between 2023 and 2024, Midwest Goods sold and shipped products totaling $1,029,319.00 to City-based Pioneer Imports LLC alone. On information and belief, most of the products Midwest Goods sold and shipped were e-cigarettes.

    d.  Between 2023 and 2024, Midwest Goods sold and shipped products totaling $288,694.49 to City-based Urban Smoke Distributors alone. On information and belief, most of the products Midwest Goods sold and shipped were e-cigarettes.

    e.  Between 2023 and 2024, Midwest Goods sold and shipped products totaling $447,305.00 to Vape More Inc. alone, a defendant in the City's suit. On information and belief, most of the products Midwest Goods sold and shipped were e-cigarettes. Midwest Goods' ongoing supply relationship with Vape More is especially troubling. On information and belief, Vape More's website, https://vapemoreinc.com/, advertises and sells e-cigarettes to the New York public. The website and Vape More's owner Sunny Chawla, were the subject of a February 27, 2024, warning letter from the FDA for offering for sale or distribution e-cigarettes that lacked an FDA marketing authorization order, including popular brands such as EBDesign (formerly Elf Bar), Funky

---

[144] GT Import & Wholesale Inc., Kayla Wholesale, Pioneer Imports LLC, Urban Smoke Distributors, Vape More Inc., Pioneer Distribution Inc., and G&A Dist. Inc. I are defendants in *The City of New York v. EnviroMD Group LLC*, *et al.*, Docket No. 24-cv-5161 (SDNY). *See* Second Amended Complaint, Doc. 61. On information and belief, Pioneer Imports LLC and Pioneer Distribution Inc. are the same or closely related entities as they have the same address. Mahant Krupa 56 LLC/Empire Smoke Distributors is a defendant in *The City of New York v. Magellan Technology, Inc., et al.*, Docket No. 23-cv-5880 (SDNY).

Republic, Hyde Edge, and Lost Mary.

f.  Between 2022 and 2024, Midwest Goods sold and shipped products totaling $282,382.50 to G&A Dist. Inc.  On information and belief, most of the products Midwest Goods sold and shipped were e-cigarettes.

g.  In 2022, Midwest Goods sold and shipped products totaling $123,047.31 to Mahant Krupa 56 LLC/Empire Smoke Distributors alone. On information and belief, most of the products Midwest Goods sold and shipped were e-cigarettes.

239.    Each of the City businesses supplied by Midwest Goods then sold or offered for sale the banned products to individual New York consumers or other unlawfully operating businesses.

240.    Midwest Goods utilized a rewards program to entice its customers to purchase more products. The program offered discounts based on the number of points accumulated. Points were earned for every $1 spent and could be redeemed for coupon codes or store credit:



241.    During the Relevant Time Period, Midwest Goods also purchased e-cigarettes from

Defendants MYLÉ Vapor, Pod Juice, Mi-One, and Safa Goods, and, upon information and belief, sold and shipped products purchased from those Defendants to their distributor, wholesale, and retail customers in New York City:

    a. On information and belief, Midwest Goods purchased e-cigarettes totaling $5,011,720 from Demand Vape, another defendant in a City suit, including popular disposable vape brands Hyde Edge, Raz, and Geek Bar Pulse in 2018, 2022, 2023, and 2024. On information and belief, Midwest Goods then sold a substantial number of those products into New York.

    b. On information and belief, during the period of 2019-2020 and 2022, Midwest Goods purchased Mylé branded disposable e-cigarettes, totaling $352,080 from Defendant Mylé. On information and belief, Midwest Goods then sold a substantial number of those products into New York City.

    c. On information and belief, during the period of 2018-2024, Midwest Goods purchased e-cigarettes totaling $8,512,217.75 from Defendant POD Juice, including the POD Juice partnership with Oxbar Magic Maze disposable e-cigarettes and the POD Juice partnership with Raz series of e-liquids. On information and belief, Midwest Goods then sold a substantial number of those products into New York City.

    d. On information and belief, between 2021-2022, Midwest Goods purchased e-cigarettes totaling $21,525 from Price Point Distributors, another defendant in a City suit. On information and belief, Midwest Goods then sold a substantial number of those products into New York City.

    e. On information and belief, between 2018-2023, Midwest Goods purchased e-cigarettes totaling $17,381,618.50 from Defendant Mi-One, including popular Disposable vape brands Elf Bar and Lost Mary. On information and belief, Midwest Goods then sold a substantial number of those products into New York City.

    f. On information and belief, between 2020-2023, Midwest Goods purchased e-cigarettes totaling $2,641,105 from Defendant Safa Goods, including popular Disposable vape brands Elf Bar, Lost Mary, and Puff Bar e-cigarettes. On information and belief, Midwest Goods then sold a substantial number of those products into New York City.

242. Like some of its best downstream customers, several of Midwest Goods' upstream distributors have received FDA warning letters for selling products without the required FDA

marketing authorization orders:

    a.    The FDA sent a warning letter to Daddy's Vapor Distro Inc. on November 6, 2024, for selling and/or distributing e-liquid products, specifically "MRKT PLCE ELIQUID" [sic] brand in blood orange tangoberry 100 mL and 3 mg, without the required marketing authorization order in violation of the FD&C Act.[145] In 2024, Midwest Goods purchased 35,540 units of MRKT PLCE ELIQUID at a total order cost of $207,615.00. Midwest Goods has sold and shipped MRKT PLCE e-liquid to at least one business in New York.

    b.    The FDA sent a warning letter to JBrands LLC on December 19, 2024, for manufacturing, offering for sale, and/or distributing celebrity boxer Tyson 2.0 Vape Round 2 brand e-cigarettes without the required FDA marketing authorization orders in violation of the FD&C Act.[146] Between 2023 and 2024, Midwest Goods purchased 183,540 units of Tyson 2.0 Vape Round 2 disposable e-cigarettes at a total order cost of $12,397,470.

    c.    The FDA also sent a warning letter to Fifty Bar on September 12, 2024, for manufacturing and offering for sale or distribution Fifty Bar e-cigarettes without the required FDA marketing authorization orders in violation of the FD&C.[147] Between 2023 and 2024, Midwest Goods purchased 13,420 units of Fifty Bar disposable e-cigarettes at a total order cost of $703,885.00.

243.    Midwest Goods knew or should have known long before these warning letters that the products sold by these suppliers were illegal. The FDA has publicly maintained a list of e-cigarettes authorized by the FDA. As of January 2024, there were only 23 e-cigarettes authorized by the FDA, none of which as of January 2024 were in a flavor other than tobacco, and none of

---

[145] Letter from John E. Verbeten, Dir., Off. of Compliance & Enforcement, Center for Tobacco Products, U.S. Food & Drug Admin., to Daddy's Vapor Distro Inc. (Nov. 6, 2024), *available at* https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/daddys-vapor-distro-inc-696036-11062024 (last visited Feb. 14, 2025).

[146] Letter from John E. Verbeten Dir., Off. of Compliance & Enforcement, Center for Tobacco Products, U.S. Food & Drug Admin., to JBrands LLC (Dec. 19, 2024), *available at* https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/jbrands-llc-698420-12192024 (last visited Feb. 14, 2025).

[147] Letter from John E. Verbeten Dir., Off. of Compliance & Enforcement, Center for Tobacco Products, U.S. Food & Drug Admin., to Beard Management Inc. d/b/a Beard Vape Co. d/b/a Lucky Bar Holdings, d/b/a Fifty Br (Sept. 12, 2024), *available at* https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/beard-management-inc-dba-beard-vape-co-dba-lucky-bar-holdings-dba-fifty-bar-692147-09122024 (last visited Feb. 14, 2025).

which was a disposable e-cigarette.

244.    Midwest Goods' shipments and sales of e-cigarettes to New York City distributors and wholesalers violate N.Y. Pub. Health L. § 1399-*ll*, which only permits shipments to licensed retailers, export warehouse proprietors or operators of a customs bonded warehouse, or the U.S. government. Such sales were also delivery sales as defined by the PACT Act.

245.    As a business that sells and ships e-cigarettes into New York City, Midwest Goods is required to file monthly reports of its shipments of e-cigarettes into New York City with New York City's tobacco administrators, documenting, *inter alia*, "the name, address, and phone number of the person delivering the shipment to the recipient on behalf of [Midwest Goods]."[148] Midwest Goods has never filed those reports.

246.    On information and belief, Midwest goods has repeatedly delivered e-cigarettes in quantities more than 10 pounds in a single shipment. For example, on August 2, 2022, Midwest Goods shipped 702 units of disposable e-cigarettes to a retailer located in Shirley, New York. The disposable e-cigarettes had various amounts of e-liquid, ranging from 1.8 mL to 14 mL. The order contained a total volume of approximately 5.09 liters or about 11.19 pounds of e-liquid alone, excluding the weight of the other component parts of each disposable vape.

247.    The FDA issued a warning letter to Midwest Goods on January 8, 2025, for selling and/or distributing e-liquid products that lacked the required FDA marketing authorization order in violation of the FD&C. The warning letter notified Midwest Goods that it is Midwest Goods' responsibility to ensure that the tobacco products they sell and/or distribute, and all related labeling

---

[148] 15 U.S.C. § 376(a)(2).

and/or advertising on any websites or other media comply with the FD&C Act and the FDA's implementing regulations.[149]

248.    Based on its wide offerings, including exclusive products, Midwest Goods purchases some of its e-cigarettes directly from China, and/or is the importer or first domestic distributor of e-cigarettes made abroad by manufacturers without a presence in the U.S., and as such was during the Relevant Time Period required, but failed to comply with the ingredient disclosure requirements of the Public Health Law throughout the Relevant Time Period.

249.    Midwest Goods has targeted adolescents throughout the Relevant Time Period by, *inter alia*, (i) controlling the marketing and distribution of brands through partnerships and marketing agreements to use flavors, bright colors, themes, and technologies that are deliberately designed to attract children, including fruity and candy flavors, (ii) selling disposable e-cigarettes, which are most accessible to adolescents by price and type, and (iii) utilizing social media outlets and online publications to market and reach customers with its false premise-that e-cigarettes are harmless fun when in fact they are dangerous and illegal.

250.    On information and belief, by its commercial conduct throughout the Relevant Time Period, Midwest Goods repeatedly violated the PACT Act by, *inter alia*, (i) shipping packages over the 10-pound legal weight limit; (ii) failing to maintain detailed records and/or submit all required reporting to New York City and other regulators, and (iii) illegally using the USPS to ship their flavored e-cigarette products.  During the Relevant Time Period, Midwest

---

[149] Letter from John E. Verbeten, Dir., Off. of Compliance & Enf't, Ctr. for Tobacco Prods., U.S. Food & Drug Admin., to Midwest Goods Inc., d/b/a Midwest Distribution and Midwest Distribution Illinois (Jan. 8, 2025), *available at*   https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/midwest-goods-inc-dba-midwest-distribution-and-midwest-distribution-illinois-696454-01082025 (last visited Feb. 10, 2025).

Goods has also repeatedly violated New York's Public Health Law, by, *inter alia*, (i) ignoring New York's complete retail ban on flavored e-cigarette products, (ii) failing to make any of the legally required disclosures concerning their products' harmful ingredients, (iii)  shipping their flavored e-cigarette products to their New York City customers, and (iv) using illegal discounts to maximize their reach and sales.

### C. Pod Juice – *A Manufacturer and Distributor of Highly Potent e-cigarettes*

251.    Pod Juice is a manufacturer and major distributor of e-cigarettes, including disposable e-cigarettes, and marketed, sold, and shipped a substantial number of e-cigarettes into New York City during the Relevant Time Period.

252.    Pod Juice's substantial sales into New York City include sales and shipments to e-cigarette distributors, wholesalers, retailers, and directly to New York City individuals throughout the Relevant Time Period.

253.    Some examples of Pod Juice's flavored products are:

   a.   Strawberry Jam

   b.   Orange Soda

   c.   Cotton Carnival

   d.   Loops, "a re-creation of your favorite childhood fruity cereal that will satisfy all of your sweet tooth cravings";[150] and

   e.   Pink Burst, which is infused with the essence of strawberry candy

254.    Currently, Pod Juice markets and sells its e-juice products by the bottle, for use in container style e-cigarettes, as well as pre-filled in Pod Juice branded and co-branded disposable

---

[150] https://provape.com/loops-pod-juice-tfn-salt-nic-e-juice-30ml.html

e-cigarettes.  To expand its market reach, Pod Juice manufactures and sells its own pre-filled disposable devices and allows other companies to pre-fill devices with Pod Juice's e-juice.

255.    From the outset, Pod Juice endeavored to market a high-potency product having high concentrations of nicotine, touting on its website that it "revolutionized the industry with the first-ever 55 mg smooth salt nic line for pod systems" and having "purposefully created a 55 mg nicotine line for people who want greater satisfaction."[151]  Pod Juice has so heavily invested in its 55 mg product, which is the equivalent concentration of 5.5% nicotine, that it has incorporated that product specification into its identity and website: *podjuice55.com*.

256.    By manufacturing e-juice with higher nicotine concentrations, Pod Juice became a major player in the industry, causing the sharp, recent increase in sales of e-cigarettes and disposable e-cigarettes having nicotine concentrations in excess of 5% nicotine.

257.    Beyond its especially high nicotine content, Pod Juice employs colorful displays, enticingly-named flavors, and youth-appealing imagery to sell its products.  Pod Juice's marketing of "Fruity Bears" e-juice exemplifies textbook methods of appealing to children and adolescents:

---

[151]          https://podjuice55.com/          (last          visited          Feb.          10,          2025); https://web.archive.org/web/20180818031355/https://podjuice55.com/ (last visited Feb. 10, 2025).



258.    Pod Juice entered the disposable e-cigarette industry after identifying the strong market trend away from re-fillable systems.  In 2019, to maintain a position in a highly competitive space, Pod Juice expanded its presence in the emerging market for disposable e-cigarettes by introducing its own line of disposable e-cigarettes, called "Instapod,"  touting the product on podjuice55.com as "the newest salt nic trend" in disposable e-cigarettes.[152]

259.    In that same 2019 website announcement, Pod Juice stressed disposable e-cigarettes' convenience, replaceability, and ease of concealment, describing their new disposable e-cigarettes as "extremely small and discreet," and adding that the consumer "can easily go out and use [the] disposable without attracting attention or having to carry something bulky around in your pocket."[153]

260.    Since the 2019 release of its branded disposable vape, Pod Juice has continuously

---

[152] https://podjuice55.com/blogs/news/disposables-the-newest-salt-nic-trend (last visited Feb. 14, 2025).

[153] *Id.*

sought to expand its market share by introducing other lines of its own branded disposable e-cigarettes, such as Podstick and Pod Pocket, as well as offering co-branded devices with other popular disposable vape manufacturers like Oxbar.

261.    Pod Juice's commitment to creating and growing the flavored e-cigarette market, and particularly disposable e-cigarettes, as well as maximizing its own sales, is evident from its website marketing materials, as well as Pod Juice marketing published on websites of other major distributors that carry its products. On its website, Pod Juice states, "Today, we continue to expand on our original offerings, consistently delivering the most delicious and innovative flavors in both disposable and bottled formats."[154]  Retail e-cigarette websites tout Pod Juice as having quickly gained momentum in the e-cigarette world, and as having "now expanded into disposables and freebase liquids, being one of the best-known USA based manufacturers around the world."[155]

262.    Since 2019, Pod Juice has regularly sold its e-juice, as well as Pod Juice-branded and co-branded disposable e-cigarettes into New York City and routinely shipped its products to New York City recipients.

263.    On information and belief, from 2019 through 2021, Pod Juice made its sales primarily through its website podjuice55.com. Throughout the Relevant Time Period, Pod Juice otherwise operated through the website JewelDistribution.com, maintained by Pod Juice and, upon information and belief, its successor entity Headway Funding Inc. d/b/a Jewel Distribution.

264.    Pod Juice also maintains direct relationships with major New York distributors, such as Demand Vape and Price Point, both of which are defendants in pending City actions.

---

[154] https://podjuice55.com/ (last visited Feb. 14, 2025).

[155] https://www.pricepointny.com/collections/pod-juice (last visited Feb. 10, 2025).

265.    Between 2021 and 2023, Pod Juice annually sold millions of dollars' worth of its products, including disposable e-cigarettes and/or flavored e-juices, into New York, as total sales rose from $4,398,359 in 2021 to $6,864,310 in 2023, including at least 83 transactions to wholesalers, distributors or retailers within the City worth $752,082.31 and 1800 transactions to individuals, totaling more than $28,270.75.  On information and belief, since January 2024, Pod Juice continues to operate some segment of its business through a fully controlled successor, Headway Funding Inc. d/b/a Jewel Distribution, selling e-cigarettes, including disposable e-cigarettes, into New York.

266.    Pod Juice has deliberately targeted the New York market, with Pod Juice representatives, including owner Mohammad Shubyre Humkar, making repeated trips into New York during the Relevant Time Period to meet with major distributors such as Demand Vape. These relationships have resulted in co-branded promotional campaigns to enhance Pod Juice's position in the New York e-cigarette market, often through bundling and discount offers that are in violation of New York law.

267.    For example, through its partnership with Demand Vape, Pod Juice entered exclusive, co-branded promotions, including starter bundles that included with the purchase of 30 bottles of flavored Pod Juice items such as trucker hats, t-shirts, lanyards, and other swag.  An image from one such promotion lays out the terms of this impermissible offer using bright, dazzling, saturated colors that are known to appeal to youth:



268.    In another example, Pod Juice entered an illegal discount promotion with Price Point, offering 25% off certain Pod Juice products.

269.    These are only two examples of Pod Juice both independently and in partnership with distributors offering illegal "buy X, get Y free," bundling, or discount deals to consumers in New York City.  On information and belief, these discounts and swag giveaways were a routine and ordinary part of Pod Juice's New York City-related business.

270.    Pod Juice's relentless work to increase its sales and market share in the e-cigarette world is evident in its corporate meeting minutes,:

    a.  In January 2018, Pod Juice resolved to launch new branding, increase sales, increase the number of sales representatives, and increase its presence at trade shows.

    b.  In January 2019, Pod Juice committed to reinvest half of six months' worth of its net profits into product and brand development to expand its business operation.

    c.  In July 2019, Pod Juice memorialized its plan to launch new e-liquid lines to appeal to a broader scope of demographics in both U.S. and foreign markets.

    d.  In January 2021, Pod Juice recorded its plan to hire new personnel to manage an influx of business activity from multiple markets.

    e.  In January 2022, Pod Juice was planning to employ even more personnel, including new sales representatives to increase brand awareness and an outside consultant to provide a strategy for increasing revenues.

271.    By January 2023, Pod Juice's minutes reveal that it was ready to collaborate with large distributors, brands, and manufacturers to grow its domestic presence.

272.    In July 2023, Pod Juice committed to purchase other brands to expand its portfolio, and to co-brand a new disposable e-cigarette with Oxbar in a joint effort to expand their market presence among U.S. consumers.

273.    Pod Juice has met its business goal—which is to reach the broadest possible audience with youth-attractive products and marketing materials, and profited from this plan, including from its New York City-based business.

274.    In the year 2020, Pod Juice sold $93,881.08 worth of e-cigarettes through its website podjuice55.com to New York consumers.  That same year, Pod Juice sold an additional $133,261-worth of e-cigarettes to New York through its distribution channel, bringing its total

New York sales for 2020 to $227,142.  In 2021, Pod Juice's combined New York sales through its distribution channel and direct sales to consumers through podjuice55.com grew to $4,398,359. Though Pod Juice discontinued direct sales to New York consumers through the website podjuice55.com in 2021, it flooded the state with its e-cigarettes through its distribution channel, with New York sales soaring to $5,436,763 in 2022 and $6,864,310 in 2023.

275.    Among other violations of law, Pod Juice has mailed e-cigarettes into New York City via the USPS through at least 780 mailings, in violation of the PACT Act.

276.    Pod Juice has also routinely made shipments of its e-juice and flavored e-cigarette products far in excess of the 10-pound weight limit imposed by the PACT Act, with single shipments weighing as much as 97 pounds.

277.    Pod Juice has flooded the market with its e-juices and disposable e-cigarettes, despite its full awareness that its products have not been approved by the FDA. On September 14, 2021, Pod Juice received a Marketing Denial Order from the FDA, denying approval to market a massive list of Pod Juice's flavored products.  Despite the denial, Pod Juice continued to sell the denied products, prompting the FDA to issue a second warning letter, dated January 7, 2022, notifying Pod Juice that it was manufacturing or offering for sale on its website podjuice55.com new tobacco products without FDA authorization, citing specifically products that were denied in the Marketing Denial Order.  Pod Juice was not deterred from its illegal commercial conduct.

278.    Pod Juice also received warning letters from the FDA dated December 15, 2021, and August 19, 2022, advising Pod Juice that it was in violation of the FD&C Act for selling e-cigarettes without premarket authorization on its website podjuice55.com.  The August 19, 2022, letter specifically references Pod Juice flavored e-juices Cotton Carnival Tobacco-Free Nicotine

Vape Juice by Pod Juice and Pink Burst Tobacco-Free Nicotine Vape Juice by Pod Juice.

279.    Despite the absence of FDA approval for any of its e-juices or other e-cigarette products, Pod Juice deceptively states on its website, podjuice55.com, that its "smooth and satisfying juice is always created and tested in an FDA-compliant, ISO laboratory in sunny LA," misleading readers to surmise that Pod Juice operates in compliance with FDA regulations.

280.    Pod Juice has targeted adolescents throughout the Relevant Time Period by, *inter alia*, (i) exclusively controlling the marketing of its branded and co-branded products, including disposable flavored e-cigarettes in fruit and candy flavors, bright colors, and with themes deliberately designed to attract children, and (ii) concentrating sales efforts on disposable e-cigarettes, which are most accessible to adolescents by price and type.

281.    Pod Juice repeatedly violated the PACT Act throughout the Relevant Time Period by, *inter alia*, (i) shipping packages many times over the 10-pound legal weight limit, (ii) failing to maintain detailed records and/or submit all required reporting to New York City and other regulators, and (iii) illegally using the USPS to ship their flavored e-cigarette products.  During Pod Juice has also repeatedly violated New York's Public Health Law, by, *inter alia*, (i) ignoring New York City's complete retail ban on flavored e-cigarette products, (ii) failing to make any of the legally required disclosures concerning their products' harmful ingredients, (iii)  shipping their flavored e-cigarette products to their New York City customers, (iv) selling swag, and (v) using illegal discounts to maximize their reach and sales.

### D.  Safa Goods – *A One-Stop Shop for Vape Sellers with a Nationwide Distribution Network*

282.    Safa Goods is a major e-cigarette distributor that has marketed, sold, and shipped a substantial number of e-cigarettes, including disposable e-cigarettes, into New York City during

the Relevant Time Period.

283.    Safa Goods' substantial sales into New York City include sales and shipments to e-cigarette distributors, wholesalers, and retailers throughout the Relevant Time Period.

284.    Safa Goods describes itself as "a national wholesale master distributor of e-cigarette products; e-cigarettes, cartridge and refill liquids including nicotine and liquids without nicotine."[156] Through strategies like partnering with Chinese manufacturers to distribute a host of disposable vape brands, Safa Goods quickly grew its distribution network and has demonstrated its success by opening branches in at least 25 states.

285.    A June 22, 2024, market analysis done by well-known international e-cigarette manufacturer Ecigator placed Safa Goods at number 6 of its list of the top 15 e-cigarette distributors in the U.S.  Safa Goods has secured a correspondingly leading role in New York's e-cigarette market as well.

286.    Specifically, in the period from 2020 through March of 2024, Safa Goods sold $14,412,821.61 worth of vapor products, including e-cigarettes, to New York distributors, wholesalers, and retailers.  The sales consisted almost exclusively of disposable e-cigarettes.

287.    In recent years, Safa Goods' New York sales of e-cigarettes have grown to millions of dollars per year, amounting to $4,475,331.5 in 2022, increasing to $8,039,930.75 in 2023.

288.    From January 2020 to March 2024, Safa Goods sold millions of dollars' worth of e-cigarettes to New York's largest wholesalers and distributors, including New York-based Magellan, to whom Safa Goods' sales amount to no less than $881,948.25, and to New York City-

---

[156] https://www.safagoods.com/about-us (last visited Feb. 14, 2025).

based Vape Plus Distribution, to whom Safa Goods' sales amounted to no less than $6,984,612.50. Particularly, between June 2022 and January 2024, Vape Plus purchased hundreds of e-cigarettes from Safa Goods, including the brands EB Design, Funky Republic, and Lost Mary.

289.    Safa Goods proudly advertises its status as a master distributor of popular disposable vape brands Lost Mary, Off-Stamp, Raz, and Viho. Some examples of products distributed by Safa Goods are:

    a.  Memers Blue Razz Ice Wukong V40000 5% Nic disposable e-cigarettes, containing up to 40,000 puffs

    b.  Off-Stamp Rocket Popsicle X-Cube 25K 5% Nic disposable vape Kit

    c.  Starbuzz Banana Cookie Super Max 15K 0.5% Nic disposable e-cigarettes

    d.  Fruitia x Fifty Bar Blueberry Pound Cake 20K 5% Nic disposable e-cigarettes

    e.  AirMez Banana Taffy Freeze X-Beats 40K 5% Nic disposable e-cigarettes

290.    Among the brands of e-cigarettes that Safa Goods sells into New York City flavors such as Orange Soda, Ice Cola, Caramel Popcorn, and Lemon Crumble are clearly designed to entice young people.

291.    In addition to alluring flavors, Safa Goods promotes disposable e-cigarettes to youth by displaying for sale on its website, safagoods.com, disposable e-cigarettes with features such as interactive touch screen displays, like the brand Yovo's space-themed "Starwalk 40K 5% Nic Disposable Vape," which boasts 40,000 puffs per unit and is lauded in the ad copy for its "convenience and portability."[157]

.

---

[157]    https://www.safagoods.com/product-details/yovo-starwalk-40k-5-nic-disposable-vapes-5pc?id=45510    (last visited Feb. 14, 2025).



292.    Flashy, youth-focused advertising on safagoods.com is shown by the banner ad for Safa Goods' product called the RAZ –LTX-, which comes in a 25,000-puff "Gush Edition" flavored e-cigarette and in alluring flavors, such as "Strawberry Peach Gush, "Blue RAZ Gush" and others, and advertising a "MEGA HD SCREEN" on the front of the devices:



293.    Regarding the "Raz" brand, in December 2023, Magellan assigned the trademark Raz (Serial numbers: 97725200, 97725208) to Raz Holdings LLC.  In the trademark assignment document, Haitham Shriteh, one of the founders of Safa Goods, is identified as the "Manager of RAZ Holdings LLC."  Accordingly, Safa Goods, through its principal, Haitham Shriteh, maintains control of Raz's marketing, development, and all aspects of its presence and success in the e-cigarette market, in New York and elsewhere. Despite becoming the trademark holder and

controlling the Raz brand, Safa Goods has not met its ingredient disclosure obligations.

294.    Safa Goods operates outside of the law deliberately.  Safa Goods received a warning letter from the FDA on October 5, 2023, advising the company that it was in violation of the FD&C Act for selling e-cigarettes without premarket authorization.  Safa Goods was undeterred.

295.    Safa Goods offers illegal incentive sales on its website, safagoods.com.  To cite but one example, in December 2024, safagoods.com advertised a Christmas sale offered by Memers Vape, of which Safa Goods is a master distributor, wherein customers were offered a "buy 5 get 1 free" deal on disposable e-cigarettes.

296.    Safa Goods has also violated the PACT Act by mailing e-cigarettes to New York City customers via the USPS. For example, on April 27, 2023, Safa Goods shipped via USPS Express $87,450.00-worth of flavored ENDS products to Vape Plus Distribution in Brooklyn, New York City.

297.    Safa Goods has also submitted PACT Act reports containing false or misleading information.  PACT Act reports submitted by Safa Goods repeatedly indicate a weight of "zero" for shipments of e-cigarettes in quantities ranging up to hundreds of units.  On information and belief, many of these shipments also violated the 10-pound weight limit on deliveries of e-cigarettes.  Safa Goods completed one such 500-unit shipment, containing a total capacity of 65,000 mL of e-juice within the e-cigarettes; this volume of liquid, assuming its weight is equivalent to that of water, weighs 143 pounds.

298.    Safa Goods has become a profitable distributor of e-cigarettes in New York City and the country in part by targeting adolescents during the Relevant Time Period by, *inter alia*, (i)

controlling the marketing of Raz branded and other products, including disposable e-cigarettes, as well as through the pervasive use of flavors, bright colors, and themes deliberately designed to attract children, including fruity and candy flavors, and (ii) concentrating its sales efforts on disposable e-cigarettes, which are most accessible to adolescents by price and type.

299.    Safa Goods repeatedly violated the PACT Act throughout the Relevant Time Period by, *inter alia*, (i) shipping packages over the 10-pound legal weight limit, (ii) failing to maintain detailed and correct records and/or submit all required reporting to New York City and other regulators, and (iii) illegally using the USPS to ship their flavored e-cigarette products.  During Safa Goods has also repeatedly violated New York's Public Health Law, by, *inter alia* (i) ignoring New York City's complete retail ban on flavored e-cigarette products, (ii)  shipping flavored e-cigarette products to their New York City customers, and (iii) failing to make any legally required disclosures concerning their products' harmful ingredients.

### E.  Mi-One – *A Brand, Distributor, and Conspiracist*

300.    Mi-One is a major distributor of its branded e-cigarettes, including disposable e-cigarettes, which marketed, sold, and shipped a substantial number of products into New York City during the Relevant Time Period.

301.    Mi-One's substantial sales into New York City include sales and shipments to e-cigarette distributors, wholesalers, retailers, and individual consumers throughout the Relevant Time Period.

302.    Some examples of Mi-One's enticing products are:

a.    Fcuking FAB Soda FASTA Burrst 35000, complete with 35,000 puffs and a flashy electronic screen casing

b.    Sour Lush Gummy OFF STAMP SW9000 Disposable

    c.  Rocket Pop Lost Mary MT15000 Turbo

    d.  Baja Slushie Fifty Bar 20K

    e.  Banana Taffy Freeze Geek Bar Pulse X 25k

303.    Mi-One markets and sells e-cigarettes primarily through its websites mipod.com and mipodwholesale.com.

304.    Mi-One holds itself out as the designer and manufacturer of its branded e-cigarettes, such as Mi-Pod, which are manufactured in China, making Mi-One the importer and first distributor of the products in the U.S.

305.    The e-cigarettes Mi-One sells into New York City come in flavors with tantalizing descriptions clearly designed to appeal to youth, such as Orange Soda, Iced Grape Bomb, Gummy Bear/Candy, Marshmallow/Cotton Candy, Strawberry Cake, and Melon Bubblegum, to name a few.

306.    Despite its position in the supply chain, Mi-One has failed to make any of the required ingredient disclosures to the NYSDOH regarding any of its e-cigarettes, including disposable e-cigarettes.

307.    To maximize its reach and manipulate its pricing, Mi-One offers illegal incentive deals, such as offers to get one free disposable vape with the purchase of five disposable e-cigarettes, holiday sales, and other "buy one, get one free" type- offerings for e-cigarette kits and disposable e-cigarettes. Mi-One maintains on its website mipod.com a page dedicated to "Daily Deals" on the products it sells, with offers like, "Save $10+ on Disposable 10 Packs" and "Save $30 on Orders over $200."

308.    Mi-One will sell to anyone who will buy its products. Indeed, Mi-One has sold e-

cigarettes directly to individuals in New York City, and has shipped close to $600,000 worth of e-cigarettes, including disposable e-cigarettes, e-juice, and e-cigarette pods, directly to residential addresses in New York during the Relevant Time Period.  Each and every one of those sales is illegal.

309.    Mi-One's illicit New York business has been lucrative.  Throughout the Relevant Time Period, Mi-One has sold into New York State well over a million dollars of e-cigarettes per year: $1,022,009.93 in 2020, $1,918,453.46 in 2021, $1,644,000.24 in 2022, and $1,649,599.30 in 2023, of which over 2000 transactions totaling at least $294,377.49 were to New York City addresses.

310.    Between January and March 2024, Mi-One sold at least $534,763.34 worth of e-cigarettes into New York.  In the period from January 2020 through March 2024, Mi-One sold $6,806,190.26 worth of e-cigarettes, including disposable e-cigarettes, e-juice, and replacement pods, to New York distributors, wholesalers, retailers, and directly to individuals, some of which, on information and belief, were to New York City customers.

311.    Mi-One has built its brand on appealing to certain sensibilities of style and fashion to attract new users.  On its website mipod.com, Mi-One boasts of the success of its strategy to sell "small" disposable e-cigarettes as a fashion statement: "Mi-Pods" became a fashion statement, setting a trend for small, stylish devices in over 60 countries.  Thes marketing strategy of promoting a small, concealable yet fashionable device further evidence a design to appeal to youth, particularly early teens or pre-teens who place a premium on appearing cool while hiding "adults only" behaviors from parents and authority figures.

312.    Mi-One's strategy of appealing to youth through fashion and style is borne out by

the reaction of media tastemakers.  A 2018 article in *Forbes*, entitled, "Smoking Vapor's MiPod Is A Solid, Hip Vape That Transcends My Outdated Lingo," elucidates how Mi-One captivates youth in the context of one of their earlier, refillable vaporizers by glamorizing a lifestyle that appeals to most teens:[158] The same *Forbes* article declares that the Mi-One device's features are "as hip as the raddest broheim."

313.    Mi-One reinforces the appeal to stylishness and concealability of its signature devices on its website mipodsvape.com:[159]

> Providing a flavorful, smooth hit and a convenience you'll find in no other device, the Mi-Pod blends advanced technology with fashion-forward style to give you the best hit on the market. The Mi-Pod is small and discreet, emitting small clouds that allow you to vape in peace and help reduce the stigma associated with e-cigarettes.

314.    Mi-One's strategy to appeal to youth through fashion and peer pressure propelled the company to great financial success.  On August 13, 2023, Mi-One bragged about its success on its website mipodwholesale.com, "Mi-One Brands is proud to announce that it has earned a spot on the esteemed *Inc.* 5000 list for the seventh time, achieving an all-time best ranking of 600. The *Inc.* 5000 list ranks the fastest growing private businesses in the US."[160]

315.    Mi-One deliberately operates its business selling unapproved products, notwithstanding having received an FDA Warning Letter in October 2018, for potentially importing new finished tobacco products and e-liquids without premarket authorization.  Mi-One

---

[158] https://www.forbes.com/sites/curtissilver/2018/04/20/smoking-vapors-mipod-is-a-solid-hip-vape-that-transcends-my-outdated-lingo/ (last visited Feb. 14, 2025).

[159] https://mipodsvape.com/our-story/ (last visited Feb. 14, 2025).

[160] https://mipodwholesale.com/blogs/news/mi-one-brands-makes-inc-5000-for-seventh-time (last visited Feb. 14, 2025).

received yet another FDA Warning Letter in December 2022, for manufacturing and offering for sale or distribution ENDS products without a marketing authorization order, in violation of the FD&C Act.

316.    Mi-One markets and sells e-cigarettes without FDA approval and has also engaged in a disinformation campaign to create a false sense of legitimacy around its products.

317.    In a Reddit post by Mi-One founders Geoff Habicht & Amir Hakak, knowing that none of their e-cigarettes have received premarket approval from the FDA, misleadingly state that "ALL of our products are legally marketed in line with the current FDA rules, regulations and guidelines."

318.    In that same post, the Mi-One founders advanced conspiracy theories to divert attention from the fact that their e-cigarettes are illegal.  Their theories include the baseless assertion that state governments were motivated to crush e-cigarette use out of a bid to bolster combustible tobacco revenues, to increase the payments required under the MSA. The Mi-One founders also alleged that "big pharma" was engaged in a lobbying campaign to present false information about e-cigarette use to protect their interests in smoking cessation remedies, a conceptual recognition by Mi-One of the addictiveness of nicotine.

319.    Mi-One consistently relies on disinformation and conspiracy theories to mislead consumers about the dangers of e-cigarette use.  In a blog post available on Mi-One's website mipod.com, dated November 13, 2019, and titled "The Truth About the Vaping Epidemic – Governments Dirty Little Secrets Revealed," a Mi-One marketing manager advances the same conspiracy theory that state governments were working in league with big tobacco to prop up sales of combustible tobacco products, thus serving the states' interests in the MSA.  This post features

a YouTube video elaborating this conspiracy theory, produced by a group deceptively calling itself the Consumer Advocates for Smoke-Free Alternatives Association.

320.    By perpetuating false conspiracies and through other statements, Mi-One has affirmatively overstated the benefits of e-cigarette use while downplaying, even concealing, the truth about the danger and toxicity of its e-cigarettes.

321.    Mi-One regularly promotes its brand and e-cigarette use in general on social media outlets, such as Facebook and Instagram, by posting articles and videos suggesting without any basis and deceptively that e-cigarette use is safe, benefits smoking cessation and reduces overall combustible cigarette use.  Prominent among these social media postings are videos and articles critical of FDA regulation of e-cigarette use and arguing that the regulatory environment for e-cigarette use is misguided.

322.    Mi-One also  uses social media to penetrate the youth market through influencers. One such influencer on Instagram is BuffaloJuiceGirl, who posts to her followers alluring selfies with Mi-Pod devices.  On information and belief, Mi-One benefits from this influencer's Mi-One marketing content:



323.    Mi-One also promotes discount offers through its social media presence, such as a 50% -off sales on various ENDS products it offered for "Black Friday" in November 2024.



324.    Mi-One also routinely violates other laws, including the PACT Act by using the USPS to ship e-cigarettes into New York City.  Mi-One's PACT Act report filed with the State of New York for December 2021 shows that Mi-One e-cigarettes were mailed via USPS to multiple

individual consumers in New York, of which at least 839 of the USPS mailing were to New York City addresses.

325.    Mi-One has also submitted PACT Act reports containing false or misleading information, repeatedly reporting shipments of e-cigarettes, even those containing multiple units, as having no weight and entering zeros into every cell calling for total weight over volume.  On information and belief, Mi-One routinely shipped in excess of the PACT Act's 10-pound limit.

326.    To become a profitable brand and distributor of e-cigarettes in New York City and the country, Mi-One targeted adolescents throughout the Relevant Time Period by, *inter alia*, (i) exclusively controlling its marketing of its branded products, including disposable e-cigarettes, as well as the broad use of flavors, including fruity and candy flavors, bright colors, and stylish themes intended to attract adolescents, (ii) concentrating its sales efforts on disposable e-cigarettes, which are most accessible to adolescents by price and type, and (iii) utilizing social media and other outlets to market and reach underage customers with the false premise that e-cigarettes are harmless fun when in fact they are dangerous and illegal.

327.    Mi-One repeatedly violated the PACT Act throughout the Relevant Time Period by, *inter alia*, (i) shipping packages over the 10-pound legal weight limit, (ii) failing to maintain detailed and correct records and/or submit all required reporting to New York City and other regulators, and (iii) illegally using the USPS to ship their flavored e-cigarette products.  During the relevant Time period, Mi-One has also repeatedly violated New York's Public Health Law, by, *inter alia*, (i) ignoring New York City's complete ban on flavored e-cigarette products, (ii) shipping flavored e-cigarette products to their New York City customers, (iii) using illegal discounts to maximize their reach and sales; and (iv) failing to make any of the legally required

disclosures concerning their products' harmful ingredients.

**F. Mylé –** *A Favored Brand and Distributor with Swag*

328.    MVH I is the owner of the word-mark trademark, MYLÉ, in the category of tobacco, smokers' articles, matches, and a family of marks consisting of or incorporating the term "MYLÉ" and/or its distinctive black and white design.

329.    Mylé Vape (*a.k.a.,* Myle Vape Inc.), which sometimes does business as Mylé Vapor Inc., is the operating entity that distributes disposable e-cigarettes bearing the Mylé brand on behalf of MVH I. Also, Mylé Vape is the owner of the word-mark trademarks, MYLÉ and MYLE, in the category of apparel, accessories, and other swag.

330.    Mylé Vape has also owned and operated the Mylé main website, Mylévape.com for a substantial segment of the Relevant Time Period.

331.    Accordingly, MVH I and Mylé Vape (together, the "MYLÉ Defendants") are affiliates that operate a common enterprise to sell MYLÉ brand disposable e-cigarettes to distributors, wholesalers, retailers, and/or individual consumers in New York City.

332.    The MYLÉ Defendants are a major distributor of their branded e-cigarettes, including disposable e-cigarettes, and marketed, sold, and shipped a substantial number of products into New York City during the Relevant Time Period.

333.    The MYLÉ Defendants' substantial sales into New York City include sales and shipments to e-cigarette distributors, wholesalers, and retailers throughout the Relevant Time Period.

334.    In 2020, MYLÉ sold into New York $37,836,544.59 worth of e-cigarettes, consisting almost entirely of disposable e-cigarettes. In the ensuing years, MYLÉ continued to

sell into New York millions of dollars' worth of e-cigarettes per year, with 2021 seeing $38,015,205.00 in sales, 2022, $16,076,419.21, 2023, $5,952,521.50, and at least $2,165,275.00 in the first ten months of 2024. Again, the vast majority of these sales consisted of prohibited disposable e-cigarettes. Significant numbers of these sales were to City addresses, especially in Brooklyn.

335.    Some examples of MYLÉ's popular products are:

    a.  MYLÉ Slim Lush Ice Disposable Device

    b.  MYLÉ Strawberry Mango Ice Mini Disposable Device

    c.  MYLÉ Iced Quad Berry Nano Disposable Device

    d.  MYLÉ Iced Watermelon Nano Disposable Device

    e.  MYLÉ Strawberry Banana Mini Disposable Device

336.    Mylé's products are manufactured in Dubai, U.A.E. Mylé is therefore the importer and first domestic distributor. However, despite this crucial and lucrative position in the supply chain, Mylé has failed to make any of the required ingredient disclosures to the NYSDOH.

337.    Mylé, on its website Mylévapor.com, describes its Mini disposables as "[f]illed with flavor...easy to use" and "with no complicated buttons or settings." It also touts this disposable product's high "5% nicotine level in each pod," so that the consumer's "cravings will be satisfied," and also describe it as "[w]eightless, disposable, [and] pocket-sized." In these ways and others, Mylé markets its products as ready-to-use and concealable—factors that appeal most to adolescents.

338.    Mylé's website, Mylévape.com, represents that Mylé is an industry world leader

and falsely markets its products as "safe" in its "About" section:[161]

> Through the development of modern vaping device technology combined with scientifically based e-liquid formulas, MYLÉ has achieved their goal in becoming a world leader in the e-cigarette industry....[Mylé is] [r]ecognized as one of the fastest growing safe and affordable nicotine delivery systems worldwide [and] has set the global market standard in providing consumers with a premium vaping experience through modern design and technology.

339.    Ariel Gorelik, founder and CEO of Mylé, has been quoted as saying that the company "invests heavily in the US market," and on information and belief, Mylé invests heavily in the New York market for e-cigarettes.

340.    Despite the fact that most of the e-cigarettes that Mylé sells have not received premarket authorization from the FDA, Mr. Gorelik deceptively stated that Mylé makes sure that its "devices are in compliance with FDA regulations."[162]

341.    Mr. Gorelik could not have been more wrong.  To the contrary, Mylé had received an FDA warning letter, dated October 12, 2018, advising that Mylé was improperly selling new finished tobacco products including, but not limited to, Mylé Devices, Mylé Pods, and Mylé Starter Kits without premarket authorization.

342.    Mylé received a second FDA warning letter, dated July 20, 2020, advising it that the FDA's "review of the website https://www.Mylévapor.com revealed that [Mylé] manufacture[s] and offer[s] for sale or distribution to customers in the United States the following

---

[161] https://www.mylevape.com/about/ (last visited Feb. 14, 2025).

[162] *Id.*

ENDS products without a marketing authorization order":[163]

    a.  Mylé Mini – Iced Lychee Disposable Device,

    b.  Mylé Mini – Lemon Mint Disposable Device,

    c.  Mylé Mini – Peach Disposable Device,

    d.  Mylé Mini – Pink Lemonade Disposable Device,

    e.  Mylé Mini 2 – Cubano Disposable Device,

    f.  Mylé Mini 2 – Iced Apple Mango Disposable Device,

    g.  Mylé Mini 2 – Iced Watermelon Disposable Device,

    h.  Mylé Mini 2 – Menthol Disposable Device,

    i.  Mylé Mini 2 – Peach Disposable Device, and

    j.  Mylé Mini 2 – Red Apple Disposable Device.

The FDA noted that this list was not comprehensive, but rather "for example," and thus did not represent all the violative products that were offered for sale on the website.

343.    Nonetheless, Mylé persists in marketing and selling these very products on its website, including under this colorful and fruit-focused banner, including in flavors that the FDA specifically warned them to stop selling:[164, 165]

---

[163]    https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/myle-vape-inc-608630-07202020 (last visited Feb. 14, 2025).

[164] https://www.mylevape.com/product-tag/mini/page/2/ (last visited Feb. 4, 2025).

[165] https://www.mylevape.com/product/myle-mini-iced-lychee-disposable-device/ (currently selling "Mylé Mini – Iced Lychee Disposable Device," *see supra* ¶ 345(a) (last visited Feb. 4, 2025).



344.    Mylé had also previously received an FDA warning letter dated October 12, 2018, advising that Mylé was improperly selling new finished tobacco products including, but not limited to, Mylé Devices, Mylé Pods, and Mylé Starter Kits without premarket authorization. Despite knowing that Mylé had been advised by the FDA that it was marketing products in violation of the FD&C Act twice, Mr. Gorelik doubled down on his misrepresentations in October 2022, stating that, "This means [Mylé's] retail partners can confidently sell MYLÉ products in store."

345.    Mylé currently markets and sells other illegal disposable e-cigarettes, available in such flavors as Strawberry Keys, Lush Ice, Frozen Peach, Royal Mango, and Magic Moon, that sport an ultra-sleek design, complete with an LED digital screen, providing "instant access to real-time information," up to 5% nicotine concentration, and 20,000 puffs.  The ad copy for this product invites users to "[a]djust the airflow to your liking with precision Touch Control, ensuring each puff is just the way you like it."[166]

---

[166] https://www.mylevape.com/product/strawberry-keys-myle-turbo-disposable-device/ (last visited Feb. 19, 2025).



346.    Indeed, Mylé products are sold in New York City retail establishments, which is evident from internet reviews and influencers promoting such sales on social media platforms. Publicly available photos on social media and review websites show MYLÉ products in New York City e-cigarette shops, including one in Brooklyn which was captured displaying Mylé e-cigarettes in a Yelp post in February 2023:[167]

---

[167] https://www.yelp.com/biz/bath-vape-and-tobacco-brooklyn (last visited Feb. 14, 2025) (red highlights added).



347.    Contrary to New York's Public Health Law prohibition on promotional events, on September 2022, Mylé ran a booth promoting its e-cigarette products at the Rolling Loud NYC hip hop festival at Citi Field in Queens, New York.

348.    To expand its reach, Mylé uses other marketing avenues that target underage users. Social media influencers have made posts promoting Mylé from New York City events, like Rolling Loud and others:

108





349.    Mylé also markets and sells branded apparel and accessories, including hats, t-shirts, and backpacks, none of which are legal under New York law.

350.    Mylé displays for sale on its website https://www.mylevape.com/product-

tag/apparel/ branded items of apparel such as lanyards, backpacks, shirts, and caps:



351.    Mylé has maximized its sales through relationships with multiple distributors that ship within and to New York, including Price Point, as well as other New York retailers, like VapeDeal and APVapeShop.  Within the period of 2019-2020 and 2022, Mylé also sold Midwest Goods $224,060 worth of Mylé's branded disposable e-cigarettes.  On information and belief, Midwest Goods then sold a substantial number of Mylé's disposable e-cigarettes into New York City.

352.    Mylé sales data shows that the company has repeatedly made bulk shipments of e-cigarettes and other vapor products to customers in New York City throughout the Relevant Time Period.  Among these are shipments containing tens of thousands of units worth hundreds of thousands of dollars.  For example, an invoice, dated February 17, 2023, shows that Mylé shipped to Price Point in Farmingdale, New York, 40,000 units of Iced Mint-flavored Mylé Mini disposable kits for a total of $200,000.00.  On information and belief, each of these kits comes in a box containing two disposable vape devices filled with e-juice containing 50mg of nicotine.  Those shipments violated the 10-pound weight restriction imposed by the PACT Act.

353.    In addition to becoming a profitable brand and distributor of e-cigarettes in New York City and the country, Mylé has targeted adolescents throughout the Relevant Time Period by, *inter alia*, (i) exclusively controlling its marketing of its branded products, including disposable e-cigarettes, as well as through the pervasive use of flavors, including fruity and candy flavors, bright colors, and stylish themes that are deliberately designed to attract adolescents, (ii) concentrating its sales efforts on disposable e-cigarettes, which are most accessible to adolescents by price and type, and (iii) utilizing social media to market and reach underage customers with the false premise-that e-cigarettes are harmless fun when in fact they are dangerous and illegal.

354.    Throughout the Relevant Time Period, Mylé repeatedly violated the PACT Act by, *inter alia*, (i) shipping packages far in excess of the 10-pound legal weight limit, and (ii) failing to maintain detailed and correct records submitted to New York City and other regulators.  Mylé has also repeatedly violated New York's Public Health Law, by, *inter alia*, (i) ignoring New York City's complete ban on flavored e-cigarette products, (ii) shipping flavored e-cigarette products to New York City customers, (iii) selling swag and using live events to promote their e-cigarette brand, and (iv) failing to make any of the legally required disclosures concerning their products' harmful ingredients.

### G.  The Relationship Among Defendants

355.    Defendants commonly sell and purchase e-cigarette products among themselves to establish an overlapping inventory of various e-cigarettes, brands, and flavors to satisfy customer demands by a single supplier.  For example, Defendant Midwest Goods purchases e-cigarette products from Defendants, Mi-One, Safa Goods, and Pod Juice.

356.    This interrelationship between Defendants underscores their collective control over

the New York market and coordination to ensure that they are each profiting in this saturated market.  It also demonstrates how each Defendant has made a direct and indirect contribution to the nuisance given each Defendant's unique posture or offerings.

**IV.    THE PRICE PAID BY THE CITY:  DEFENDANTS' FLAVORED E-CIGARETTES HAVE HARMED NEW YORK CITY AND WILL CONTINUE TO DO SO IF UNABATED.**

357.    The influx of e-cigarettes into New York City is a significant threat to public health and safety.  The City has passed laws to protect against injury to the public health, relied on federal and New York State regulations and laws, and acted swiftly to quell the harm evolving out of the e-cigarette crisis.  But by the conduct described in detail above, Defendants undermine those efforts and affirmatively harm New Yorkers by creating and perpetuating a misapprehension around the safety of  e-cigarettes and marketing their products to entice New York City youth to begin and continue e-cigarette use.  E-cigarette use in turn increases the risk of illness caused both by the flavored e-cigarettes themselves and separately increases the likelihood of use of combustible cigarettes with all the accompanying harms associated with those products.[168]

> **A. Too Many New York Teens Are Vaping Today Because of the Defendants-Controlled Market for disposable e-cigarettes, Despite a Steep Decline in the Use of Tobacco Products.**

358.    As discussed above, rates of youth smoking combustible cigarettes in New York fell dramatically following various public health efforts.  According to the NYSDOH, the rate of cigarette use among middle and high school students dropped to extraordinarily low levels between 2000 and 2014:

---

[168] https://tobaccocontrol.bmj.com/content/26/e2/e106 (last visited Feb. 10, 2025).



Percentage of Current Smokers among Middle and High School Students

| | 2000 | 2002 | 2004 | 2006 | 2008 | 2010 | 2012 | 2014 |
|---|---|---|---|---|---|---|---|---|
| Middle School | 10.2% | 6.1% | 5.1% | 4.0% | 3.4% | 3.2% | 3.1% | 1.2% |
| High School | 27.1% | 20.4% | 18.5% | 16.3% | 14.6% | 12.6% | 11.9% | 7.3% |

359.    That fall in tobacco product use was reversed by the emergence of e-cigarettes. Between 2014, when e-cigarette use among high school students was first measured in New York, to 2018, tobacco product use among high school students increased by 57%. That increase in tobacco product use was caused entirely by  e-cigarette use, which more than doubled from 10.5% to 27.4% of students during the 4-year period.



Trends in Any Tobacco Product Use[2] among High School Students in NYS, NY-YTS 2000-2022

| | 2000 | 2002 | 2004 | 2006 | 2008 | 2010 | 2012 | 2014 | 2016 | 2018 | 2020 | 2022 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Any Tobacco Products | 33.6% | 26.2% | 24.3% | 21.8% | 22.8% | 21.2% | 21.8% | 19.5% | 25.4% | 30.6% | 25.6% | 20.8% |
| Cigarettes | 27.1% | 20.4% | 18.5% | 16.3% | 14.7% | 12.6% | 11.9% | 7.3% | 4.3% | 4.8% | 2.4% | 2.1% |
| E-Cigarettes | n/a | n/a | n/a | n/a | n/a | n/a | n/a | 10.5% | 20.6% | 27.4% | 22.5% | 18.7% |
| Other Tobacco Products | 18.1% | 14.6% | 13.0% | 11.0% | 15.0% | 14.8% | 16.8% | 12.0% | 10.6% | 9.2% | 6.1% | 3.5% |

113

360.    While the rate of combustible cigarette use continued its decline through 2022, the rate of use for any nicotine-containing products shot up to approximately 10 times the usage rate of traditional cigarettes, attributable primarily to e-cigarettes. At every grade level within high school, e-cigarette use exploded from 2014 to 2018 and beyond:



**Current Electronic Cigarette Use Among High School Youth by Grade Level, NYS-YTS 2014-2018**

361.    By 2022, New York rates of high school tobacco use even as to e-cigarettes fell slightly but remained unacceptably high.  By then, New York was able to lower overall tobacco use to *1 in 5 high school students*, which based on enrollment in the 2022-2023 school year would equate to approximately 150,000 New Yorkers,[169] with the vast majority choosing e-cigarettes over other nicotine options.  Although that rate demonstrates a year over year improvement since 2018, New York's 2022 youth e-cigarette use rate exceeds the national average, demonstrating the outsized effect of the flavored vapor product industry's hold on New York youth.[170]

---

[169] https://data.nysed.gov/enrollment.php?year=2023&state=yes (last visited Feb. 14, 2025).

[170] https://publichealthlawcenter.org/sites/default/files/resources/NYS-Flavored-Tobacco-Brief.pdf (last visited Feb. 10, 2025) ("In 2022, 18.7% of New York State high school-aged children reported vaping as compared to 14.1%

362.    The rise in the rates of e-cigarette use by middle and high school users in New York City should be of no surprise to Defendants.  Based on data available to the City to date, the median distance from a middle or high school to certain Defendants' customers was just 0.75 miles, making their products too easily accessible within walking distance of our public schools.

363.    These numbers do not represent casual use, nor are they skewed by a large number of single use instances.  Rather, "[d]isturbingly, … a growing percentage of America's youth who use e-cigarettes have become frequent e-cigarette users (defined as reporting use on 20 days or more of the prior 30-day period)."[171]    That frequent use, coupled with the high nicotine concentrations in these products is likely to result in long-term nicotine addiction in high school students who use e-cigarettes.[172]

364.    There is substantial scientific evidence that the use of e-cigarettes increases the risk of ever using combustible tobacco cigarettes among youth and young adults.[173]  While combustible cigarette smoking is at an all-time low,[174] combustible cigarettes  remain the leading preventable cause of death and disease in the U.S.—more than 16 million Americans are living with a smoking-related disease[175] and approximately  8,000 New Yorkers die of smoking-related cancer each

---

nationally.").

[171] USDHHS, FDA, & CTP, *supra* n.17.

[172] Neal L. Benowitz, *Nicotine Addiction*, N Engl J Med, June 17, 2010 ("The risk of [nicotine] dependence increases when smoking begins early. Studies of the developing brain in animals suggest that nicotine can induce permanent changes that lead to addiction. Brain changes in adolescent rats exposed to nicotine are greater than those in exposed adult rats. Adolescent rats that have been exposed to nicotine have higher rates of nicotine self-administration as adults, which is consistent with the idea that early exposure to nicotine increases the severity of dependence.").

[173] USDHHS, FDA, & CTP, *supra* n.17.

[174] https://news.gallup.com/poll/648521/cigarette-smoking-rate-ties-year-low.aspx, (last visited Feb. 4, 2025).

[175]  https://archive.cdc.gov/#/details?url=https://www.cdc.gov/tobacco/data_statistics/fact_sheets/fast_facts/diseases-and-death.html, (last visited Feb. 4, 2025); CDC, *State Fact Sheets* (Feb. 14, 2023), https://rb.gy/pau8fu (last visited Feb. 4, 2025).

year.[176]  The increasing number of adolescents using e-cigarette may well increase the number of future smokers of combustible cigarettes, perpetuating the long-standing, well-known public health harms caused by traditional cigarettes.

365.    On information and belief, the reduction in teen usage of e-cigarettes between 2018 and 2022 is largely due to public health efforts by New York City and State.[177]  Defendants' commercial and marketing conduct and control over the vast majority of e-cigarettes flowing into New York City is responsible for the rise in persistent users and new young users of those products from 2022 through today.

### B. Defendants' Disposable E-cigarettes Are Negatively Affecting New York City Adolescents' Health and Wellbeing.

366.    Nicotine and its effects and harms are known to be magnified in adolescents because they are simply more vulnerable to its effects than adults.[178]  Young people report symptoms of dependence or addiction after exposure to even low levels of nicotine, and the consequences of Defendants' commercial successes include avoidable and substantial increases in health risks to youth:

    a.  interference with cognitive development, executive functioning, inhibitory control,

    b.  disturbances in working memory and attention,

---

[176]  https://www.health.ny.gov/statistics/diseases/cancer/docs/tobacco_related_cancers_report_2016-2020.pdf   (last visited Feb. 14, 2025).

[177]  https://www.publichealthlawcenter.org/sites/default/files/resources/NYS-Flavor-Bans.pdf (last visited Feb. 10, 2025) ("Comprehensive flavor bans on tobacco products in the U.S. and Canada have been successful in reducing smoking rates and saving lives.").

[178]  https://pmc.ncbi.nlm.nih.gov/articles/PMC3543069/ (last visited Feb. 10, 2025); *see also* https://pmc.ncbi.nlm.nih.gov/articles/PMC4560573/ (last visited Feb. 10, 2025) ("[A]dolescence is a sensitive period for maturation of brain circuits that regulate cognition and emotion, with resulting vulnerability to the effects of nicotine and tobacco.").

c.  nicotine toxicity, which may bring about headaches, abdominal pain, nausea, vomiting, heart palpitations, hand tremors, or in extreme cases, seizures or cardiac arrhythmia,

d.  respiratory health issues, including increased incidence of respiratory disease, and lung inflammation,

e.  poor cardiovascular health, including arterial stiffness, impaired blood vessel function, and increased blood pressure and heart rate,

f.  increased susceptibility to oral infections,

g.  development of mental and behavioral problems such as major depressive disorder, agoraphobia, panic disorder, addiction to other substances, antisocial personality disorder, or academic problems,

h.  development of psychiatric disorders and cognitive impairment in later life,

i.  higher rates of wheezing and coughs,

j.  facial and limb burns due to a malfunction of a vapor product,

k.  prevalence of asthma, and

l.  increased susceptibility to pulmonary (lung) infections.

367.   For those New York City high schoolers who are already using e-cigarettes, lifelong harm is already done: "Chronic nicotine exposure during adolescence produces alterations in neurochemistry and behavior that differ markedly from those in adulthood."[179]

368.   It is known that chronic nicotine exposure during adolescence causes long-lasting alterations in neurochemistry and behavior.[180]  "[M]ore recent studies have indicated that even brief exposure to a low dose of nicotine can produce lasting change in the adolescent brain," but the vast majority of Defendants' products carry extraordinarily high concentrations of nicotine, and they have failed to disclose, or actively conceal, whatever other potentially hazardous

---

[179] https://pmc.ncbi.nlm.nih.gov/articles/PMC4560573/ (last visited Feb. 10, 2025).

[180] *Id.*

compounds are being inhaled through their products

369.    Even certain Defendants' zero-nicotine e-cigarettes cause serious harm, such as mouth and airway irritation, inflammation, cell toxicity, chemical side effects, serious respiratory illnesses, and increased risk of smoking combustible cigarettes.

370.    Each of Defendants' e-cigarettes, particularly the most popular products, i.e., disposable e-cigarettes, are also hazardous to non-users. Between April 1, 2022, and March 31, 2023, the CDC found that 7,043 e-cigarette exposure cases were reported to the National Poison Data System.[181] That data showed a 32% increase in reported poisoning from e-liquid ingestion during this one-year period, with nearly 90% of the cases involving children younger than five years old. A brand that was among the most reported as involved in these incidents was "Elf Bar," a disposable vape available in a variety of flavors and sold by Price Point, the DEMAND Defendants, Happy Distro, and Midwest Goods.

371.    Accordingly, every young New Yorker is made less safe and has an increased risk of these physical and mental health injuries because of each Defendant's commercial conduct relating to its own products and their collective control over the marketing and sales of e-cigarettes, particularly disposable e-cigarettes, in New York City.

### C. Defendants Must Abate the Harm They Have Caused, Contributed to, or Maintained.

372.    As described above, New York State and City have enacted a sweeping set of laws and has become a national leader in tobacco and nicotine control policy.  The purpose of New York's comprehensive suite of laws is stated as follows by the NYSDOH:

---

[181] Karen A. Cullen et al., *e-Cigarette Use Among Youth in the United States*, 2019, JAMA, Nov. 5, 2019, 322(21), at 2095, *available at* https://jamanetwork.com/journals/jama/fullarticle/2755265 (last visited Feb. 5, 2025).

> The state's strong and effective laws and regulations protect youth from deadly nicotine addiction by reducing access to tobacco and vaping products; protect New Yorkers from exposure to dangerous secondhand cigarette smoke and e-cigarette aerosol; and hold tobacco and vapor product manufacturers to transparency…. The relevant provisions are designed to provide additional protection, together with NY's Clean Indoor Air Act, the ban on sales of tobacco or vapor products in any retail establishment with a pharmacy, the highest tax on tobacco and vapor products of any state, and the registration of tobacco and vapor product retailers and wholesalers [182]

373.    New York has had to confront the evolving nature of the e-cigarette crisis, and while it continually updates and refreshes its tobacco-related policies, use remains too high.  In fact, notwithstanding the strides made over decades, tobacco remains one of the focus areas in New York State's Prevention Agenda to Prevent Chronic Diseases Action Plan:[183]

> Goal 1: Prevent initiation of tobacco use, including combustible tobacco and vaping products (defined as e-cigarettes and similar devices) by New York youth and young adults.

Some of the interventions that the State has identified to reach that goal are:

> Intervention: Increase Tobacco Control Program Funding to the CDC-Recommended level, to ensure a comprehensive tobacco control program.

> Intermediate-level measure: Raise program funding to $52 million, approximately 25 percent of recommended full funding.

> Intervention: Use media and health communications to highlight the dangers of tobacco, promote effective tobacco control policies and reshape social norms.

---

[182] https://www.health.ny.gov/prevention/tobacco_control/current_policies.htm (last visited Feb. 10, 2025).

[183]  https://www.health.ny.gov/prevention/prevention_agenda/2019-2024/docs/ship/chr.pdf (last visited Feb. 10, 2025).

> Intermediate-level measure: Evidence of increasing support for effective tobacco control measures that would reduce youth initiation.

> Intervention: Keep the price of tobacco uniformly high by regulating tobacco company practices that reduce the real price of cigarettes through discounts.

> Intervention: Decrease the availability of flavored tobacco products including menthol flavors used in combustible and non-combustible tobacco products and flavored liquids including menthol used in electronic vapor products.

374. It is proven that "[w]ell-funded, accessible, culturally competent cessation programs serve an important role in reducing inequities and supporting individuals in their quit journey."[184] And New York City meets that standard. Indeed, in addition to the above highlights of New York City's supports for individual struggling with nicotine addiction, "individuals in New York State can get a free starter kit by calling the New York State Smokers' Quitline."[185]

375. New York is engaged and invested in treating its young citizens who fell prey to Defendants' false and misleading messaging around the safety of e-cigarettes. For example, the NYSDOH directs young users to the Drop the Vape initiative and maintains the New York State Quitline:[186]

> Drop the Vape is a New York State-specific free and anonymous text messaging program, designed by the Truth Initiative®, and created with input from teens, college students, and young adults who have attempted to, or successfully, quit vaping. New York State youth, ages 13-17, and young adults, ages 18-24, can text DropTheVape to 88709 to sign up to receive age-appropriate supportive and

---

[184] https://www.publichealthlawcenter.org/sites/default/files/resources/NYS-Flavor-Bans.pdf (last visited Feb. 10, 2025).

[185] *Id.*

[186] https://www.health.ny.gov/prevention/tobacco_control/campaign/e-cigarettes/ (last visited Feb. 10, 2025).

> motivating text messages to support quit efforts. Enrollees in the program receive interactive daily text messages tailored to their sign-up date or their target quit date if they set one. Those without a quit date receive messages for at least one month. Program users who set a quit date (which they can change) receive messages for at least one week prior to the quit date and for at least two months following the quit date.
>
> Drop the Vape also directs users to the New York State Quitline for free and confidential quit-coaching via telephone, internet, and text, and free starter kits of nicotine replacement therapy (NRT) for eligible New Yorkers.

376. Additionally, New York's Tobacco Control Program has acted to prevent the initiation of nicotine-containing products' use, including e-cigarettes, by youth and young adults through its program called Reality Check:[187]

> [Reality Check] is a youth engagement component for New York State teens, ages 13-18, to increase support for New York State's tobacco-free and vape-free norms through youth action and community engagement. Evidence-based, policy-driven, and cost-effective approaches are implemented to decrease youth tobacco use, protect youth from exposure to tobacco marketing and imagery, and eliminate exposure to secondhand smoke.

377. These expenditures are necessary due in no small part to the unhealthy and dangerous conditions caused by Defendants' self-serving and illegal business practices.

378. These interventions are not free. And they are not easy to accomplish, especially when Defendants are actively working against the City's efforts and investments in preventing nicotine-related chronic illnesses. For example, the NYSDOH has estimated that, since 2019, the State has spent, *inter alia*:

   a. Nearly $5.7 million on anti-e-cigarette media, including the new "Nicotine

---

[187] *Id.*

121

Equals" media campaign launched in January 2025;

    b.   Over $5.3 million on necessary e-cigarette surveys, policy research and related evaluations and report-making;

    c.   Over $3.8 million on Tobacco Dependence Treatment Contractors, who work within the Health Systems for a Tobacco-Free New York on tobacco dependence treatment;

    d.   Nearly $35 million on the Reality Check program, described above; and

    e.   Over $3 million on New York's Quitline and the Drop the Vape texting campaign;

While this list of expenditures does not represent the full extent of harm to the City's fisc related to the claims herein, it demonstrates that New York is grappling with a multi-faceted issue and that NYSDOH alone has contributed nearly $53 million to stem the crisis.

379.    Although the City was recently enjoying the benefit of improved public health following its effective responses to the tobacco industry and JUUL-caused harms, it must now repeat much of that work to prevent, save, and assist new generations from life-long nicotine addiction and the accompanying mental and physical detriments.

380.    By their conduct, Defendants are nullifying the benefits the City should be enjoying from its efforts on this issue. Most obviously, Defendants are stripping New York City's effective flavor ban of its impact, and consequently the number and rate of individuals throughout the state using e-cigarettes, particularly disposable e-cigarettes, and developing nicotine addiction will continue to rise.

381.    Accordingly, given the nature of each Defendant's business practices and products, together with the known nature of the e-cigarettes market and the statistical relationship between disposable e-cigarettes and youth use, Defendants are knowingly, negligently, and/or recklessly

causing harm to New York City's public health and safety.

382.    "[A] one-year delay in the age of substance use initiation is associated with a decrease of 4–5% in the likelihood of lifetime substance use disorder."[188]  To that end, when an individual has not started smoking before the age of 25, they are unlikely to ever smoke.[189]  But each Defendant's individual tactics and the collective impact of their illicit business conduct in New York City hook children on their disposable e-cigarettes as young as possible, increasing the likelihood of lifetime substance use disorders across the youngest cohorts of users.

383.    With every sale Defendants have made during the Relevant Time Period, they circumvented, undermined, and violated New York City's nicotine-related public health measures for their own profit, and have created, maintained, or contributed to a dangerous condition.

## CLAIMS FOR RELIEF

### AS AND FOR A FIRST CAUSE OF ACTION
#### VIOLATIONS OF THE PACT ACT, 15 U.S.C. § 376a
#### DELIVERY SALES
#### (AGAINST ALL DEFENDANTS EXCEPT EVO BRANDS AND MVH I)

384.    The City realleges each and every allegation in the paragraphs above as though fully set forth herein.

385.    The PACT Act authorizes the Corporation Counsel to bring a civil action in a United States District Court to seek civil penalties, money damages, and injunctive and other relief against any person for violations of the PACT Act.

386.    Each Defendant (except EVO Brands and MVH I) operates as a delivery seller and

---

[188] https://pmc.ncbi.nlm.nih.gov/articles/PMC11629554/ (last visited Feb. 10, 2025).

[189]  https://www.publichealthlawcenter.org/sites/default/files/resources/NYS-Flavor-Bans.pdf (last visited Feb. 10, 2025).

makes delivery sales, as the term is defined in 15 U.S.C. § 375(5).

387.    Every Defendant, as a delivery seller within the meaning of 15 U.S.C. § 375(6), must abide by the PACT Act delivery sale requirements set forth in 15 U.S.C. § 376a.

388.    Each Defendant (except EVO Brands and MVH I) maintains a website accessible to New York City residents that advertises, sells, and/or offers for sale and delivery e-cigarettes to the public, including to consumers, as that term is defined in 15 U.S.C. § 375(4).  All sales through the website are delivery sales within the meaning of the PACT Act because consumers  place orders for e-cigarettes remotely on Defendants' websites, or by phone, by email, mail, or other remote means.

389.    Each Defendant (except EVO Brands and MVH I) has sold e-cigarettes to "consumers," as defined under the PACT Act, and have shipped or caused to be shipped e-cigarettes  to consumers in New York City. At no time during either the purchase or the delivery of the e-cigarettes were Defendants in the physical presence of the consumers.

390.    Each Defendant (except EVO Brands and MVH I) sold e-cigarettes to consumers, wherein the e-cigarettes were delivered to consumers located in New York City by common carrier, private delivery service, or other method of remote delivery.

391.    Each Defendant (except EVO Brands and MVH I) made sales of e-cigarettes to unlicensed and/or unlawfully operating businesses in New York City. Those businesses are "consumers" as defined by the PACT Act. At no time during the purchase or delivery were Defendants in the physical presence of the consumers.

392.    As delivery sellers, each Defendant (except EVO Brands and MVH I) was required but failed to comply with one or more of the following PACT Act shipping, packaging, weight,

age verification, and recordkeeping requirements:

    a.  Including on the bill of lading, if any, and on the outside of the shipping package, on the same surface as the delivery address, a clear and conspicuous statement providing as follows: "CIGARETTES/NICOTINE/SMOKELESS TOBACCO: FEDERAL LAW REQUIRES THE PAYMENT OF ALL APPLICABLE EXCISE TAXES, AND COMPLIANCE WITH APPLICABLE LICENSING AND TAX-STAMPING OBLIGATIONS";

    b.  Selling, offering for sale, delivering or causing to be delivered in any single sale or single delivery of e-cigarettes weighing no more than 10 pounds;

    c.  Selling, delivering or causing to be delivered e-cigarettes to persons 21-years of age or older;

    d.  Using a method of mailing or shipping that requires the purchaser placing the delivery sale order, or an adult who is at least 21 years of age, to sign to accept delivery of the shipping container at the delivery address;

    e.  Using a method of mailing or shipping that requires the person who signs to accept delivery of the shipping container to provide proof, in the form of a valid, government-issued identification bearing a photograph of the individual, that the person is at least 21-years of age;

    f.  Not accepting a delivery sale order from a person without (i) obtaining the full name, birth date, and residential address of that person; and (ii) verifying the information provided in (i) through the use of a commercially available database or aggregate of databases, consisting primarily of data from government sources, that are regularly used by government and businesses for the purpose of age and identity verification and authentication, to ensure that the purchaser is at least 21-years of age;

    g.  Keeping a record of any delivery sale, including the name and address of the person to whom the shipment was made, the brand, the quantity, and the name, address, and phone number of the person delivering the shipment to the recipient on behalf of the delivery seller, organized within the State, by the city or town and by zip code, into which the delivery sale is made;

    h.  Retaining the records of a delivery sale until the end of the 4th full calendar year that begins after the date of the delivery sale; and/or

    i.  Making its delivery sale records available to the City to ensure compliance of the PACT Act delivery sales requirements.

393.    As set forth above, as delivery sellers, each Defendant (except EVO Brands and

MVH I) was required but failed, in part or in whole, to comply with all State, local, tribal, or other

laws generally applicable to the sale of vapor products, including e-cigarettes, as if the delivery

sales occurred entirely within New York, including one or more of the following laws:

    a. *Age Restriction*, N.Y. Pub. Health L. § 1399-cc – New York law restricting access to tobacco products, liquid nicotine, and e-cigarettes to individuals under 21-years of age. These age restrictions apply to all vapor products, including e-cigarettes, sold by each Defendant;

    b. *Ban on Price Reductions*, N.Y. Pub. Health L. § 1399-bb – New York law restricts the sale or offer for sale of vapor products, including e-cigarettes, for less than the listed price or non-discounted price;

    c. *Ban on Swag and Event Promotions*, N.Y. Pub. Health L. §§ 1399-bb-1 – New York law restricts e-cigarette branded swag. Effective January 1, 2024, New York prohibits any manufacturer or distributor of e-cigarettes from marketing, licensing, distributing, selling, or causing to be marketed, licensed, distributed, or sold any item (other than electronic cigarettes and its component parts) or service which bears the brand name or other indicia of product identification of the brand. Moreover, no manufacturer, distributor, or retailer may sponsor any athletic, musical, or other social or cultural event, using any e-cigarette branding;

    d. *Shipping Ban*, N.Y. Pub. Health L. § 1399-*ll*(1-a) – New York law prohibits the persons engaged in the business of selling vapor products to ship or cause to be shipped vapor products, including e-cigarettes, to any person in the state who is not: (a) a licensed vapor products retailer, (b) an export warehouse proprietor or customs bonded warehouse operator, or (c) an officer, employee or agent of the U.S. government;

    e. *Labeling Requirement*, N.Y. Pub. Health L. § 1399-*ll*(3) – New York law requires that when a person engaged in the business of selling vapor products ships or causes to be shipped any vapor products to any person in the state, other than in the vapor products manufacturer's original container or wrapping, the container or wrapping must be plainly and visibly marked with the words "vapor products;"

    f. *Flavor Ban*, N.Y. Pub. Health L. § 1399-mm-1 – New York law prohibits the sale or offer for sale at retail of any Flavored E-Cigarette, such that each and every sale of a flavored e-cigarette to a New York retailer is outside the scope of New York's retail licensing scheme, and together with Defendants' obligations under the PACT Act which limits Defendants' ability to remotely

sell e-cigarettes to consumers, is illegal by operation of New York's flavor ban; and/or

g. *Ingredient Disclosures*, N.Y. Pub. Health L. § 1701 – New York law requires every manufacturer, as that term is defined in N.Y. Pub. Health L. § 1700(7), to furnish to the commissioner for public record and post on such manufacture's website information including, but not limited to:

    a. For each vapor product, a list naming each ingredient of each vapor product, including e-cigarettes, distributed, sold, or offered for sale in New York; and

    b. For each e-cigarette, a list naming any toxic metal, including but not limited to lead, manganese, nickel, chromium, or zinc, as a constituent of any heating element included in such e-cigarette.

h. *City Flavor Ban* – N.Y.C. Ad. Code §17-715 – Prohibits sales, offers to sell, possession with the intent to sell or with the intent to offer to sell flavored e-cigarettes.

394. By reason of the foregoing, each Defendant (except EVO Brands and MVH I) has violated the PACT Act, 15 U.S.C. §376a, and is subject to civil penalties set forth in 15 U.S.C. § 377(b)(1)(A), in addition to any other remedies available under federal, state, local, tribal, or other law. 15 U.S.C. § 378(c)(4).

### AS AND FOR A SECOND CAUSE OF ACTION
**VIOLATIONS OF THE PACT ACT, 15 U.S.C. § 376**
***REGISTRATION & REPORTING***
**(*AGAINST ALL DEFENDANTS EXCEPT EVO BRANDS, AND MVH I*)**

395. The City realleges each and every allegation in the paragraphs above as though fully set forth herein.

396. The PACT Act authorizes the City to bring a civil action in a United States District Court to seek civil penalties, money damages, and injunctive and other relief against any person for violations of the PACT Act.

397. New York City imposes a sales tax of eight and one-half per cent (8.5%) on the

127

retail sale of e-cigarettes sold in the City. N.Y. Tax L. § 1107.

398.    Each Defendant (except EVO Brands and MVH I) is a "person", as defined in 15 U.S.C. § 375(11) of the PACT Act engaged in the sale, transfer, and shipment for profit of e-cigarettes in "interstate commerce", as defined in 15 U.S.C. § 375(10).

399.    Each Defendant (except EVO Brands and MVH I) advertised and/or offered the sale, transfer, and shipment of e-cigarettes in interstate commerce.

400.    Each Defendant (except EVO Brands, MVH I, and the Price Point Defendants) have sold, transferred, and shipped for profit e-cigarettes into New York through interstate commerce.

401.    Each Defendant (except EVO Brands, MVH I, and the Price Point Defendants) was required, but failed either entirely or substantially, to file with the tobacco tax administrators of New York, a statement setting forth the name, the addresses of the principal place of business and of any other place of business, the telephone numbers for each place of business, the principal e-mail address, any website addresses, and the name, address and telephone number of an agent in New York authorized to accept service on behalf of the person.

402.    Each Defendant (except EVO Brands, MVH I, and the Price Point Defendants) was required, but failed either entirely or substantially, no later than the 10th day of each calendar month, to file with the tobacco tax administrator of New York a memorandum or a copy of the invoice covering each and every shipment of e-cigarettes made during the previous calendar month into New York; the memorandum or invoice to include the name and address of the person to whom the shipment was made, the brand, the quantity thereof, and the name, address, and phone number of the person delivering the shipment to the recipient on behalf of the delivery seller, with

128

all invoice of memoranda information relating to specific customers to be organized by city or town and by zip code.

403.    By reason of the foregoing, each Defendant (except EVO Brands, MVH I, and the Price Point Defendants) has violated the PACT Act, 15 U.S.C. §376, and is subject to civil penalties set forth in 15 U.S.C. § 377(b)(1)(A). The remedies available under 15 U.S.C. §§ 377-378 are in addition to any other remedies available under federal, state, local, tribal, or other law. 15 U.S.C. § 378(c)(4).

**AS AND FOR A THIRD CAUSE OF ACTION**
**VIOLATIONS OF THE PACT ACT, 18 U.S.C. § 1716E**
***NONMAILABLE PRODUCTS***
***(AGAINST ALL DEFENDANTS EXCEPT EVO BRANDS AND MVH I)***

404.    The City realleges each and every allegation in the paragraphs above as though fully set forth herein.

405.    The PACT Act authorizes the Corporation Counsel to bring a civil action in a United States District Court to seek "injunctive and equitable relief and damages equal to the amount of unpaid taxes on tobacco products mailed in violation of this section [18 U.S.C. § 1716E] to addresses in that State, locality, or tribal land." 18 U.S.C. § 1716E(h)(1).

406.    The PACT Act makes all e-cigarettes, including e-cigarettes, nonmailable and prohibits their deposit in or carriage through the mails.

407.    Each Defendant (except EVO Brands and MVH I) deposited in and delivered through the mails nonmailable e-cigarettes, including e-cigarettes, in violation of 18 U.S.C. § 1716E.

408.    Each Defendant (except EVO Brands and MVH I) has committed, in part or in whole, violations of the PACT Act registration and reporting requirements set forth in 15 U.S.C.

§ 376, the delivery sales requirements set forth in 15 U.S.C. § 376a, N.Y. Pub. Hlth. L. § 1399-*ll*,

and Administrative Code § 17-715 such that each Defendant is not a "legally operating business"

to which the business purpose exception to 18 U.S.C. § 1716E applies.

409.    As set forth above, each Defendant (except EVO Brands and MVH I) has made

delivery sales to individuals, unlicensed businesses, and/or businesses violating Administrative

Code § 17-715, such that each Defendants' delivery sales were not between "legally operating

businesses" for which the business purpose exception to 18 U.S.C. § 1716E would apply.

410.    By reason of the foregoing, each Defendant (except EVO Brands and MVH I) has

violated 18 U.S.C. § 1716E, in addition to any other fines and penalties applicable under Title 18

of the United States Code, is subject to an additional civil penalty in the amount equal to 10 times

the retail value of the nonmailable e-cigarettes, including e-cigarettes, and including all Federal,

City, and local taxes. 18 U.S.C. § 1716E(d). The injunctive and equitable relief, and damages

available under 18 U.S.C. § 1716E(h) are in addition to any other remedies available under Federal,

State, local, or tribal, or other laws. 18 U.S.C. § 1716E(h)(4).

### AS AND FOR A FOURTH CAUSE OF ACTION
#### VIOLATION OF N.Y.C. ADMINISTRATIVE CODE § 17-715
#### (*AGAINST ALL DEFENDANTS*)

411.    The City realleges each and every allegation in the paragraphs above as though

fully set forth herein.

412.    In violation of N.Y.C. Ad. Code § 17-715(b)(1), Defendants sell, offer for sale, or

possess with intent to sell or offer for sale, flavored electronic cigarettes and/or flavored e- liquids.

413.    Pursuant to General City Law § 20 (22) and NYC Charter § 394, the Corporation

Counsel has standing to enforce Ad. Code § 17-715 (b) (1) on behalf of the City and to impose

and collect the penalties provided for under the Administrative Code.

## AS AND FOR A FIFTH CAUSE OF ACTION
### VIOLATION OF N.Y. PUB. HLTH. L. § 1399-*ll*
### (*AGAINST ALL DEFENDANTS*)

414.    The City realleges each and every allegation in the paragraphs above as though fully set forth herein.

415.    N.Y. Pub. Hlth. L. § 1399-*ll* (1) provides that in New York State e-cigarettes may be shipped only to (a) licensed cigarette tax agents, licensed wholesale dealers, or registered retail dealers, (b) export warehouse proprietors or customs bonded warehouse operators, or (c) agents of the federal or state government.

416.    N.Y. Pub. Hlth. L. § 1399-*ll* (1) further provides that when a person engaged in the business of selling vapor products ships or causes to be shipped to any person in this state any vapor products intended or reasonably expected to be used with or for the consumption of nicotine, other than in the vapor products manufacturer's original container or wrapping, the container or wrapping must be plainly and visibly marked with the words "vapor products."

417.    Defendants knowingly shipped and/or caused to be shipped vapor products to persons in New York City whom those defendants knew were not (a) licensed cigarette tax agents, licensed wholesale dealers, or registered retail dealers, (b) export warehouse proprietors or customs bonded warehouse operators, or (c) agents of the federal or state government, who were not holders of Vape Certificates and in packages not marked with the words "vapor products."

418.    By knowingly shipping or causing to be shipped vapor products to persons in New York City and State other than those designated as the permissible recipients of cigarette deliveries set forth in N.Y. Pub. Hlth. L. § 1399-*ll*, Defendants violated that statute.

419.    The City's corporation counsel is entitled to recover on behalf of the City the civil penalties provided by N.Y. Pub. Hlth. L. § 1399-*ll* (5) and to obtain such other relief as may be deemed necessary with respect to any cigarettes or vapor products shipped or caused to be shipped in violation of N.Y. Pub. Hlth. L. § 1399-*ll* to any person located within the City.

## AS AND FOR A SIXTH CAUSE OF ACTION
### COMMON-LAW PUBLIC NUISANCE
(*Against All Defendants*)

420.    The City realleges each and every allegation in the paragraphs above as though fully set forth herein.

421.    Residents of the City of New York enjoy common rights, including, without limitation, the right to public health, safety, and order, unburdened by the foreseeable dangers caused by the sale, especially to underage individuals, of illegal e-cigarettes, especially flavored disposable e-cigarettes.

422.    Each Defendant owes a duty to the public not to offend, interfere with, or damage the common rights of the public through acts and omissions that violate applicable laws and regulations.

423.    By manufacturing, promoting, marketing, selling, and/or distributing flavored disposable e-cigarettes in New York City, each Defendant, individually and acting through agents and employees, has violated that duty by engaging in actions and omissions that offend, interfere with, and/or damage the public in the exercise of rights common to all, and endanger or injure the property, health, safety, or comfort of a considerable number of persons in the City of New York.

424.    Each Defendant engaged in violations of law through such actions and omissions, resulting in offense, interference, and/or damage to the public in the exercise of common rights.

425.    Each Defendant knew, or should have foreseen, that its actions and omissions would result in offense, interference, and/or damage to the public in the exercise of common rights.

426.    The offense, interference, and/or damage to the public in the exercise of common rights caused by Defendants' collective and individual actions and omissions is ongoing.  Each Defendant's conduct is continuing in nature and has produced permanent and long-lasting injury. Each Defendant's unlawful conduct has foreseeably caused e-cigarette addiction and increased e-cigarette consumption —particularly among young people—that the public nuisance caused in substantial part by each Defendant's conduct constitutes a public health crisis.

427.    By engaging in the acts described above, each Defendant's conduct constitutes a public nuisance.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff, the City of New York, respectfully requests that the Court enter an order and judgment to:

1.    On the First Cause of Action, enjoin each Defendant, pursuant to 15 U.S.C. § 376a from making delivery sales into the City without complying with the terms of the PACT Act;

2.    On the Second Cause of Action, pursuant to 15 U.S.C. § 376, from making any sales of e-cigarettes into the City without complying with the terms of the PACT Act pertaining to filing of the required reports with the City;

3.    On the First and Second Causes of Action, award the City, pursuant to 15 U.S.C. § 377(b), a civil penalty, the greater of: (i) $5,000 for the first violation, or $10,000 for any other violation of the PACT Act; or (ii) for any violation, 2% of each Defendant's gross sales of e-cigarettes during the 1-year period ending on the date of the violation, as well as damages and equitable relief;

4.    On the Third Cause of Action, award the City all appropriate fines and penalties, pursuant to 18 USC § 1716E, and enjoin the Defendants from using the mails to transport e-cigarettes;

5.    On the Fourth Cause of Action, (i) permanently enjoin Defendants from violating New York City Administrative Code § 17-715 by selling, offering for sale, or possessing with intent to sell or offer for sale flavored electronic cigarettes or flavored e-liquids; (ii) order each Defendant to pay the City the penalties provided for by New York City Administrative Code § 17-717 for their prior violations in an amount to be determined at trial;

6.    On the Fifth Cause of Action, (i) permanently enjoin Defendants from violating N.Y. Pub. Hlth. L. § 1399-*ll* by making remote deliveries of e-cigarettes to unauthorized recipients; (ii) ordering Defendants to pay the City the penalties provided for by N.Y. Pub. Hlth. L. § 1399-*ll* (5);

7.    On the Sixth Cause of Action, direct Defendants, jointly and severally, to endow an abatement fund with sufficient funds to eliminate the public nuisance they are responsible for creating, maintaining, exacerbating, contributing to and/or perpetuating in the City;

8.    Grant such other and further relief as the Court deems just and proper.


Dated:  New York, New York
        April 7, 2025

                                MURIEL GOODE-TRUFANT
                                Corporation Counsel of the
                                  City of New York
                                Attorney for Plaintiff
                                    the City of New York
                                100 Church Street, Room 20-99
                                New York, New York 10007
                                (212) 356-2032


                        By:     _____
                                Eric Proshansky
                                Aatif Iqbal
                                Alexandra Jung
                                Elizabeth Slater
                                Assistant Corporation Counsels

134