UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------- x

THE CITY OF NEW YORK,

                                         Plaintiff,

                             -against-

PUFF BAR, EVO BRANDS, LLC, PVG2, LLC d/b/a PUFF
BAR, MIDWEST GOODS INC. d/b/a MIDWEST
DISTRIBUTION ILLINOIS, 10 DAYS, INC. d/b/a POD
JUICE, SAFA GOODS LLC, SV3, LLC d/b/a MI-ONE
BRANDS, MYLÉ VAPE INC., MVH I, INC.,

                                    Defendants.

Case No. 25-cv-02850

------------------------------------------------------------------------- X

# CITY OF NEW YORK'S MEMORANDUM OF LAW
## ADDRESSING PACT ACT PENALTIES

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ............................................................................................ ii

ARGUMENT ................................................................................................................... 1

      I.     THE "2 PERCENT OF THE GROSS SALES" PENALTY
            UNDER 15 U.S.C. § 377(B)(1)(A)(II) IS NOT LIMITED TO
            SALES INTO THE ENFORCING JURISDICTION ....................................... 1

            A.  The Plain Language of the Statute Does Not Limit "Gross
                 Sales" to Sales into an Enforcing Jurisdiction ............................................. 2

            B.  The Principal Purpose of the PACT Act Was to Strengthen the
                 Weak Penalties Available under the Jenkins Act ....................................... 3

            C.  Defendant's Interpretation Impairs the Intended Operation of
                 The PACT Act ........................................................................................... 6

            D.  Precedent Supports The City's Interpretation of the 2% Penalty ................ 7

      II.    THE CITY'S INTERPRETATION ESTABLISHES A
            REASONABLE STARTING POINT FOR PENALTY
            CALCULATIONS ....................................................................................... 8

CONCLUSION ............................................................................................................. 10

## TABLE OF AUTHORITIES

**Cases**                                                                      **Pages**

*City of N.Y. v. Golden Feather Smoke Shop, Inc.*,
   2013 U.S. Dist. LEXIS 142127 (E.D.N.Y. Sep. 30, 2013)......................................8, 10

*City of N.Y. v. Milhelm Attea & Bros.*,
   2012 U.S. Dist. LEXIS 116533 (E.D.N.Y. Aug. 17, 2012)....................................7, 8, 9

*City of New York v. Enviromd Grp. LLC*,
   2025 U.S. Dist. LEXIS 133942 (S.D.N.Y. July 14, 2025) .........................................3

*City of New York v. Magellan Tech., Inc.*,
   735 F. Supp. 3d 312 (S.D.N.Y. 2024)....................................................................3

*Devlin v. Empire Blue Cross & Blue Shield*,
   274 F.3d 76 (2d Cir. 2001)...................................................................................9

*Hardt v. Reliance Standard Life Ins. Co.*,
   560 U.S. 242 (2010).............................................................................................3

*Hemi Grp., LLC v. City of N.Y.*,
   559 U.S. 1 (2010)................................................................................................4

*Jingrong v. Chinese Anti-Cult World Alliance Inc.*,
   16 F.4th 47 (2d Cir. 2021) ...................................................................................3

*New York v. UPS*,
   942 F.3d 554 (2d Cir. 2019)...........................................................................2, 8, 9

*Schindler Elevator Corp. v. U.S. ex rel. Kirk*,
   563 U.S. 401 (2011).............................................................................................3

*Tull v. United States*,
   481 U.S. 412 (1987).............................................................................................9

*United States v. Bulloch*,
   165 F.4th 676 (2d Cir. 2026) ...............................................................................3

*United States v. Maddux*,
   917 F.3d 437 (6th Cir. 2019) ...............................................................................7

ii

| **Statutes** | **Pages** |
|---|---|
| 15 U.S.C. § 377 | 1, 4, 5, 6 |
| 15 U.S.C. § 377(b) | 1, 7, 9 |
| 15 U.S.C. § 377(b)(1)(a)(i) | 8, 9 |
| 15 U.S.C. § 377(b)(1)(a)(ii) | 1, 2 |
| 15 U.S.C. § 377(b)(ii) | 2, 6 |
| 15 U.S.C. § 378 | 5 |
| 18 U.S.C. § 1716E | 6 |
| 18 U.S.C. §2341, *et seq* | 8 |
| 18 U.S.C. § 2343(c)(3) | 6 |

## Other Authorities

| | |
|---|---|
| Pub. L. No. 111–154 (2010) | 7 |
| S. 1177, 108th Cong. (2003) | 5 |
| S. 3810, 109th Cong. (2005) | 5 |

The City of New York (the "City") respectfully submits this memorandum of law addressing the calculation of penalties under the Prevent All Cigarette Trafficking ("PACT") Act, 15 U.S.C. § 377, per the Court's Order dated April 27, 2026.

## ARGUMENT

### I. THE "2 PERCENT OF THE GROSS SALES" PENALTY UNDER 15 U.S.C. § 377(B)(1)(A)(II) IS NOT LIMITED TO SALES INTO THE ENFORCING JURISDICTION

15 U.S.C. § 377(b) provides that:

> (1) In general
>
> Except as provided in paragraph (3), whoever violates this chapter shall be subject to a civil penalty in an amount not to exceed--
>
> (A) in the case of a delivery seller, the greater of—
>
>> (i) $5,000 in the case of the first violation, or $10,000 for any other violation; or
>>
>> (ii) for any violation, 2 percent of the gross sales of cigarettes or smokeless tobacco of the delivery seller during the 1-year period ending on the date of the violation.

As detailed below, the plain language, history, and operation of the statute all point to the same conclusion: that the 2% penalty in 15 U.S.C. § 377(b)(ii) is to be calculated from the "gross sales of cigarettes or smokeless tobacco of the delivery seller during the 1-year period ending on the date of the violation"— not from some unspecified subset of those sales, and especially not those into only an enforcing jurisdiction. Congress could have specified a different basis, such as "gross sales of cigarettes… delivered into the jurisdiction seeking the penalty." It did not.

Defendants' contention that the 2% penalty calculation is to be limited to sales into the enforcing jurisdiction also ignores a core principle underlying the purpose of penalties: that in civil or criminal enforcement actions, "there is no requirement that the government prove injury, because the purpose of such actions is deterrence, not compensation." *New York v. UPS*, 942

F.3d 554, 597-98 (2d Cir. 2019) (addressing PACT Act penalties). The PACT Act has nationwide reach – violations are violations no matter where they occur. Defendants nowhere provide a basis for immunizing some violations on the basis of location. The purpose of a penalty is to deter illegal conduct, not to compensate a jurisdiction for lost tax revenue. A penalty premised on a violator's revenue from *all* illegal sales implements this principle.

### A.    The Plain Language of the Statute Does Not Limit "Gross Sales" to Sales into an Enforcing Jurisdiction

Elementary rules of statutory construction mandate rejection of Defendants' interpretation of 15 U.S.C. § 377(b)(1)(A)(ii). Defendants interpret "2 percent of the gross sales of cigarettes" as if it says "2 percent of the gross sales of cigarettes… *sold into the enforcing jurisdiction.*" Adding a term to a statute "from which it is conspicuously absent more closely resembles invent[ing] a statute rather than interpret[ing] one." *Hardt v. Reliance Standard Life Ins. Co.*, 560 U.S. 242, 252 (2010). *See also City of New York v. Magellan Tech., Inc.*, 735 F. Supp. 3d 312, 324 (S.D.N.Y. 2024) (Stanton., J.) (declining to change the plain meaning of "lawfully operating" under the PACT Act to "licensed"); *City of New York v. Enviromd Grp. LLC*, 2025 U.S. Dist. LEXIS 133942, *17-18 (S.D.N.Y. July 14, 2025) (Woods, J.) (refusing to adopt defendants' limit on the City's enforcement powers under the PACT Act because doing so would require the court to "depart from the plain meaning of the text, which imposes no such limitation").

Defendants' attempted addition of language also ignores the plain meaning of "gross sales." "[U]ndefined statutory terms carry their ordinary meaning." *Schindler Elevator Corp. v. U.S. ex rel. Kirk*, 563 U.S. 401, 416 (2011); *see also United States v. Bulloch*, 165 F.4th 676, 683 (2d Cir. 2026) ("Where Congress did not define certain terms . . . we presumptively give those terms their ordinary meaning.") (cleaned up); *Jingrong v. Chinese Anti-Cult World Alliance Inc.*,

2

16 F.4th 47, 57 (2d Cir. 2021) ("Where the plain meaning of the text is clear, our inquiry generally ends there.") (cleaned up).

The plain meaning of the term "gross sales" means all sales—not sales into a specific place. Black's Law Dictionary defines "gross sales" to be the "*total sales* (esp. in retail) before deductions for returns and allowances." SALE, *Black's Law Dictionary* (12th ed. 2024) (emphasis added). Multiple industry sources define "gross sales" to mean *all* sales by a business. The financial media website Investopedia defines "gross sales" as "measur[ing] the *total sales* . . . unadjusted for the costs related to generating those sales." https://www.investopedia.com/terms/g/grosssales.asp (emphasis added). NASDAQ defines gross sales as "*Total* sales calculated by summing *all* sales at invoice values." *https://www.nasdaq.com/glossary/g/gross-sales* (all emphases added). The company SalesForce, which provides sales-related software, puts it succinctly: "Very simply, gross sales are the *total amount* of your sales." https://www.salesforce.com/blog/gross-sales-vs-net-sales (emphasis added). Congress would not have intended to specify Defendants' proposed discrete sub-group of sales—those in or those outside a given jurisdiction—by use of a term commonly understood to mean "all" sales.

### B. The Principal Purpose of the PACT Act Was to Strengthen the Weak Penalties Available under the Jenkins Act

The PACT Act's legislative history further supports application of the statute's plain meaning. That history—traceable in seven bills introduced from 2003 to 2010 and culminating in the enactment by unanimous vote of Public Law 111-154 on March 31, 2010—abundantly demonstrates congressional dissatisfaction with the toothless enforcement provisions of PACT Act-predecessor the Jenkins Act, and the resulting intent to create powerful enforcement penalties.

In amending the Jenkins Act, the Senate referenced studies showing virtually all Internet tobacco vendors as failing to pay taxes or adhere to age verification, blaming the Jenkins Act's weak penalties as the primary basis for that rampant cigarette trafficking. S. Rpt. 110-153 at 7 (2007) ("[T]he penalties for violating some of the laws governing tobacco smuggling are not strong enough to deter violators."). Violators of the original Jenkins Act faced (at most) a single misdemeanor charge consisting of a $1,000 fine and/or a 6-month jail term, with no civil penalty. *See* 15 U.S.C. § 377 (1955), *amended by* Prevent All Cigarette Trafficking Act of 2009, Pub. L. No. 111–154, 124 Stat. 1087 (March 31, 2010); *Hemi Grp., LLC v. City of N.Y.*, 559 U.S. 1, 16 n.2 (2010) (the "Jenkins Act… provides quite limited remedies"). Weak penalties failed to incentivize actions by enforcement agencies. "Unless these existing laws are strengthened, traffickers will continue to operate with near impunity." *Cong. Rec*, Vol. 156, No. 35, p. S1486 (March 11, 2010).

The number of penalty provisions increased as successively-introduced bills evolved from 2003 into the 2010 enactment of the PACT Act. In 2003, Senate Bill 1177 created the first civil penalty provision for what were formerly Jenkins Act violations. *See* S. 1177, 108th Cong. § 2 (2003). That bill also added a grant of enforcement powers to state, local and tribal governments currently embodied in 15 U.S.C. § 378, yielding a more than fifty-fold expansion of the jurisdictions with standing to pursue violators. *See id.* § 2(e). New remedies grew even stronger between the bill's introduction and its passage by Congress. For example, the civil penalty provision initially included only the 2% penalty; the alternative $5,000/$10,000 per violation penalty was added later. *Compare* S. 1177, 108th Cong. § 2 (as introduced June 3, 2003) *with* S. Bill 1177, 108th Cong. § 2 (as passed by Senate, Dec. 9, 2003). The added "per violation" penalties can be viewed as a recognition that the 2% penalty would not sufficiently deter a small

4

delivery seller that engages in significant number of individual violations but otherwise has minimal total sales. Similarly, Senate Bill 1177 initially provided for 2 years imprisonment; by the time it passed Congress, it had become a felony punishable by up to 3 years imprisonment. *Compare* S. 1177, 108th Cong. § 2 (as introduced June 3, 2003) *with* 15 U.S.C. § 377. Still later, by 2006, Senate Bill 3810 prohibited new forms of conduct—for Postal Service and ATF-related violations. *See* S. 3810, 109th Cong. §§ 3, 6.

The evolving provisions of the bills eventually enacted as the PACT Act thus display a steadily increasing array of penalties, in steadily increasing amounts. Enforcement agencies can obtain: (1) a 3-year felony imprisonment and a criminal fine; (2) the $5,000/$10,000 or 2% civil penalty under 15 U.S.C. § 377; and (3) entirely new penalties for postal violations under 18 U.S.C. § 1716E (making cigarettes non-mailable) and ATF inspection refusals under 18 U.S.C. § 2343(c)(3) ($10,000 fine). All of that is "in addition to any criminal penalty and any other damages, equitable relief, or injunctive relief . . . including the payment of any unpaid taxes." 15 U.S.C. § 377(b)(2).

The evolved strength of the PACT ACT was characterized at the time of its 2010 enactment as:

> clos[ing] loopholes in current tobacco trafficking laws, enhanc[ing] penalties for violations, and provid[ing] law enforcement with new tools to combat the innovative methods being used by cigarette traffickers to distribute their products.

*Cong. Rec*, Vol. 156, No. 35, p. S1486 (March 11, 2010). "The PACT Act does that by… increas[ing] penalties for cigarette trafficking under the Jenkins Act from a misdemeanor to a felony." *Id*. In its own words, Congress in the PACT Act wanted to "*show these people we mean business*" and end the "slap on the wrist" imposed by the Jenkins Act. *Id.*

5

Put simply, the PACT Act significantly strengthened enforcement, including by (1) increasing the dollar amount of the penalties; (2) adding new conduct subject to penalties; (3) providing for the "stacking" of penalties (15 U.S.C. § 377(b)(2)); and (4) empowering newly deputized state, local and tribal governments to enforce not just their own laws, but the new prohibitions of the PACT Act itself. After all that, Congress would not have watered down this robust deterrence by setting penalties in a manner that completely ignored all violations of the law other than those pertaining to sales into the specific jurisdiction suing to enforce the PACT Act. If Congress intended such a limitation, it would have made that clear.

### C.    Defendant's Interpretation Impairs the Intended Operation of The PACT Act

Any interpretation of the 2% penalty that provides for an unstated geographic reduction of a delivery seller's "gross sales" weakens PACT Act enforcement, contrary to the expressed intent of Congress, by diminishing the penalties recoverable by an enforcing jurisdiction. A simple example makes this clear.

Suppose a delivery seller in State A ships e-cigarettes into 25 other states, but not into State A. Under Defendants' interpretation, in an enforcement action by State A, the 2% penalty amount would be zero, because there are no delivery sales into State A. In such a scenario, effective enforcement of the PACT Act might require each of those 25 states to sue separately. That result has no basis in the statutory text, and undermines the PACT Act's explicit stated "purpose"—*i.e.* to "(2) create strong disincentives to illegal smuggling of tobacco products"; "(3) provide government enforcement officials with more effective enforcement tools; and "(4) make it more difficult for cigarette . . . traffickers to engage in and profit from their illegal activities." Pub. L. No. 111–154 § (1)(c) (2010). Moreover, a resident jurisdiction might well not wish to serve as a haven for illegal activity. Delivery sellers would strategically choose to ship into

6

receiving jurisdictions that lack enforcement resources, with Defendants' interpretation effectively immunizing them from enforcement by the jurisdiction where in which the delivery seller operate. [1]

### D.    Precedent Supports The City's Interpretation of the 2% Penalty

There appear to be only two cases that have calculated a 2% penalty under 15 U.S.C. § 377(b): *City of N.Y. v. Milhelm Attea & Bros.*, 2012 U.S. Dist. LEXIS 116533 (E.D.N.Y. Aug. 17, 2012), and *City of N.Y. v. Golden Feather Smoke Shop, Inc.*, 2013 U.S. Dist. LEXIS 142127 (E.D.N.Y. Sep. 30, 2013). Both support the City's position.

*Milhelm Attea* and *Golden Feather* addressed violations of the Contraband Cigarette Trafficking Act, 18 U.S.C. §2341 *et seq*. (the "CCTA") by sellers of "untaxed" cigarettes. In *Milhelm Attea*, wholesalers in Nassau County sold cigarettes that were delivered into Suffolk County. 2012 U.S. Dist. LEXIS 116533, at *19, 23-26. In *Golden Feather*, retailers in Suffolk County sold cigarettes on-site, of which some unknown percentage was ultimately resold by bootleggers inside the City. 2013 U.S. Dist. LEXIS 142127, at *3. Because the CCTA imposes civil penalties by an enforcing jurisdiction but does not specify a penalty amount, the Court, recognizing that "the PACT Act penalties [] serve as useful guideposts of Congressional intent in this area of regulation," applied the PACT Act penalty provisions to determine penalty amounts for CCTA violations. *See Milhelm Attea*, 2012 U.S. Dist. LEXIS 116533, at *89, 92-96. Under Defendants' interpretation, the "gross sales" in both cases would have been zero, since they did not take place in the City—the enforcing jurisdiction. But, in both cases, the Court calculated the 2% penalty without reference to the ultimate situs of delivery, which would have been irrelevant

---

[1] *See United States v. Maddux*, 917 F.3d 437, 442 (6th Cir. 2019) (defendants, cigarette sellers, "recognized that the [PACT] Act made their scheme more difficult to run within the United States, so they converted it to an offshore operation").

to the amount of "gross sales."[2] *Id.*; *see also Golden Feather*, 2013 U.S. Dist. LEXIS 142127, at *6-8. The City had express statutory standing to pursue CCTA violations, and with that standing came the power to collect penalties, regardless of whether the statutory violations were accompanied by compensable damages. The same principle applies here.[3]

## II. THE CITY'S INTERPRETATION ESTABLISHES A REASONABLE STARTING POINT FOR PENALTY CALCULATIONS

Importantly, 15 U.S.C. § 377(b) provides for "a civil penalty in an amount *not to exceed*…the greater of" (emphasis added) either $5,000/$10,000 per violation or 2% of gross sales over the past year.[4] Moreover, "the ultimate assessment of penalties is a discretionary matter for the district court." *Devlin v. Empire Blue Cross & Blue Shield*, 274 F.3d 76 (2d Cir. 2001); *Tull v. United States*, 481 U.S. 412, 426-27 (1987) ("Since Congress itself may fix the civil penalties, it may delegate that determination to trial judges."). "[W]hen Congress adopts legislation authorizing the award of civil penalties, it generally leaves to the courts the job of fleshing out federal common-law rules governing the maximum aggregate size of penalties . . . . The fact that the district court's penalty award is technically permissible under the

---

[2] While the situs of delivery would have been relevant to a calculation of unpaid taxes as a damages measure, "in an enforcement action …there is no requirement that the government prove injury." *UPS*, 942 F.3d at 597-98.

[3] Under Defendants' interpretation, State A in the above example would also be prohibited from collecting penalties under 15 U.S.C. § 377(b)(1)(A)(i) because their contention—at its core—is that only a jurisdiction on the receiving end of illegal delivery sales can recover penalties.

[4] This language also undermines any notion that Congress must have assumed that a penalty calculated from 2% of national gross sales would be necessarily unreasonable. The PACT Act's $5,000/$10,000 per-violation penalty has no cap on the number of violations, or on the total penalty assessed. *See, e.g., Milhelm Attea*, 2012 U.S. Dist. LEXIS 116533, at *92 ("Because the defendants are liable for an enormous number of individual CCTA violations, the City concedes that § 377(b)(1)(A)(i) would suggest an excessive penalty amount if the per violation measure were used"). That metric could yield a penalty under the present facts that would astronomically exceed a nationwide 2% penalty. Yet Congress specified that it is the *greater* amount that the penalty must not exceed.

statutory regimes at play does not necessarily mean that it is a reasonable penalty in all circumstances." *UPS*, 942 F.3d at 599–600 (reducing PACT Act penalties as unreasonable).

Ignoring both the statutory language and this consistent caselaw, Defendants have conjured implausible scenarios wherein the City's interpretation "would lead to extraordinary and untenable results" that "could expose a defendant to multiplying penalties untethered to any sensible limit" for "the same underlying course of conduct." *Dkt. No*. 80 at 2.[5] For example, they argue that "if all 50 state Attorneys General and several municipalities brought individual suits, plaintiffs' position would lead to collective penalties of more than 100% of national gross sales." *Id*.

The "untenable results" defendants conjure—*i.e.* large penalties recovered by multiple jurisdictions (for different sales that might arguably be "within the same underlying course of conduct") that are each calculated, in part, from the same "gross sales" figure—are not "untenable" in the least. As the Court concluded in *Golden Feather*, "using the PACT Act calculations as a *starting point* for an award of civil penalties is appropriate" because the court will "inform its determination of a civil penalty *up to* these amounts using traditional factors, including the good or bad faith of the defendants, the injury to the public, and the defendants'

---

[5] Defendants also mistakenly contend that "Plaintiffs have taken the position that they may seek a separate 2% penalty for each individual violation based on the one-year lookback period preceding each such violation," which could result in "numerous overlapping 2% penalties within the same year based on the same alleged course of conduct." *Dkt. No*. 80 at 2. The most reasonable reading of 15 U.S.C. § 377(b)(1)(A)(ii) is that a violation on a given date triggers the one-year lookback period. So, for example, for a violation on January 1, 2021, the lookback period would be for sales made between January 1, 2020 and January 1, 2021, *i.e.*, "the 1-year period ending on the date of the violation." In the present case, Defendants are alleged to have committed continuous violations each year until the date this suit was filed, which was April 7, 2025. Accordingly, for *each year* of violations the 2% penalty should be assessed on the basis of the gross sales in that year, except that the lookback for 2025 begins on the date of filing and ends on January 1, 2025. There is no overlapping recovery for the same violations, rendering Defendants' concerns unwarranted.

ability to pay." 2013 U.S. Dist. LEXIS 47037, at *120 (cleaned up). Defendants are amply protected from "untenable results" because the Court will determine what constitutes a reasonable penalty under the circumstances.

## CONCLUSION

For the foregoing reasons, the Court should hold that the term "gross sales" in 15 U.S.C. § 377(b)(1)(A)(ii) refers to a delivery seller's nationwide gross sales.

Dated:          New York, New York
                May 11, 2026

                                        **STEVEN BANKS**
                                        Corporation Counsel of the
                                         City of New York
                                        *Attorney for Plaintiff the City of New York*
                                        100 Church Street, Rm. 3-211
                                        New York, New York 10007
                                        (212) 356-2032

                                        By:     */s/ Eric Proshansky*
                                                Eric Proshansky
                                                Aatif Iqbal
                                                Elizabeth Slater

                                                Assistant Corporation Counsels

10