**Office of the New York State Attorney General**

**Letitia James**
**Attorney General**

September 17, 2026

VIA ECF
Hon. Valerie Figueredo
United States Magistrate Judge
Southern District of New York
500 Pearl Street, Room 1660
New York, New York 10007

*Re: State of New York v. Puff Bar, et al.,* Case No. 25-cv-01445 (MMG)*;*
*City of New York v. Puff Bar, et al.*, Case No. 25-cv-2850 (MMG)

Dear Judge Figueredo:

This Office represents the State of New York (the "State") and submits this letter in compliance with this Court's Order, dated August 19, 2026 (ECF No. 217), directing the parties to file on ECF a joint letter prior to the September 24, 2026 discovery conference outlining the outstanding discovery issues and each party's respective positions. The State respectfully submits this letter together with all Defendants, as well as the City, in both cases captioned above.

**State's Position**

The State has spent significant efforts and engaged Defendants' counsel in numerous conferrals to resolve several discovery disputes with Defendants. While some issues have been resolved, several key disputes remain for which the State seeks Court intervention.

A. AEO/Confidentiality Designations. The parties continue to dispute what designations apply to which categories of documents; however, following a September 10 conferral with all Defendants, the parties have made some progress to identify ways to resolve or narrow this dispute. Of paramount concern to the State is that "Highly Confidential – Attorneys' Eyes Only" ("AEO") and "Confidential" designated documents have significant limitations imposed on such document's use.[1] AEO documents impose such a limitation on the document's use that they cannot be shown to a witness in a deposition; and Confidential documents cannot be filed on the docket without a sealing order. As a public law enforcement agency, there is a strong public interest in transparency and the State maintains serious concerns about the volume of documents designated and for which such protections should not apply.

[1] *See* ECF No. 119 at ¶¶ 2, 6, 25.

As of September 10 conferral, all Defendants (other than Puff Defendants and Midwest Goods[2]) maintain certain categories of confidentiality designations which the State disputes. One such example includes an "AEO" designation for all invoices, purchase orders, contracts, and undefined financial data, which Defendants insist, but the State disputes, are AEO.[3] Additionally, the parties disagree as to whether there is a three-year or four-year "staleness" bar to certain commercial information.[4] Defendants seek to preserve as Confidential the aforementioned categories of commercial information that are four years old and older, even if, as is the situation with the Price Point Defendants, YLSN, and the Puff Defendants, the business has ceased selling vapor products.[5] Defendants also request that all bills of lading and licensing documents be designated as Confidential; the State does not believe these documents are Confidential because they do not contain sensitive business information and the licensing documents at issue are public. Moreover, the State does not believe that bills of lading that misrepresent the shipped goods, which appear in some of Defendants' productions, should be protected.

To streamline resolution of the continued designation disputes, the State has proposed a de-designation process in which counsel can identify documents in advance of depositions, such that the document's designation will not interfere with the party's ability to examine witnesses. Insofar

[2] The Puff Defendants do not assert an AEO designation over any documents produced, other than one study they commissioned; however, it does maintain a Confidential designation over all agreements, financial documents, and invoices produced. The State is still determining whether it needs to challenge such designations in light of their representation that they no longer conduct business in the United States. As detailed *infra*, Midwest Goods has failed to meaningfully participate in these discussions and thus has not provided the State a position as to the Confidentiality or AEO designations of their documents other than the stamps originally applied in its two January productions.

[3] Defendants maintain that categories of documents, such as invoices, purchase orders, or other documents containing financial information must necessarily be designated "AEO" because of a generalized concern about protecting competitive business interests. However, because the protective order designations require a fact-specific inquiry, the State disputes that these kinds of documents necessarily contain information that would cause substantial competitive harm to the business if divulged. *See e.g. Multi-State Partnership for Prevention, LLC v. Kennedy*, 2024 WL 5146067, at *5 (E.D.N.Y. Dec. 17, 2024) (denying protective order for plaintiff's failure to demonstrate a specific, particularized harm beyond a general competitive concern) *citing Glob. Material Techs, Inc. v. Dazheng etal Fibre Co.*, 133 F.Supp.3d 1079, 1084 (N.D. Ill. 2015) (the party designating the material for attorneys' eyes only "must show that disclosure will result in a clearly defined and serious injury, by pointing to specific demonstrations of fact ... conclusory statements – including broad allegations of potential harm or competitive injury – are insufficient to meet the good cause standard"). Notably, as of this writing, Myle Defendants seek an AEO designation for invoices and purchase orders even though they have failed to produce *any* of these documents. Moreover, insofar as Defendants similarly seek to shield shipping documents—such as bills of lading—from disclosure, the State has reviewed shipping documents that contain false or misleading information, such as misidentifying the shipment of vaping products as "smoke detectors", and in any event, has sought pursuant to Rule 45 such equivalent documents from defendants' common carriers and such bills of lading do not have any such confidential designation assigned.

[4] The State has identified several cases in which courts within and outside of the Second Circuit have found that information older than three, even two, years does not deserve the protection of an AEO designation. *See e.g. United States v. Int'l Bus. Mach. Corp.,* 67 F.R.D. 40, 47–48 (S.D.N.Y. 1975) (revenue, sales, and manufacturing data between 3 and 15-years-old not entitled to protection)*; Sprint Nextel Corp. v. Simple Cell Inc*., No. CCB-13-0617, 2015 WL 13840324, at *4 (D. Md. Oct. 5, 2015) (no protective order coverage of pricing strategies that were 2, 3, and 4 years old at time of litigation)*; JTS Choice Enters., Inc. v. E.I. Du Pont De Nemours & Co.,* No. 11-CV-03143-WJM-KMT, 2013 WL 791438, at *4 (D. Colo. Mar. 4, 2013) (ordering a confidential designation on 2-year-old information rather than AEO)*; Zavala v. Wal-Mart Corp.,* No. CIV.A.03-5309 JAG, 2007 WL 2688934, at *10 (D.N.J. Sept. 12, 2007) (no seal for documents containing information 3-years-old and older).

[5] Counsel for YLSN and Price Point Defendants argues that because these entities have not formally dissolved, and that Price Point is still selling paper goods, disclosure of this information would cause substantial competitive harm.

as the document producing party disputes such de-designation, we respectfully request this Court's assistance in providing judicial guidance as to next steps. The parties are also discussing a de-designation process for filing purposes. We anticipate providing to the Court the Parties' de-designation protocol once we have identified a mechanism for seeking expedited judicial review after de-designation impasse.

B. Deficient Overlay Productions.[6] The parties have had several conferrals related to deficiencies in various Defendants' document productions. One such issue relates to Defendants SV3, Demand Vape, Magellan, and Price Point Defendants outstanding overlay productions on documents to which they have agreed to de-designate.[7] The State has requested the outstanding overlay productions with Defendants multiple times since May 22, 2026, and recently requested the production of such updated overlays by September 17. The State has raised with Defendants YLSN, Safa, and 10 Days since August 28 that certain overlay productions produced do not properly align the de-designated metadata with the actual stamps applied to certain documents. We have requested that these Defendants fully correct this overlay issue by September 17.[8] YLSN has stated that it intends to correct their stamping later in the discovery process for efficiency reasons given that there remain disputes regarding designations and as a result, current designations are subject to change.

Myle Defendants have designated nearly all 837 produced documents "Confidential," including photos of models wearing Myle-branded attire and stock product images. The State has asked whether Myle Defendants will de-designate these documents in conferrals on July 16, July 24, and September 14, in addition to numerous emails beginning in May 2026. To date, Myle Defendants have refused to provide a position on whether they will maintain these designations, because they have not reviewed the documents.

C. Deficient Email and Phone Collections. The State expresses a general concern about Defendants' overlapping and shared use of the same discovery vendor to process collections, review, and production of e-discovery. As identified below, some Defendants have provided updates on their email and cellular phone collections—including that such collections are still ongoing[9]; however, the progress appears to be slowed by the practical reality that nearly all Defendants share the same e-discovery vendor. Moreover, not all Defendants have provided updates to the State and thus we are not in a place to identify any concern for each Defendant's progress.

[6] In addition to the outstanding overlay productions, there is a "broken image" problem associated with the overlays for thousands of emails produced by 10 Days, Safa, Price Point Defendants, Demand Vape, and SV3. The parties are currently attempting to resolve this with their e-vendors and will report back if Court assistance is needed to address this deficiency.

[7] An overlay production effectively replaces both the images and metadata for a document to provide corrected or replacement information, such as expected here, an updated confidentiality designation and stamp applied to a document.

[8] SV3, Demand Vape, Safa, and 10 Days provided a new overlay production on September 17 addressing this issue. The State has not yet reviewed the production to confirm whether the corrections were made.

[9] Counsel for Safa and 10 Days indicated on September 15 that phone collections for those two Defendants were complete.

1. Price Point Defendants – Per their most recent update via email on September 14, the Price Point Defendants have not completed phone or email collections.[10]

2. YLSN – YSLN provided a status report today regarding their phone collections and represented that they have imaged the phone of two former employees, have sent an imaging kit to a third former employee, and are working to secure the cooperation of two more former employees. YLSN advised for the first time today that at least one former employee used a persona laptop to conduct YLSN business, but has not yet secured the laptop for imaging. YLSN did not know how many other employees, if any, used their personal laptop for work business.

3. Demand Defendants - Counsel for Demand Vape and Magellan provided an update on September 15 that collections of its custodians were still ongoing, but counsel expected to complete them by end of the week.

4. SV3 - As of September 15, 2026, SV3 is still in the process of phone collection for custodian Amir Hakak.

5. Puff Defendants, Myle Defendants and Midwest Goods – Because of the nature of the State's concerns with these Defendants' discovery conduct, they are discussed separately below.

D. Myle Defendants' Continued Failure to Meaningfully Participate in Discovery. The State is alarmed that 3 months since being retained to represent the Myle Defendants, counsel has failed to meaningfully participate in discovery. Conferrals are frustrated because counsel feigns any understanding of his client's discoverable materials—whether those that have already been produced into discovery by prior counsel; or such materials are those currently within Myle Defendants' possession, custody, and control that have been requested but remain outstanding. Myle Defendants' counsel attends conferrals unprepared to discuss the many outstanding issues despite being provided notice in advance of the topics to be discussed. Despite having conferrals with current counsel on July 16, July 24, and September 14, questions and disputes remain as to Myle Defendants' email and phone collection and imaging. Counsel has failed to explain why email collections for most custodians do not cover the entirety of the relevant time period even though the start of their employment predates the relevant time period. As recently as September 14, counsel for Myle Defendants could not confirm which message applications were used by custodians to communicate; nor could counsel provide the State with an anticipated date of when the confirmation would be provided. Myle Defendants refuse to collect emails from commitment@mylevape.com, an email address that according to Myle documents was available to report underage vaping. Despite being alerted by the State of its existence during the July 16, July 24, and September 14 conferrals and in July 16 and August 31 emails, Myle Defendants appear to still be unaware of its existence and emails from the account have not been collected.

[10] Price Point Defendants agreed during the September 2 conferral to continue with the collection of Mohammad Jalili's personal phone and email and provide the State with search term hit reports.

Myle Defendants have produced a total of 837 documents, the overwhelming majority of which are product and marketing images marked "Confidential." They have produced nine documents since new counsel was retained in June.[11] They have failed to produce documents or communications responsive to the majority of the State requests, including go-get documents such as (i) sales and purchase invoices, (ii) PACT Act Reports and (iii) bills of lading. They have produced no communications. While sensitive to the catch up required to get up to speed on a case of this size, the State is dismayed by the absence of progress in addressing, at a minimum, the significant outstanding document production, and Myle Defendants' refusal to provide even a timeline for when additional productions will be made. Indeed, Myle Defendants' counsel confirmed during the September 14 conferral that a review of go-get documents such as PACT Act Reports has not even begun. It is incredulous to the State that despite 3 months of onboarding, counsel can't produce more than nine documents or propose a timetable for rolling productions, let alone remedy basic designation issues.

E. State Amended RFP 20. As discussed during the August 18 discovery conference, State Amended RFP 20 was the only request that, as of the August 18 discovery conference, remained outstanding and was still in dispute between the State and Defendants 10 Days, Safa, SV3, Demand Vape, and Magellan (collectively "Thompson Hine Defendants"). *See* Tr: 62-63: 14-8 (August 18 Discovery Conference). On September 11, the State met with Thompson Hine Defendants to further discuss their objections to the State's Amended RFP 20. Based on that conferral, on or before September 25, 2026, Thompson Hine Defendants will: (1) identify whether documents have been produced responsive to Amended RFP 20, and if so, the bates number of said responsive documents; and (2) advise as to the date of the next anticipated production of documents responsive to Amended RFP 20. Additionally, between now and the October discovery conference, Thompson Hine Defendants will identify the types or categories of documents/communications responsive to Amended RFP 20 that they are withholding, if any, and if so, the basis for withholding said documents. As the parties are continuing to work to resolve or narrow Thompson Hine Defendants' dispute with Amended RFP 20, it is not yet ripe for judicial resolution.

F. Defendants YLSN, Myle Defendants and Price Point Defendants Refusal to Identify Specific State Requests, if any for Which They are Standing on Their Written Objections and Withholding Responsive Documents.[12] In light of this Court's August 19, 2026 Order (ECF No. 217) concerning the scope of nationwide discovery and in an attempt to affirmatively identify any potential discovery dispute so that continued document productions can proceed expeditiously, the State requested on August 27 that Defendants YLSN, Myle Defendants, and Price Point Defendants identify by September 3: (1) the specific State requests, if any, for which they are standing on their written objections and withholding documents; and (2) the specific objection(s).

To date, Myle Defendants have refused to state whether they are withholding any documents on the basis of an objection, claiming that the State's request is premature because they have not completed their review of documents. YLSN and Price Point Defendants have advised

[11] Myle Defendants' previous counsel moved to withdraw as counsel on May 3, 2026, citing professional considerations implicating Rules of Professional Conduct 1.2, 1.5, and 1.16(a), and provided further information regarding the issues *in camera*. *See* ECF Nos. 165-1 and 167.
[12] Puff Defendants confirmed they are not withholding any documents or communications based on an objection.

that, to date, they have not withheld any responsive documents based on an objection, but because discovery and document review are ongoing, reserve the right to withhold documents based on an objection going forward. YLSN also has previewed that they may withhold documents based on a First Amendment related objection.

These Defendants' responses are insufficient. Defendants' review of documents[13] responsive to the State's First Requests for Documents, which were served in October 2025 should have been long completed. To the extent Defendants' review of documents is incomplete, Defendants should still nevertheless know if they are withholding documents based on a privilege, or vague and ambiguous, overly broad and unduly burdensome objections.[14] Furthermore, Price Point Defendants and YLSN's responses to several State requests assert that they will produce "non-confidential documents;" but provide no explanation for the response in light of the protective order that has been in place since October 20, 2025 or whether they are withholding documents based on such purported confidentiality. Myle Defendants have objected to at least two State requests "on the grounds that it seeks documents and/or information protected by the attorney-client privilege, the work product immunity doctrine, and/or the joint defense and common interest privilege, in that it expressly encompasses communications with 'any other Defendant' concerning, inter alia, 'legal compliance,' and thereby purports to reach communications among Defendants and/or their respective counsel made in furtherance of a common defense effort or strategy" and have refused to produce such communications based on the objection. The State requests an order directing YLSN, Myle Defendants and Price Point Defendants to identify by September 30 specific State requests, if any, for which they are withholding documents based on an asserted objection.

G. <u>Midwest Goods's Failure to Fully Participate in Discovery and Comply with the Court's August 19 Order</u>. Midwest Goods last produced documents on January 8. Although it has answered the Complaint and provided written objections and responses to the State's discovery requests, it has otherwise failed to fully participate in document discovery. It has not provided any search term reports, nor responded to State inquiries regarding the status of email and phone collections, and it is the State's understanding that such collections have not occurred. Midwest Goods also failed to comply with the Court's August 19, 2026 Order directing it to confirm by August 24, 2026 "whether it has produced from 2020-2026 documents to demonstrate its net income or profits during that period." ECF No. 217. Counsel for Midwest Goods represented in an August 24 email that Midwest Goods has produced documents demonstrating its net income or profits for the 2020-2025 period, and that it intends to produce a P&L statement for mid-year 2026 within the next two weeks. It further explained that the seizure of most of its inventory in September 2025 left it with significant accounting issues preventing the preparation of a final P&L for year-end 2025 and its tax returns, and it does not know when the documents will be available. The State responded on August 25 that documents demonstrating Midwest Goods's net income or profits for 2020-2025 had not, in fact, been produced. Although Midwest Goods produced in January a spreadsheet of its purported gross and net revenue from New York sales, the spreadsheet does not demonstrate its

---

[13] As opposed to communications, which Defendants refused to produce and, *inter alia*, was the subject of the State's March 30 motion to compel discovery. *See* ECF No. 131.

[14] No Defendant has produced a privilege log, or responded to the State's inquiries as to when a privilege log will be forthcoming.

net income or profits. Midwest Goods has additionally failed to produce its nationwide sales information required by the Court's July 6 oral ruling (*see* Tr. 18:10-14 (July 6, 2026 Discovery Conference)) and as requested by the State in its RFP 178. The State requested that if Midwest Goods is still maintaining that "[t]hey don't have the financial wherewithal to continue with discovery", that it provide the actual income and profit statements for the entire period of 2020-2026. Tr. 44:21-24 (Aug. 18, 2026 Discovery Conference). The State received no response to its August 25 email, and to date, the State has not received the anticipated P&L statement for mid-year 2026 as assured by Midwest Goods's counsel. In a follow up email on August 27 the State inquired as to whether Midwest Goods will be fully participating in discovery given its (i) limited document productions to date and (ii) lack of any update regarding the status of its e-discovery. No response was provided. As Midwest Goods has failed to provide documents in support of its claim that it does not have the financial resources to continue with discovery, the State requests an Order directing it to fully participate in discovery, including collecting and imaging all 11 custodian emails and phones and providing search term reports by September 30.

H. The State's Concerns with Puff Defendants' Email and Phone Collections and Spoliation of Relevant and Responsive Documents and Communications. The State remains concerned that Puff Defendants' email and phone collections are deficient. Puff Defendants' August 24 update to the Court (ECF No. 223, hereinafter the "August Status Letter") included several inaccuracies and omissions. The August Status Letter discussed the anticipated collection of the mobile phones of the two co-owners, but provided no status of the collection of the personal phones and emails of the Puff Defendants' nine former employees (who they represent were dismissed as of March 20, 2024). It is unclear whether Puff Defendants have even reached out to their former employees to seek collection and imaging of their phones or know whether the former employees maintained Puff email accounts.[15] Furthermore, despite representing that the mobile phones of the co-owners would be "collected and examined in person . . . most likely on Thursday, August 27" (*see* August Status Letter, at 1), counsel for Puff Defendants confirmed on September 2 that the two phones have not been imaged; instead, counsel has merely taken "screen shots" of "a few items" from the phones. The State submits that taking select screen shots of a phone is not a collection. Puff Defendants also represented to the Court in August Status Letter that "[o]nly three email accounts have been maintained". That is inaccurate. The two co-owners in declarations provided to the State, dated June 26, 2026, identified **four** email accounts used in connection with Puff Defendants' operations: the 3 emails discussed in Puff Defendants' August Status Letter, as well as the email address "support@puffbar.com." Counsel for Puff Defendants on September 2, 2026 also advised the State of the existence of a **fifth** email account "billing@puffbar.com", which Puff Defendants still pay to maintain. Puff Defendants state that "support@puffbar.com" was disabled, but to date, have failed to respond to the State's repeated inquiries as to when the account was deactivated, why it was deactivated, and whether the files/communications associated with the account have been preserved (the co-owners stated in their declarations that the account was "active primarily for record preservation"). Indeed, Puff Defendants' counsel confirmed on September 2 that none of the 5 email accounts have in fact been collected and preserved. On the contrary, as of September 2, counsel merely had "log in access" to three email accounts allowing

[15] Per the Court's August 28, 2026 Memo Endorsed Order, counsel for Puff Defendants must determine by September 24 "if there are additional archived emails that must be collected and reviewed and must also have determined whether prior defense counsel has any text messages for the terminated employees" ECF No. 228.

for counsel's ability to log in and review emails. The files and communications from the five email accounts have neither been collected nor uploaded to a review platform where they can be reviewed for responsiveness. In fact, counsel confirmed that a review of the emails has not even begun.

The foregoing have heightened the State's increasing concern regarding the spoliation of relevant documents and communications by the Puff Defendants. Though Puff Defendants' 9 former employees may have been terminated as of March 20, 2024, and one email account deactivated, Defendants EVO Brands, LLC and PVG2, LLC are parties in several ongoing trademark cases that commenced in 2022 and 2023 for which there should have been litigation holds.[16] *See* e.g., *EVO Brands v. Al Khalifa Group LLC, et al.*, Case No. 22-cv-3909-AB-MAR (CD Cal.); *TIW Holdings LLC v. EVO Brands LLC, et al.*, Case No. 23-cv-0005-AB-MAR (CD Cal.). Defendant Puff Bar was also a defendant in several cases, including in a state court action brought by the Commonwealth of Massachusetts in 2020, and a class action complaint that commenced in 2021. *See Commonwealth of Massachusetts v. Puff Bar, et al.*, Case No. 2084-cv-01525-BLS2 (Mass. Super.); *Simkin v. Puff Bar*, Case No. 21-cv-7177 (S.D.N.Y), respectively. Nonetheless, Puff Defendants' counsel represented to the State that the co-owners disposed of company computers in early 2024 and have refused to advise the State of what steps, if any, Puff Defendants took to preserve the files on the computers prior to their disposal. Should the State's concerns with spoliation remain, the State anticipates seeking all available remedies available pursuant to Fed.R.Civ.P. 37.

I. <u>The State's Response to the Defendants' Position.</u> Defendants' characterization of the State's purported "failure to engage in proper discovery generally" is inaccurate and without basis as evidenced by the record. Defendants' litany of complaints regarding the State's document productions reveal that they misconstrue the nature of this law enforcement action, wherein the evidence of Defendants' unlawful conduct is in *Defendants'* own records. Defendants seek far more than that to which they are entitled. They are not entitled to a document-by-document justification as to why each bates-identified document is responsive to each one of their discovery requests. They cannot use discovery as a fishing expedition into the Attorney General's investigative files. Moreover, several of the proffered disputes are premature. While Defendants' Position purports to raise issues on behalf of all Defendants, only Safa, Demand Vape, and Magellan (Demand Vape and Magellan are collectively the "Demand Defendants") have sought conferrals on the topics purportedly raised by all Defendants. No other defendant has sought a conferral regarding the State's responses to their near identical requests. Lastly, Defendants insist on misrepresenting the legal obligations which flow from different state actors. The most salient explanation the State can provide as to the real basis for Defendants' discovery complaints is that

[16] EVO Brands and PVG2 are represented by the Thompson Hine firm in the two trademark cases. During an August 24 conferral with Puff Defendants' counsel in this action and their Thompson Hine counsel, the latter counsel represented that he did not know whether a formal litigation hold was ever placed, but that they were collecting and producing documents in the *Al Khalifa* trademark litigation well into 2023 and that the documents produced in the two trademark cases remain in Thompson Hine's possession. It is the State's position that the Puff Defendants' discovery obligations require them to collect the files maintained by Thompson Hine and review for documents and communications responsive to the State's requests. Puff Defendants have not responded to the State's requests for an update as to the collection and review. To date, Puff Defendants have produced a total of 392 documents and no communications.

Defendants either fail to accept or appreciate that discovery in this case rises or falls on their own materials—accordingly, nearly all potentially responsive documents, whether to the defenses or claims in this case (beyond expert discovery) are those in the possession, custody, or control of Defendants.[17] Nonetheless, we address the topics raised in Defendants' Position.

Though the relief requested is made on behalf of all Defendants, Defendants' complaints are limited to the State's responses to specific Safa, Demand Vape, and Magellan requests. As such, Defendants' complaints and the relief sought on behalf of all other Defendants is not ripe for judicial intervention. Counsel for the other Defendants did not participate in the State's conferrals with Safa and the Demand Defendants, and no other Defendants have sought a conferral concerning the issues raised in Defendants' Position.[18]

Nevertheless, aside from tangentially referencing Rule 34, Defendants have failed to identify any discovery abuse committed by the State, and Defendants' cited case, *SEC v. Collins & Aikman Corp.,* 256 F.R.D. 403 (S.D.N.Y. 2009), is inapposite. In that case, the SEC dumped 1.7 million potentially responsive documents totaling 10.6 million pages and failed to search emails. Here, the State has produced 2,491 documents and—unlike Defendants (except for Puff Defendants and Price Point Defendants)—has identified by bates number the documents responsive to each request. *See Stidhum v. 161-10 Hillside Auto Ave., LLC*, 2022 WL 17852023, at *4 (E.D.N.Y. Dec. 22, 2022) (directing defendants to "identify the bates ranges of documents responsive to each request" if documents were not produced in the usual course) (cited by Defendants). And, unlike the SEC, the State has produced emails.

1. <u>Multiple documents respond to different requests</u>. Defendants' requests seek documents "supporting" or relating" to different causes of action and the State is unaware of any rule prohibiting a party from producing the same multiple documents in response to different requests, particularly where, as here, the different causes of action are predicated upon overlapping facts. Defendants complain that the "State cited nearly the exact same set of pages" in response to Demand Vape Requests 3, 4, 8, and 12. As Defendants note, Requests 3 and 4 both relate to the State's Third Cause of Action (public nuisance), a cause of action that imposes joint and several liability and therefore implicates all Defendants. Request 8 concerns the State's gross negligence cause of action. Request 12 seeks documents "supporting or relating to allegations in Paragraphs 499–526 of the Complaint that 'Defendants' Flavored Vapor Products have harmed New York and will continue to do so if Unabated." That many of the same documents are responsive to these four requests is unremarkable and obvious.

2. <u>Defendants' statements regarding the State's purported "reliance on publicly available materials" in response to Safa Requests 13, 14, 32, and 33 are inaccurate</u>. Request 13 seeks "[a]ll documents and communications relating to New York State Department of Taxation

[17] Notably other than five (5) documents produced by Myle Defendants earlier this week; and one document produced by Puff Defendants, there have been no rolling productions from Defendants since the last court conference in August.
[18] This is not the first time Defendants have prematurely sought judicial intervention concerning purported "disputes" with the Court without first complying with the Court's Individual Rules, as well as the general practice of litigants in the Southern District of New York to first meet and confer in good faith prior to seeking judicial relief. *See* ECF Nos. 195 and 204.

and Finance's Technical Memorandum TSB-M-19(3)S, "Vapor Products Dealer Registration and Filing Requirements," dated October 18, 2019." This request seeks documents and communications relating to a memorandum issued by the Department of Taxation and Finance ("DTF"). The State clarified during its September 11 conferral with Safa that it has no documents or communications responsive to Request 13 in its possession, custody or control, and as noted in the State's response, directed Safa to the DTF website. As for Request 14 (documents and communications relating to New York State Department of Health's "Guidance for Vapor Product Manufacturers, Wholesalers, Distributors, and Retailers Regarding New Shipping Restrictions"), the State produced documents responsive to the request as part of its March 11 and July 24 productions. The State's response also included the link to the actual pdf of the guidance on the Department of Health ("DOH") website. As for Requests 32 and 33, Safa did not request to confer on the State's responses to said requests and any request for judicial relief as to those requests is premature. Regardless, the State produced documents in response to Requests 32 and 33.

3. Defendants are not entitled to a document by document explanation of responsiveness. The State is unaware of any rule requiring it to justify why a particular document is responsive to a particular request, as Defendants have sought. In asking for specific justifications for each produced document, it appears that what Defendants are really seeking is a roadmap of the State's case and identification of the documents it intends to rely on in a motion for summary judgment or at trial. Defendants are not entitled to that information at this stage in the litigation.

4. The State has produced communications and Defendants' request for the State's collection process is premature and unjustified. The State does not know what Safa is referring to when it states that it "separately requested information concerning the State's collection and search of email and other communications." Any "dispute" regarding any purported deficiency in the State's email review is both unfounded and premature. Unlike Defendants, the State has never refused to produce communications (*see* State Motion to Compel, ECF No. 131) and has produced email communications. Safa conceded as much during the conferral when Safa counsel admitted they had not reviewed the communications produced by the State. Regardless, the State has produced communications in response to Requests 14, 26, 30, and 34. Notwithstanding that Safa has never requested a conferral to discuss the State's responses to Requests 21, 32, and 33, the State has produced communications in response to these requests. As discussed above, the State has no communications responsive to Request 13 in its possession, custody and control. As for Request 15, the State responded that there are no non-privileged responsive documents within its possession, custody or control, and clarified during its conferral with Safa that the response extended to communications. As the State has in fact produced communications (which Safa has not reviewed) any assumption that the State has not "made a good faith attempt to search emails and other communications" is unfounded, and Defendants' request for relief is both premature and without merit. There is no basis in law or fact to encourage what appears to be the beginning stage of Defendants' demand to conduct a meritless fishing expedition into a law enforcement agency's confidential and sensitive records.

5. Defendants misrepresent the State's response to Request 17.[19] Defendants inaccurately assert that the State is withholding documents responsive to Request 17 on the basis that "Defendants may possess additional documents addressing the same subjects." The State has made clear during the conferrals, that as alleged in the Complaint, the State has identified the Defendants as having created, maintained, and contributed to the public nuisance. The Complaint identifies the public nuisance - the public health crisis among its youth attributable to each Defendants' marketing, sales, promotions, and distribution of illegal Flavored Vapor Products into New York State - a nuisance for which Defendants are jointly and severally liable. In response to Safa and Demand Defendants' requests for documents that identify "all other persons that may have contributed to the alleged nuisance" and each such person's claimed or alleged contribution, the State directed Defendants to the documents produced by all Defendants in this litigation and produced by Defendants in response to the State's investigatory subpoenas.[20] The State also noted that documents going to relative responsibility are in Defendants' own records (including State Request 179) and the State would not be reproducing Defendants' documents back to them when they are already a part of discovery in this action. Defendants additionally want the State to identify which documents within Defendants' own records the State thinks are relevant to the case, an obligation that the State does not believe it is required to undertake. Defendants' frustrations are borne out of their own collective unwillingness to share documents by and between each other because by failing to engage in the open exchange of discovery required by Federal Rule of Civil Procedure 5, they are depriving each other of information relating to the other's conduct: it is Defendants' own records that demonstrate their contribution to the public nuisance.

6. Judge Garnett did not issue a ruling regarding state agencies and Defendants distort and misunderstand the legal distinction between the New York Office of the Attorney General and the various state agencies, including DTF and DOH, as defined by statute in Executive Law § 63(18). Defendants raise a concern about "incomplete and long-delayed document productions" with regards, purportedly, to Demand Vape's Rule 45 subpoenas[21] issued to DOH and DTF. As to this issue, Defendants (1) misrepresent Judge Garnett's statements during our July discovery conference; and, more importantly, (2) distort the legal distinction between the New York Office of the Attorney General ("OAG") and the various state agencies, including DTF and DOH, as defined by in Executive Law § 63(18).

[19] Request 17 seeks "Documents sufficient to identify all other persons that may have contributed to the alleged nuisance in this matter and each such person's claimed or alleged relative contribution to or share of the alleged nuisance." Safa Good LLC's First Request for Production of Documents, dated October 27, 2025; Ecto World, LLC D/B/A Demand Vape's First Request for Production of Documents, dated October 27, 2025.

[20] The State filed this action after conducting an investigation, in which they subpoenaed and received records from most Defendants. These records are part of the OAG investigative files. Subpoenaed Defendants all produced records with highly confidential and other similar protective designations into the investigation. The State engaged in multiple rounds of discussions with Defendants in order to secure de-designated documents such that the State could re-produce into discovery here the State's complete investigative files. Defendants all refused any efforts to de-designate, forcing the State to serve State Request 179 for all documents produced in response to the State's investigatory subpoenas. Accordingly, the State's response to Request 17 references and reflects that tension: the State's investigative files are Defendants' records.

[21] Demand Vape is the sole Defendant to have provided notice to the State that it issued a Rule 45 subpoena to DTF and DOH. Therefore, it is the State's understanding that those two Demand Vape issued subpoenas are the basis for all Defendants' purported shared concern.

Judge Garnett issued no ruling during the July 6 discovery conference concerning any delay by the State agencies in responding to Demand Vape's subpoena. Neither DOH nor DTF were parties to or in attendance at the July 6 conference; nor—at any point to date—have Defendants sought to compel DTF or DOH's compliance with Demand Vape's subpoenas. Judge Garnett warned generally about the need by all parties, including third parties, to comply with discovery obligations, *see* July 6, 2026 Hr'g Tr. 42:24–43:6 (explaining that the Court will be evenhanded, holding not just Defendants but government actors, too, "equally accountable for their obligations in civil discovery"). The Court did not make any findings about the relationship between OAG and any sister executive agencies; but, in any event, Executive Law § 63(18), signed into law in 2025, makes clear the distinction between them.

In 2025, the New York State legislature, in response to recent court decisions that failed "to recognize and adhere to the state's constitutional separation of powers and longstanding legal principles regarding the distinct roles and responsibilities of the attorney general and the governor and executive agencies," Assembly Bill A3005C, Part RR (2025), amended Executive Law § 63 to add subdivision 63(18), which provides that, "[n]otwithstanding any other law to the contrary, in any civil enforcement action initiated by the attorney-general, neither the attorney-general nor the department of law has, or shall be deemed to have, possession, custody, or control of, or the right, authority, or practical ability to obtain documents, communications, other information, or personnel of any agency, entity, or authority other than the department of law." N.Y. Exec. Law § 63(18). Governor Hochul signed into law Bill A3005C, which included the new subdivision 63(18) on May 9, 2025. It became effective immediately and applied to all pending actions brought by the Attorney General and all actions commenced on or after May 9, 2025. *See* Assembly Bill A3005C, Part RR, Section 3 (2025). The 2025 amendments to 63(18) are intended to and do make clear the specific and distinct separate roles amongst the executive agencies.

Nonetheless Defendants seek to cherry pick portions of the July 6 transcript to coerce this Court into perpetuating an admonishment that did not occur (as Defendants' selective citations suggest), to absent third parties that are entirely unaware that a controversy exists.[22] Indeed, at no point have DOH or DTF been afforded any process with regards to a motion to compel its compliance with a Rule 45 subpoena, let alone an opportunity to be heard - an important distinction Judge Garnett specifically recognized during the conference. *See* July 6, 2026 Hr'g Tr. 63:12-18 ("I fully understand that you, as attorneys, are not representing these state agencies; that if anything is going to be done by me as a penalty or anything else, that they have to be present and have an opportunity to be heard before that happens. So I appreciate you raising it, but I understand that issue completely."). The Court should summarily reject Defendants' misleading attempt to create a controversy that does not exist and bar them from trying to fabricate a connection when the statute clearly says that OAG and these agencies are distinct.

---

[22] While the OAG offered to help facilitate communications with the third-party agencies to assist Demand Vape in making further progress with DTF and DOH; at no point did the OAG represent DTF or DOH at the conference, nor could it because they are each sister agencies within the State. Executive Law § 63(18) prevents such a blurring of these distinct lines.

7. The State opposes Defendants' late filed "request" for an extension until the October conference of the Court's August 19 Order (ECF No. 217) directing the relevant Defendants to "file a separate letter . . . explaining the categories of documents it has designated as Confidential or Attorney's Eyes Only." Nonetheless, the State does not oppose Defendants' request to extend their deadline beyond September 17, so long as they file the separate letters on or before the September 24 conference. The State objects to any further delay beyond that.

**City Position**

The City has participated in meet and confers alongside the State and is in agreement with the discovery disputes outlined above. The City does not have any additional discovery disputes to raise at this time.

**Defendants' Position**

Defendants write to provide the Court an update on the disputes that Defendants have with the State's discovery to date. Then, each Defendant group provides their respective positions on each of the discovery issues identified by the State.

1. **The State's RFP Responses and Bates Designations Are Not Tailored to the Individual Requests**

Beyond the State's failure to engage in proper discovery generally, several defendants have specific objections to the State's failure to fully respond to particular RFPs.

Put bluntly, the State's responses and document production to date are utterly insufficient and completely unacceptable. The State: (1) has failed to properly identify which documents respond to which requests and indeed, often produces the same massive multi-thousand-page ranges of documents in response to numerous disparate requests; (2) includes large numbers of documents that appear wholly unrelated to the RFPs for which they are cited; (3) identifies no documents whatsoever for several central and presently ripe requests; and (4) improperly relies on the contention that responsive materials are publicly available without identifying the specific public materials it contends are responsive to the particular RFP. Further, there do not appear to have been proper searches conducted for email and other communications that would be relevant to Defendants' requests. All of this must be remedied.

2. **General Issues with Plaintiffs' Productions**

Safa, Demand Vape, Magellan, and all other Defendants served Requests for Production upon the Plaintiff NYAG seeking documents supporting the State's claims and factual allegations against each Defendant individually, as well as the State's positions concerning causation, allocation of responsibility, and the relief sought. In its July 24, 2026 Second Supplemental Responses to every Defendant, respectively, the State listed Bates ranges after individual RFPs, thereby purporting to identify the documents responsive to each request.

By way of example, Safa's analysis revealed, however, that those designations are largely not request-specific: the State cited the identical 5,392-page collection for eight materially different RFPs and cited substantially the same collection for most of the remaining merits requests.

Demand Vape's analysis revealed a comparable pattern: nine materially different RFPs—spanning statutory illegality, fraud, public nuisance, gross negligence, and multiple harm allegations—are all cited to substantially the same roughly 5,700-to-5,800-page collection, and several of those RFPs cite collections that differ from one another by only a handful of pages despite the fact that they concern independent causes of action. The State's citations for Demand Vape's three separate PACT Act causes of action are likewise nearly identical, differing by only a single page when the subject matter of requests are vastly different.[23]

Magellan's analysis reveals an even more pronounced version of this same pattern. Request Nos. 1, 3, 11, 12, and 31 concerning, respectively, statutory illegality, public nuisance, the Paragraph 499-526 harm allegations (both as originally pleaded and as expanded), and the Paragraph 231-287 allegations cite an identical collection of documents, down to the page, despite addressing entirely different causes of action and allegations. Requests Nos. 8 and 22, concerning gross negligence and Magellan's contribution to the alleged nuisance, likewise cite one another's collection exactly. And Request No. 2, concerning fraud, cites more than double the number of pages cited for any other merits request, effectively the entire universe of documents the State has cited anywhere in its responses to Magellan's Requests.

Those collections also include documents that appear facially unrelated to many of the RFPs for which they were designated, as well as facially unrelated to many of the Defendant as an individual party of the suit.[24] As a result, the responses do not tell Safa, Demand Vape, Magellan, or any other Defendant subject to this practice which specific documents actually support which specific claim. Instead, no matter which RFP is at issue, the State's answer is effectively the same: nearly the entire production or some identical range within. This creates the appearance of a responsive, request-specific production while, in substance, the State has not meaningfully

[23] The three PACT Act RFPs contemplate vastly different subject matter: RFP 5 concerns 15 U.S.C. § 376a Delivery Sales; RFP 6 concerns 15 U.S.C. § 376 Registration & Reporting; and RFP 7 concerns 18 U.S.C. 1716E Nonmailable Products. While some overlap in responsive documents would be expected given their shared statutory basis, it is not plausible that the same collection of documents is objectively relevant and responsive to each of these three distinct requests.

[24] As it relates to Demand and Magellan, for example, the State designated a news article concerning alleged violations of Chinese law by Chinese e-cigarette manufacturers (NYAG0001076) as responsive to fourteen separate RFPs—Request Nos. 1, 2, 3, 4, 8, 11, 12, 22, 23, 24, 25, 26, 28, and 31—the identical set of RFPs for both Demand Vape and Magellan. When Defendants raised this document, among others, at the parties' August 28, 2026 meet and confer and asked the State to explain the basis for designating it as responsive to so many unrelated Requests, the State took the position that it has no obligation to justify why it believes a particular document is responsive, asking rhetorically what basis it would have "to then go through for you and talk about the theory of our case and explain document by document why this is appropriate for us to produce to you." In other words, the State's position is that a document is responsive to a given RFP simply because the State has determined that it is without further explanation, regardless of how facially unrelated that document may be to the specific claim or Defendant at issue.

engaged with the discovery process at all; rather, it has simply attached the same undifferentiated collection to request after request, regardless of subject matter. If such a practice were sufficient, the entire process of serving and responding to individualized requests for production would be rendered meaningless.

The parties met and conferred regarding these deficiencies—Safa on September 11, 2026, and Demand Vape and Magellan on August 28, 2026—but in both instances the State maintained that its responses are sufficiently tailored and declined to revise them.[25] We believe the parties therefore have reached an impasse on this specific issue.

Rule 34(b)(2)(E)(i) requires a responding party either to produce documents as maintained in the usual course of business or to organize and label them to correspond to the requests. In *SEC v. Collins & Aikman Corp.*, the court rejected the SEC's treatment of a 1.7-million-document investigative compilation as an ordinary-course production and ordered the agency to "produce or identify documents organized in response" to the defendant's requests. 256 F.R.D. 403, 409–14 (S.D.N.Y. 2009). Likewise, where documents are not produced in their ordinary-course organization, courts in this Circuit have required the responding party to identify the Bates ranges responsive to each request. See *Stidhum v. 161-10 Hillside Auto Ave., LLC*, No. 21-CV-7163 (HG) (RLM), 2022 WL 17852023, at *5 (E.D.N.Y. Dec. 22, 2022).

Here, the State purported to identify responsive documents on an RFP-by-RFP basis, but its designations largely reproduce the same collection across materially different requests. As to Safa, the State cites the identical 5,392 pages for RFPs 1, 3, 4, 8, 11, 12, 22, and 34, although those requests seek different proof concerning, among other things, repeated illegality, public nuisance, gross negligence, harm attributable to Safa, Safa's relative contribution to the alleged nuisance, and the specific allegations against Safa.

As to Demand Vape, the State cites Bates ranges that overlap by more than 99.8% for Requests Nos. 3, 8, and 12 (which respectively concern public nuisance, gross negligence, and the specific harm allegations), differing by only eight pages, with the same near-total overlap recurring across all nine of Demand Vape's merits-related RFPs.

For example, Requests Nos. 3, 4, 8, and 12 concern four different legal theories — public nuisance (twice), gross negligence, and the harm allegations relating to the "price paid by the State"— yet the State cited nearly the exact same set of pages for all four, differing by no more than about a dozen pages. This is not an isolated example: all nine of Demand Vape's merits-related RFPs cite the large majority of that same collection, ranging from roughly 92% to nearly 100% overlap.

---

[25] When Defendant Demand asked the State to reconsider or withdraw its bulk citations, the State was unequivocal that it would not do so, stating: "[W]e stand by [our] production." The State reiterated that it had "produced documents that are responsive to all of the requests" and would not revisit that determination, taking the position that Defendants had no basis to demand a document-by-document explanation of why materials were marked as responsive, even where an objective review shows they are plainly not.

More broadly, as to Safa, fourteen of the twenty-three RFPs with Bates citations direct Safa to between 4,965 and 5,392 pages—approximately 77% to 84% of the entire 6,451-page cited production—and nineteen receive a set exactly identical to that cited for at least one other RFP. The State even cites the same 4,965 pages for RFP 26, concerning potential benefits to *adult* smokers, and RFP 31, concerning health effects on New York consumers *under* twenty-one.

As to Demand Vape, nine of the twenty-four RFPs with Bates citations direct Defendants to between roughly 90% and 99% of the entire 5,789-page cited production.

Defendants' preliminary review confirms that the overlap is not merely attributable to documents legitimately responding to multiple requests. For example, an article about lithium batteries from disposable vapes entering landfills (NYAG0001198) was designated for fourteen RFPs served by Safa and, separately, fourteen RFPs served by Demand Vape—including, for each Defendant, requests concerning fraud, public nuisance, gross negligence, and adult harm reduction. A generic Amazon article available on the Amazon homepage explaining dropshipping (NYAG0003831) was likewise designated for fourteen RFPs served by Safa and fourteen RFPs served by Demand Vape, including all three PACT Act requests for each Defendant. A news article concerning solely individual owners of an unrelated co-defendant (NYAG0001148) was separately designated for eight RFPs directed specifically at Demand Vape's own alleged conduct, including the causes of action for statutory illegality, public nuisance, gross negligence, and contribution.

Defendants asked the State to identify the documents or reasonable document groups that actually respond to each RFP and remove unsupported bulk citations. General relevance to vaping does not establish responsiveness to every RFP to which a document was assigned.[26]

The State's reliance on publicly available materials presents a related issue for multiple Defendants. Courts within this Circuit differ on whether a party must reproduce an exact document that is equally and readily available to the requesting party. See *Murphy v. Maggs*, No. 18-CV-6628FPG, 2024 WL 884992 (W.D.N.Y. Mar. 1, 2024) (collecting cases). Even where reproduction is unnecessary, however, *Murphy* required the responding parties either to provide the document or supply a link to the specific document or information requested. The State therefore should identify the particular public documents on which it relies.

As to Safa, more fundamentally, citing a final public document does not answer RFPs Nos. 13, 14, 32, and 33 to the extent those RFPs also seek nonpublic communications, drafts, attachments, internal analyses, policies, and enforcement materials. The State must produce those materials, assert a specific objection, or state whether responsive materials are being withheld. *See* Fed. R. Civ. P. 34(b)(2)(B)–(C).

[26] When pressed on this point by Demand at the August 28, 2026 meet and confer, the State offered one explanation for the overlap: that certain documents are "responsive to... all the RFPs regarding a public nuisance" because "the public nuisance cause of action... [has] joint and several liability," such that a document related to one defendant's conduct is "relevant for all defendants... because there [is] joint[] and several liability." Even accepting that rationale as to the public nuisance cause of action, it does not explain the State's bulk-citation practice across the remainder of the 34 RFPs—the large majority of which do not concern public nuisance or joint-and-several liability at all.

As to Demand Vape and Magellan, Request No. 13 (seeking documents and communications relating to the Department of Taxation and Finance's Technical Memorandum on vapor product dealer registration) still identifies zero responsive documents as of the State's July 24, 2026 supplemental response, citing only a public agency website, and Request Nos. 14, 29, and 30 (seeking documents and communications relating to Department of Health shipping guidance and the interpretation of New York's vapor-product statutes) each cite the same small set of documents across differently worded requests, again coupled only with links to public agency websites. The State clarified to Demand and Magellan during its August 28, 2026 meet and confer that the OAG is not the same entity as DTF/DOH, and that it has produced all non-privileged documents in its own possession, custody, and control. To the extent it hasn't produced more, that's either because (a) nothing further exists in OAG's own files, or (b) it's on the forthcoming privilege log — not that OAG is improperly withholding non-privileged DTF/DOH material. Defendants do not believe that the OAG is the same entity as other State agencies, but believe that the State has materials responsive to these requests that are inevitably not being produced.

The parties are also at an impasse regarding RFP No. 17, served in materially identical form by both Safa and Demand Vape and Magellan, which seeks documents concerning other persons or entities that contributed to the alleged public nuisance and their relative contributions. As to Safa, the State refused to produce documents on the ground that Safa seeks Defendants' own records. As to Demand Vape and Magellan, the State likewise affirmatively stated that "the State is not producing any documents responsive to this Request"— a position that remains unchanged despite the parties' meet and confer on this exact issue, at which the State represented that any responsive material is likely already before the Court through the reciprocal production of documents Defendants produced in response to the State's investigatory subpoenas (State RFP No. 179), but the parties did not reach a resolution as to which, if any, Bates-stamped documents within that broader universe are actually responsive to RFP 17.

RFP No. 17, however, encompasses documents within the State's own possession, custody, or control concerning other alleged contributors and their relative responsibility—materials directly relevant to causation, contribution, apportionment, and Defendants' respective defenses. The State cannot avoid producing its own or third-party records merely because Defendants may possess additional documents addressing the same subjects.

Finally, Safa separately requested information concerning the State's collection and search of email and other communications. Contrary to the State's assertion above, Safa counsel did not state it had not reviewed produced communications, rather that it was still reviewing the productions. Several RFPs expressly seek such communications—including RFPs Nos. 13, 14, 15, 21, 26, 30, 32, 33, and 34—and the State, during the September 11th meet-and-confer asserted in response to RFP 15 that no nonprivileged responsive communications exist. Because the State responded that it had not received a formal request for collection information, Safa and all other Defendants likewise formally request identification of the custodians and shared accounts collected; the mailboxes, repositories, devices, and messaging platforms searched; the applicable date ranges; the search terms and hit counts; and the status of the State's review. This information is necessary to evaluate the adequacy of the State's assertion that no responsive communications

exist. We request that this Court give the State a firm and short deadline to produce this information so that the parties can evaluate whether the State has actually made a good faith attempt to search emails and other communications – an obligation the State has relentlessly pursued against Defendants.

Therefore, Safa and all other Defendants respectfully request that the Court direct the State to immediately revise its RFP responses and Bates designations; address the public and nonpublic materials encompassed by RFPs Nos. 13, 14, 32, and 33; supplement RFP No. 17; and provide the requested collection and search information.

In sum, the State has failed to provide any meaningful response to Defendants' discovery demands. This has continued despite Defendants' repeated expressions of concern regarding the State's discovery failures. The State is fully aware of its discovery obligations given its almost daily badgering of Defendants on exactly these issues.

In total, Defendants respectfully request that the Court direct the State to: (1) revise its RFP responses and Bates designations across the board to identify, on a request-specific basis, the documents actually responsive to each request; (2) address the public and nonpublic materials encompassed by Safa's RFP Nos. 13, 14, 32, and 33 and by Demand Vape and Magellan's Requests Nos. 13, 14, 29, and 30; (3) supplement RFP 17, served in materially identical form by both Safa and Demand Vape and Magellan and met with a non-response in both instances; and (4) provide the collection and search information requested by Safa, Demand, and Magellan.

3. **The Parties Are Making Progress on AEO Designations and Court Intervention Is Not Yet Warranted.**

All of the parties also met and conferred regarding AEO designations on September 10, 2026. The parties have made substantial progress on this issue—reaching agreement, for example, that PMTAs qualify for AEO treatment and that PACT Act reports generally qualify subject to a staleness cutoff the parties are continuing to negotiate. The State has also proposed a de-designation procedure intended to narrow disputes over specific documents as they arise in depositions and motion practice, which the parties are continuing to discuss. The State has raised concerns, to which Defendants disagree, that certain Defendants should not be entitled to confidentiality / AEO designations merely because they are no longer selling flavored vapes into New York. The Parties will continue to meet and confer regarding this matter.

While the parties have not resolved every issue, including the appropriate staleness cutoff and the treatment of invoices, contracts, and related financial documents, Defendants do not believe these remaining disputes are ripe for Court intervention at this time. The parties intend to continue conferring and anticipate that any genuine impasse on AEO issues will be better presented to the Court, if necessary, in connection with the October status conference.

4. **Outstanding Third-Party Agency Productions (Department of Taxation and Finance; Department of Health).**

Defendants also remain concerned about incomplete and long-delayed document productions from the State's own third-party agencies, which were served with subpoenas in March 2026. The Department of Taxation and Finance has, for several months, repeatedly represented that it would provide a substantial document production and an updated privilege log; to date, however, Defendants have received only a handful of documents, and the promised production and privilege log remain outstanding. Defendants intend to raise this issue in a separate letter motion in advance of the October conference. Defendants further note that they are still in the process of reviewing the State's recent production from the Department of Health and reserve the right to raise any deficiencies identified in that review.

Separately, Defendants respectfully ask the Court to reaffirm the standard Judge Garnett already articulated on July 6, 2026, regarding the State's obligations with respect to its own executive agencies. At that hearing, the Court was explicit that although it was "not prejudging anything at all" and understood "the difficulties that can be encountered in getting discovery from any government agency," it nonetheless held that these agencies "are equally obligated," explaining: "The case is being brought in the name of the State of New York. I know these agencies are not participating as plaintiffs, but they are New York State executive agencies. And the case is being brought in the name of the State of New York, and so they have to comply. I mean, really, they shouldn't even be treated as third parties." Tr. 43:17-25 (July 6, 2026). The Court further made clear it has "no difficulty at all holding government agencies equally accountable for their obligations in civil discovery, including to confer in good faith on any privilege claims or the scope of discovery," and directed the State to convey to the relevant agencies that it is also "not going to tolerate refusal to comply with discovery obligations even though it's coming from a state agency." *Id.,* at 3-6, 10-13.

Defendants raise this now because the State's continued treatment of the Department of Taxation and Finance and the Department of Health as passive, arm's-length third parties, rather than as the executive agencies of the very plaintiff prosecuting this action, is inconsistent with that ruling. Defendants respectfully request that the Court reaffirm that the State bears an active role in facilitating discovery from its own agencies, consistent with Judge Garnett's July 6 ruling, so that the State is not permitted to treat its own agencies' noncompliance as someone else's problem going forward.

**5. <u>Joint Defense Response to the State's Identified Discovery Disputes</u>**

**A. <u>AEO/Confidentiality Designations</u>**

Defendants agree with the State that the parties have made progress on this issue, including reaching agreement that PMTAs qualify for AEO treatment and that PACT Act reports generally qualify subject to a staleness cutoff the parties continue to negotiate. While the parties have not resolved every issue—including the appropriate staleness cutoff and the treatment of invoices, contracts, and related financial and shipping documents—Defendants do not believe these remaining disputes are ripe for Court intervention at this time. The parties intend to continue

conferring in good faith and anticipate that any genuine impasse will be better presented to the Court, if necessary, in connection with the October conference.[27]

Though Defendants do not believe the AEO and Confidentiality designation dispute is ripe for Court intervention at this time, Defendants nonetheless wish to rebut the cases the State has cited in Footnote 4 because a review of those cases reveals that they do not support what the State says they do. Each of these decisions makes clear that the propriety of a confidentiality or AEO designation is not resolved by counting years or using a presumption of age, but rather, by a fact-specific inquiry into the actual competitive harm, or lack thereof, presented on the particular record before the court. As one of the State's own cited authorities recognizes, "decisions regarding the propriety of confidentiality designations are intensely fact-based." *Sprint Nextel Corp. v. Simple Cell Inc.*, No. CCB-13-0617, 2015 WL 13840324, at *4 (D. Md. Oct. 5, 2015).

As set forth below, when the State's cited cases are examined on their own terms, none of them supports the categorical, age-based rule the State asks this Court to apply here.

i. *Multi-State Partnership for Prevention, LLC v. Kennedy*, 2024 WL 5146067, at *5 (E.D.N.Y. Dec. 17, 2024) (denying protective order for plaintiff's failure to demonstrate a specific, particularized harm beyond a general competitive concern)"

To the extent the State cites *Multi-State Partnership for Prevention, LLC v. Kennedy* for the proposition that a general competitive concern is insufficient to justify an AEO designation, that citation omits the balancing test the case itself applies: courts must weigh the producing party's risk of economic harm against the requesting party's specific need for the information—not assess harm in isolation. Kennedy is also factually distinguishable. There, the AEO designation was denied because the excluded party was the very author and copyright holder of the source code at issue, whose personal, first-hand knowledge went to the central disputed fact in the case—a "need" with no analogue here. That is a materially different circumstance from the commercial invoices, purchase orders, and financial data at issue here, where the State bears no comparable authorship relationship to the documents, and where the case does not turn on any comparison between what a party personally created and what is presently alleged. Accordingly, reliance on *Kennedy* for a categorical rule that a general competitive concern is insufficient to defeat AEO protection without regard to the balancing test or the authorship-specific facts that drove the court's holding overstates what that decision actually supports.

ii. *United States v. Int'l Bus. Mach. Corp.*, 67 F.R.D. 40, 47–48 (S.D.N.Y. 1975) (revenue, sales, and manufacturing data between 3 and 15-years-old not entitled to protection)

The State's citation is an apples-to-oranges comparison from the outset. *IBM* does not address AEO or Confidential designations under a civil protective order at all. Rather, it concerns

[27] The AEO/Confidentiality issue is not ripe for judicial intervention because the Parties are still in discussions and Defendants believe additional time will allow the Parties to reach a solution without Court intervention. Defendants respectfully request that the Courts' Order to "file a separate letter . . . explaining the categories of documents it has designated as Confidential or Attorney's Eyes Only" be extended to the October Conference.

whether nonparty deposition testimony and exhibits should be sealed and received in camera in a government antitrust action governed by the Publicity in Taking Evidence Act, 15 U.S.C. § 30, a statute unique to certain government antitrust suits that affirmatively mandates depositions "be open to the public as freely as are trials in open court" and provides that "no order excluding the public . . . shall be valid or enforceable." *United States v. Int'l Bus. Mach. Corp.*, 67 F.R.D. 40, 42 (S.D.N.Y. 1975). The court itself acknowledged it was operating in uncharted territory, with "no precedential judicial guidance," precisely because of that extraordinary statutory presumption of openness—a presumption with no analogue in an ordinary civil protective order dispute like this one. *Id*. In addition to this misleading comparison, the State has manufactured a bright-line, age-based rule that the case never adopted.

Even setting that threshold problem aside, the specific data to which *IBM* denied protection bears no factual resemblance to Defendants' information here. As to Burroughs' data, the court found that "Burroughs' general allegations of confidentiality do not demonstrate measures taken to guard the secrecy of this data," that Burroughs' claim of competitive value was offered "only in general and hypothetical terms," and that the data was twelve to fifteen years stale and, in any event, "evident to or open to extrapolation from earnest observation of the EDP industry." *Id*. at 47–48. As to Honeywell's data, the court likewise found that "the value of this information is presented not in terms of its value to Honeywell but in terms of its possible, if not tenuous, value to Honeywell's competitors," that "none of this data is current," and, as to Honeywell's 1967 customer list specifically, that "there has been no demonstration that the list has been maintained under pledge of secrecy or that it is not readily reconstructable by anyone in Honeywell's sales, production or finance departments." *Id*. at 48–49.

Defendants' showing is the inverse of both. As explained at the parties' September 10, 2026 meet and confer, Defendants' customer and supplier relationships are not static, decades-old snapshots—they compound and grow over time, such that a sale reflected in an older record frequently corresponds to a customer relationship that remains active today. Defendants also described specific, ongoing measures taken to guard this information's secrecy: customer and supplier information is not shared with other industry participants or outside third parties except in narrow, defined circumstances, and access is restricted internally on a role-specific basis—sales personnel generally lack access to supplier and purchasing data, warehouse personnel lack access to customer identities, and marketing personnel are not given visibility into the full customer or supplier base. Where Burroughs and Honeywell offered only general allegations, stale and unguarded data, and speculative claims of competitor value, Defendants have identified current, actively-protected, and compounding business relationships whose value does not diminish with time the way a fixed historical snapshot does. The State's cited authority accordingly provides no basis for the categorical, age-based rule it proposes.

iii. *Sprint Nextel Corp. v. Simple Cell Inc.*, No. CCB-13-0617, 2015 WL 13840324, at *4 (D. Md. Oct. 5, 2015) (no protective order coverage of pricing strategies that were 2, 3, and 4 years old at time of litigation)

The State's citation to *Sprint Nextel Corp. v. Simple Cell Inc.*, for the proposition that there was "no protective order coverage of pricing strategies that were 2, 3, and 4 years old at time of

litigation" mischaracterizes the decision in two material respects. First, the court did not strip the data of protection at all—it granted the motion only "in part," directing that the disputed "Fishbowl Data," including invoices, purchase orders, and pertinent customer information, be re-designated from AEO to the less restrictive "Confidential" tier, with an additional restriction limiting disclosure to specific personnel. *Id*., at *6. "[T]he Court [did] not order the "wholesale, unrestricted disclosure of this information" to Sprint. . . Instead, the Court [ordered Defendants to de-designate the data to confidential] with the additional restriction that the Fishbowl Data may only be disclosed to "necessary personnel from Sprint's legal, corporate fraud, and security departments in connection with this lawsuit."" *Id*., at *6. The data remained protected discovery material under the protective order throughout; the State's characterization of "no protective order coverage" is simply inaccurate.

Second, and more importantly, the age of the data was not the basis for the court's ruling. The court weighed several factors—including whether Defendants had already publicly disclosed the data, whether the parties were competitors, the data's age, and the prejudice to the requesting party from maintaining the AEO designation—and expressly found that staleness "weigh[ed] against disclosure, but only slightly." Id. at *5. What the court actually found "nearly dispositive" was something entirely different: that the AEO designation was being used to withhold what was "essentially a summary of information" the requesting party could already access through other productions marked merely "confidential," causing needless prejudice to its ability to prepare for trial. *Id*. at *6. No comparable redundancy exists here.

The court's own discussion of staleness confirms why the State's reliance on this case is misplaced. In addressing a competing authority involving historical pricing data, the Sprint Nextel court explained: "Putting aside the fact that decisions regarding the propriety of confidentiality designations are intensely fact-based, Stanislaus has limited application to this case. There, the court found that even though the documents at issue were historical, 'the information could be extrapolated to predict future strategies and practices.' This made the information current rather than stale." *Id*. at *4 (citation omitted). That is precisely Defendants' position here. As explained to the NYAG at the parties' September 10, 2026 meet and confer, Defendants' customer and supplier relationships compound and grow over time, such that a sale reflected in an older record frequently corresponds to a customer relationship that remains active today—meaning the information can be extrapolated to predict current business, just as in Stanislaus, and just as the Sprint Nextel court found lacking on the record before it. The State's own authority therefore confirms that where historical data can be shown to predict current practices, it is not stale.

iv. *JTS Choice Enters., Inc. v. E.I. Du Pont De Nemours & Co.*, No. 11-CV-03143-WJM-KMT, 2013 WL 791438, at *4 (D. Colo. Mar. 4, 2013) (ordering a confidential designation on 2-year-old information rather than AEO)

The State's citation to *JTS Choice Enterprises, Inc. v. E.I. Du Pont De Nemours & Co.*, for the proposition that the court there ordered "a confidential designation on 2-year-old information rather than AEO" is doubly flawed.

First, *JTS Choice* is not binding authority in this District. That a decision exists somewhere in a legal database referencing an age of documents loosely comparable to the documents at issue here does not make it relevant, let alone persuasive, authority.

Second, and more fundamentally, *JTS Choice* does not stand for the proposition that documents lose protection simply because they are approximately two years old. The court's ruling turned on a specific, discrete intervening event—the plaintiff's June 22, 2011 sale of its business to a direct competitor of the defendants, and the plaintiff's principals' resulting non-compete agreements—which fundamentally altered the competitive relationship between the parties. As the court explained: "Documents containing the highly confidential designation but predating June of 2011 are now antiquated. DuPont's business model was apparently . . . undergoing significant changes in the way wholesalers in one market were allowed to compete against one another beginning in 2009 . . . [and] the documents which reflect the prior way of doing business . . . are not only highly relevant to the issues in this case, they also have little to do with the current competitive practices of DuPont and its wholesalers." *Id*., at *3. The court went on to confirm that "[a]s a general rule, business information that is substantially out of date is unlikely to merit protection," but that staleness "is not an absolute bar" and must instead be "overcome by a specific showing of present harm." *Id*. at *4 (citation omitted). Tellingly, the same court simultaneously held that documents postdating the June 2011 sale remained entitled to the full "Highly Confidential" designation, because the plaintiff's principal had by then become affiliated with an active competitor. *Id*.

In other words, staleness in *JTS Choice* was not a function of age at all—it was a function of whether an intervening event had rendered the documents obsolete descriptions of a business relationship that no longer existed in that form. No comparable disqualifying event has severed Defendants' business relationships from their current form here. To the contrary, and as explained at the parties' September 10, 2026 meet and confer, Defendants' customer and supplier relationships compound and build on one another over time, such that older records continue to describe pricing practices, supplier relationships, and business strategy that remain in active, current use. Properly read, *JTS Choice* confirms that staleness turns on whether information still reflects an existing, ongoing competitive relationship, not on the mere passage of a fixed number of years. On that standard, the information at issue here retains its full protection.

**E. State's Amended RFP 20**

Defendants agree with the State's characterization of the status of Amended RFP 20. Following the parties' September 11, 2026 conferral, the Thompson Hine Defendants confirmed they will, on or before September 25, 2026, identify whether documents have been produced in response to Amended RFP 20 and, if so, the corresponding Bates ranges, and will advise as to the anticipated date of any further production. The Thompson Hine Defendants further confirmed they will identify, before the October conference, any categories of documents or communications they intend to withhold in response to Amended RFP 20 and the basis for doing so. Defendants agree with the State that this issue is not yet ripe for judicial resolution.

*** State's Privilege Log Footnote No. 14**

The State's suggestion in footnote 14 that no Defendant has produced a privilege log omits that the State's own privilege log remains outstanding despite multiple representations that one was forthcoming. In a letter emailed to the Demand Defendants the night before the parties' August 5, 2026 meet and confer about the State's Responses and Objections to interrogatories, the State represented that a privilege log was "forthcoming."

When Defendants asked on the call for a specific date, the State did not provide one. Then, on an August 28, 2026 meet and confer with the Demand Defendants, the State acknowledged that the log was already overdue, stating it had "full intent that that was supposed to be out to you a while back," and attributed the delay to a newly discovered "coding issue." That same explanation was repeated, still without a firm date for resolution, at the parties' September 10, 2026 conferral. Defendants do not raise this to excuse their own privilege log obligations, but to note that the State's footnote presents an incomplete picture of the parties' mutual, and equally outstanding, privilege log obligations.

**<u>Thompson Hine Defendants</u>**

As this Court is aware, Thompson Hine represents Magellan Technology, Inc., Ecto World, LLC d/b/a Demand Vape, Midwest Goods, Inc. d/b/a Midwest Distribution Illinois, 10 Days, Inc. d/b/a Pod Juice, Safa Goods LLC, and SV3 LLC, (collectively, the "Thompson Hine Defendants"). We respond to each of the State's positions below:

**A. <u>AEO/Confidentiality Designations</u>**

The Thompson Hine Defendants do not believe the Parties require the Courts' intervention with respect to the identified issue. The Parties have traded their positions on the confidential treatment of certain categories of documents. The Thompson Hine Defendants believe additional discussion will allow the parties to reach a solution without Court intervention. Additionally, the Thompson Hine Defendants have also offered an alternative de-designation process, and the Parties will continue to work together to come to an agreement on such a process.

Additionally, the Thompson Hine Defendants adopt the above positions asserted by the wider Joint Defense Group.

**B. <u>Deficient Overlay Productions</u>**

The relevant Thompson Hine Defendants, SV3, Demand Vape, Safa, and 10 Days provided image overlays as requested by the State. Therefore, the as with respect to the Thompson Hine Defendants, this issue has been resolved. The Thompson Hine Defendants take no position as to rest of the issues raised by the State.

**C. <u>Deficient Email and Phone Collections</u>**

Demand Vape and SV3 confirm that the collections are ongoing and search terms will be run once the data has been processed. There are no disputes to be addressed by the Court concerning this issue as it pertains to the Thompson Hine Defendants and Demand Vape and SV3 in particular.

**D. Myle Defendants' Continued Failure to Meaningfully Participate in Discovery**

This issue does not concern the Thompson Hine Defendants and therefore, they take no position as to this section raised by the State.

**E. State Amended RFP 20**

The Thompson Hine Defendants do not believe the Parties require the Courts' intervention at this time with respect to the identified issue. The Parties have agreed to continue to meet and confer on this Request.

**F. Defendants YLSN, Myle Defendants and Price Point Defendants Refusal to Identify Specific State Requests, if any for Which They are Standing on Their Written Objections and Withholding Responsive Documents**

This issue does not concern the Thompson Hine Defendants and therefore, they take no position as to this section raised by the State.

**G. Midwest Goods's Failure to Fully Participate in Discovery and Comply with the Court's August 19 Order**

Counsel has continued to communicate with Midwest Goods regarding the production of a mid-year 2026 profit-and-loss statement to the State and hopes to be able to do so before the upcoming status conference on September 24, 2026. As counsel has repeatedly represented to the State, Midwest is in the process of winding down its operations and does not intend to fully participate in discovery given its current lack of financial resources to do so.

**H. The State's Concerns with Puff Defendants' Email and Phone Collections and Spoliation of Relevant and Responsive Documents and Communications**

This issue does not concern the Thompson Hine Defendants and therefore, they take no position as to this section raised by the State.

**Price Point Defendants**

Phone Collections - Price Point Defendants have made substantial progress in connection with its phone collections. Three of the four phones have been imaged and are currently being processed by KLD for search terms and upload to Relativity. One remaining phone belonging to Mr. Elias Jalili, a former employee remains to be imaged. KLD has sent an imaging kit to Mr. Jalili and arrangements are being made to have the phone imaged this weekend.

After our conferral with the State and notwithstanding Mr. Mohammad Jalili's assertion that he has not been involved in the business, and absent any evidence that either was used for Price Point business, Price Point has agreed to have Mr. Jalili's phone and email collected.

With respect to emails, all primary emails have been collected and uploaded to Relativity. We have already begun reviewing them for responsiveness. With respect to secondary emails as well as personal emails, the majority of emails have been collected by KLD. We anticipate that all email collections will be complete and available for search within the next one to two weeks.

With respect to ongoing productions, Price Point has been reviewing responsive documents and anticipates a substantial production (approximately 10,000 emails and documents) by next week.

AEO / Confidentiality Designations – Price Point has agreed to de-designate specific documents. Price Point has communicated to the State that it was hoping to reach broad agreement with the JDG on all the designations in order to avoid costs of multiple de-designations. Complicating matters, the State has asserted that Price Point is not entitled to designate any documents as AEO or Confidential merely because it is not currently selling vapor products.

The State's attempt to minimize Price Point's competitive harm misconstrues the record. The governing standard turns on whether disclosure would cause substantial harm to Price Point's competitive position – not on whether Price Point currently operates in the vapor industry. Price Point Distributors has been operating since 2014 as a distributor of a broad range of consumer goods, including vapor products. Its brand name has substantial value. The mere fact that Price Point is not currently selling vapor product is irrelevant for purposes of determining competitive harm. Price Point can resume selling vapor products immediately if it chooses to do so. Price Point's wholesale business is still operational and not merely registered with the Secretary of State. Price Point continues to hold assets of value and continues to maintain valuable customer goodwill built up over years of operation. Removal of relevant confidentiality designations risks destroying or devaluing these assets. Notwithstanding the above, we are hopeful that we can resolve differences regarding confidentiality / AEO designations in a manner that is acceptable to both parties.

Price Point must also correct the record regarding the State's characterization that Price Point is refusing to state whether it is withholding any documents on the basis of any objection. Price Point has made clear to the State in an email dated September 14th that "Price Point Defendants have not withheld any responsive documents based on written objections."

**YLSN Defendants**

With respect to email and phone collections, YLSN Defendants provided the State with a further status update on September 16, 2026. Phones of Duo Zhong and Xin Wang have been

imaged and searched. Search terms have been loaded to Relativity and we will conduct searches as agreed. With respect to phones of former employees –

- Grace Guo and Liang Yang - Phones have been imaged and searched. Search terms with hits have been loaded to Relativity and we will conduct searches as agreed.
- Simeon Adan - Mr. Adan has agreed to have his phone imaged. KLD has shipped an imaging kit to Mr. Adan's address and will coordinate imaging.
- Juan Carlos Portillo and Zaiper Subate – YLSN has been in touch with these individuals. Thus far, Mr. Carlos has not agreed to cooperate. Mr. Subate has only recently reached out in response to our inquiries. YLSN will continue to reach out to these individuals to seek cooperation.

AEO / Confidentiality Designations – YLSN Defendants' AEO and Confidential designations are proper and should be maintained. The fact that YLSN has, for the time being, ceased conducting business does not diminish the substantial competitive harm that disclosure would cause. As a threshold matter, YLSN could resume its operations at any time, including in non-New York markets for which the State has requested extensive discovery. YLSN has not formally dissolved, continues to hold assets of value, and continues to maintain customer goodwill built up over its years of operation – goodwill and assets that YLSN may yet monetize, including through a possible sale of the business. Moreover, at least one entity the State itself alleges is related or affiliated with YLSN, Beavers, remains actively in business today, underscoring that the customer and vendor relationships reflected in these documents retain present competitive value. Removal of relevant confidentiality / AEO designations risks destroying or devaluing these assets, and would do so for no purpose other than relieving the State of the handling restrictions that AEO or Confidential protection imposes.

Bills of lading likewise warrant, at minimum, a Confidential designation. Even where an individual bill of lading does not itself disclose pricing or financial terms, YLSN's bills of lading in the aggregate reveal its client and supplier lists – the universe of entities to or from which YLSN shipped or purchased products, and the pattern, frequency, and volume of those shipments. A confidentiality designation does not depend on who generated the document. The fact that certain bills of lading were prepared by a third-party carrier rather than by YLSN itself does not diminish the confidentiality of the client and supplier information they reveal in the aggregate. Nor does it matter that some bills of lading misidentify the type of goods shipped – the confidential information at issue is the identity of YLSN's customers and suppliers in the aggregate, not the accuracy of the cargo description on any individual shipping document.

Nor does the age of a document by itself necessarily strip it of protection. The relevant inquiry is whether the document reflects information that remains current – not simply how old the document is. Where, as here, YLSN's client relationships and its client list continued to grow since its founding in 2021, a document reflecting a customer relationship that remains today is no less sensitive for being four years old. The Court cannot simply assume, without a document-specific showing, that release of older information will not harm YLSN's financial or competitive position; that assumption is not a substitute for the fact-specific inquiry the governing standard requires, and the State has made no such showing here.

Overlay Productions – YLSN Defendants will produce re-stamped versions of the documents at issue once the parties' AEO / CBI designation disputes are resolved. Re-stamping documents now, only to potentially re-stamp them again as designations continue to be negotiated and narrowed, would impose needless cost and burden on YLSN without any corresponding benefit to the State, which retains full access to these documents and the overlay with their current designations in the interim.

Finally, contrary to the State's representation above, there has been no "refusal" by YLSN Defendants to identify specific RPFs in which they are withholding documents based on asserted objections. As the State concedes later, the YLSN Defendants have represented that they have not to date withheld any documents based on specific objections.

**Myle Defendants' Response**

The State opens by declaring itself "alarmed" that Myle Defendants' counsel has, in three months, "failed to meaningfully participate in discovery." If what the State means by "failing to meaningfully participate" is:

1. retaining and paying for a third-party e-discovery vendor at significant cost to process collections, review, and production;
2. completing collection of five custodian phones, with phone search-term hit reports now underway;
3. disclosing and confirming collection of nine mailboxes: five individual custodians, three general or shared mailboxes, and a mailbox for a non-employee contractor who performed discrete graphic design work;
4. producing an email search-term hit report using the State's own corrected terms;
5. responding to three separate sets of written discovery requests from the State including RFP's, RFA's and as amended;
6. making two document productions under prior counsel,
7. a production of New York and nationwide sales reports in July and August dating back from 2020- present.
8. a production on September 15, 2026 of seven substantive manufacturer, supplier, and logistics agreements, each mapped to the specific RFP it answers;
9. identifying and correcting the record on that contractor's status, including her contact information and a full mailbox collection;
10. continuing to work through go-get document categories; and
11. engaging in numerous meet-and-confers with the State throughout, all while transitioning in as new counsel on a case of this size, and in three months

then yes, Myle Defendants counsel concedes the point.

**To be clear**: review of the collected materials is set to begin under the search terms the parties have agreed upon. Myle Defendants are, quite literally, participating in discovery in every respect the State identifies: collection, production, search terms, review, and continued meet-and-confer. The State's letter does not explain how this record amounts to a "failure to meaningfully participate"; it simply asserts the conclusion.

Substantial completion of document discovery is not due until January 29, 2027, and completion of all document discovery is not due until March 31, 2027. The Mylé Defendants remain well within Court-ordered deadlines. Against that procedural backdrop, the State's characterization of the past three months as a period of noncompliance is simply not borne out by the record. Those months reflect active and continuing discovery efforts within the schedule established by the Court, not a failure to meet obligations that have not yet come due. The State should not recast ongoing discovery as delinquency merely because certain items remain outstanding while the discovery period remains open.

***AEO/Confidentiality Designations.***

Myle Defendants' 830-document production consists overwhelmingly of product and marketing imagery. A position on de-designation follows from actually reviewing the documents, and Myle Defendants are doing so; the State's demand for an immediate position does not reflect the volume involved.

***Remaining Items.***

The remaining items the State raises, including messaging-application confirmation, the commitment@ mailbox, PACT Act reports, and bills of lading, require further collection and review, which take time given the volume at issue. Myle Defendants are addressing them and will update the Court and the State as that work progresses.

***Refusal to Identify Specific Requests.***

Myle Defendants have made clear that they are not withholding any documents on the basis of a written objection. The State's repeated demand that Myle Defendants take a final position on this before collection and review are even complete is, itself, premature; a party cannot meaningfully represent what it is or is not withholding on an objection until it has actually reviewed what it has collected. Myle Defendants will confirm their position as review progresses, consistent with the discovery schedule already in place.

**<u>Puff Bar Defendants</u>**

The State's recent characterization that the Puff Defendants have produced only 392 documents and no communications is inaccurate as to the document count and does not provide the full context of the materials produced, the limits of the records inherited by the current brand owners, or the work completed since the Court's July 6, 2026 conference. The Puff Defendants have provided 479 documents to the State to date, amidst some very challenging circumstances as set forth below.

**Facts Previously Presented to the Court**

At the July 6 conference, counsel explained that Nicholas Minas Alfaro and Patrick Beltran acquired the Puff brand assets beginning in January 2021; they did not purchase or succeed to the former operating company. Counsel further explained that the prior owners departed and left Messrs. Minas and Beltran with the brand assets and significant legacy problems. Tr. 35:3-20. The present clients therefore are brand owners, not the former company's owners, and they do not possess every record that may once have belonged to the prior business or its former personnel. Those records of the owners of the former companies that owned the were never transferred to the current owners and attempts to contact the former owners have not been successful.

With the exception of the sale of their zero nicotine products, Counsel also advised the Court that the Puff Defendants have not sold any nicotine products for approximately five years and that counsel and her paralegal reviewed the Google Drive in which the available business materials were maintained and produced the responsive materials located there. Tr. 36:1-10. Counsel separately obtained materials used in the prior Senate investigation that she personally requested, reviewed her own client storage boxes for approximately six and one-half hours in order to identify whether any additional Puff documents had been provided in paper that had not been electronically stored, and uploaded the resulting materials for the State and the City. Tr. 36:11-23. The Puff Defendants also supplied declarations addressing the available materials and supplemented their responses when the State identified items it believed were missing. Tr. 36:24-37:4. Please note that in their declarations to the Court Messrs. Alfaro and Beltran misspoke and initially indicated that the support@puffbar.com email had been maintained; however, that email had been disabled and the billing@puffbar.com email was the additional fourth email that had been maintained in addition to the other three emails.

With respect to mobile devices, counsel advised the Court that Messrs. Minas and Beltran had changed phones over time and that the availability of older devices and records was either nonexistent or consequently limited. Tr. 37:5-14. Counsel further disclosed that the relevant cellular accounts were maintained in the names of family members and that the carrier reportedly retained records for only approximately one year. Tr. 37:20-38:1. Finally, counsel made clear that the Puff Defendants authorized production of the materials available to them, including documents predating their ownership. Tr. 38:13-21.

**Updated Mobile Device Review**

Since that conference, Messrs. Minas and Beltran appeared at counsel's office with their current phones. Counsel and her legal team reviewed the devices in person and examined the context of the available messages and other materials. Approximately 90 percent of the material observed was personal and unrelated to the claims or defenses in these actions. Counsel preserved screenshots of the business-related material identified as relevant and necessary for production and review.

The Puff Defendants did not retain a third-party vendor to create forensic images of the phones because the cost was beyond their present financial means. This was not a refusal to permit review or an effort to conceal information. The owners brought the devices to counsel, permitted an in-person review, and allowed counsel to preserve the potentially responsive material identified during that review. The Puff Defendants remain willing to confer regarding a

proportionate and financially feasible protocol for any additional targeted review that the State believes is necessary.

**Email Review Status**

Counsel is now reviewing the four email accounts identified by the Puff Defendants. The present gross account-level counts, before deduplication, threading, application of search terms, privilege review, or responsiveness review, are as follows:

| Account | Gross Email Count |
|---|---|
| Nick@puffbar.com | 38,029 To be confirmed |
| Billing@puffbar.com | 10,485 To be confirmed |
| Patrick@puffbar.com | 36,826 To be confirmed |
| Info@puffbar.com | 524,869 To be confirmed |

The four confirmed accounts presently contain 25,476 gross emails in total. That figure is not a count of responsive or producible documents. The count for the info account remains under review and the final number will be provided when confirmed. Counsel is continuing to review the accounts for responsive, nonprivileged communications and will produce such materials on a rolling basis.

It is important to note that no personal laptops were used by the former employees of the Puff Defendants. All documents relevant to this present litigation were on the Google drive which Counsel for the Puff Defendants has reviewed and downloaded documents. Counsel has also, since the last conference with the State and the City, found an IT firm to assist Counsel with exporting all the emails mentioned below and preserving them for continued review. Please keep in mind that one counsel and one paralegal are reviewing all of the emails. That one counsel and one paralegal will also need to review the Thompson Hine documents when it receives them as noted below as well. Needless to say, due to the financial situation that the Puff Defendants are in its Counsel must balance this work against the financial reality in which it operates. Unless there was an email that Counsel for the Puff Defendants has not received, Counsel has been forthcoming with letting the State and the City know what is happening with the discovery.

**Status of Receipt of Information from Trademark Counsel**

At the time of the last conference with the State and the City, Counsel for the Puff Defendants indicated that they had been in touch with counsel at the Thompson Hine firm. Today, just prior to submitting this letter Counsel for the Puff Defendants has confirmed that it should have all the materials relating to the trademark cases that the State and City requested information on. Those items will be reviewed in due course.

**Production Count Clarification**

The Puff Defendants have provided 479 documents to the State, including materials produced from their Google Drive, as well as the Senate investigation materials, and supplemental productions. Accordingly, the State's statement that the Puff Defendants produced only 392 documents understates the production by 87 documents. The 479-document total is separate from the email accounts now under review and should not be understood as evidence that the Puff Defendants possessed responsive communications and declined to produce them.

The Puff Defendants have acted in good faith within the practical limitations created by their asset-only acquisition, the absence of the former owners and employees, the loss or unavailability of historical devices, and their limited financial resources. Counsel will continue reviewing the available email accounts, supplementing their production, and conferring with the State and the City regarding reasonable and proportionate next steps.

**Spoilation Concerns and the Current Puff Reality**

There has been zero spoilation by the current brand owners Messrs. Alfaro and Beltran. Both of these men who were incidentally 26 and 27 years old respectively when they purchased the Puff brand intellectual property, have tried their absolute best to act responsibly with respect to the products they placed into the market, which as stated above, were zero nicotine products. They sold a miniscule number of products with a retail value in the extremely low five figures into the State of New York. They made hardly any mentionable monies from the sale of Puff branded products yet here they are in these two cases with the State and the City being concerned about spoilation. Is it spoilation when you have no place to keep your business assets and no monies to store them so you sell these assets because there is no other option? The Puff Defendants have provided evidence of their financial condition to the State and the City. They have not intentionally erased nor have they refused to provide any data that they have in their possession. At the present time counsel in two firms, Thompson Hine and Zanicorn Legal PLLC are continuing to represent the Puff Defendants because (i) the trademark cases that are being handled by the Thompson Hine firm include cases that deal directly with a very distressing situation that the Puff Defendants found themselves in upon purchase of the assets and (ii) these cases the State and the City brought against the Puff Defendants should never have been brought in the first place which have continued the suffering both financial and reputational that should never have occurred in the first place. The current brand owners have suffered for the actions of the former owners. If the State and the City were after justice why did they not bring these actions against the former owners of the brand? Instead, the State and the City have sued two young men who did nothing but set up companies to try to turn the Puff brand around.

Currently both mentioned law firms are struggling to keep the cases moving and assisting the Puff Defendants with their discovery. There has been no refusal to provide information just the reality of dealing with life on a daily basis amidst the very bleak financial reality they live with daily. It is a stark reality for the Puff Defendants and an extremely difficult path for its counsel. The very mention of the use of any sanctions by the State or the City is extremely overly aggressive under the circumstances.

Respectfully submitted,

/s/ Joy K. Mele

Joy K. Mele
Assistant Attorney General
*Counsel for Plaintiff* People of the State of New York

/s/ Elizabeth Slater
Assistant Corporation Counsel
*Counsel for Plaintiff City of New York*

/s/ Eric N. Heyer

Eric N. Heyer (admitted *pro hac vice*)
THOMPSON HINE LLP
*Counsel for Defendants SV3, LLC (d/b/a Mi-One Brands) and Midwest Goods Inc. (d/b/a Midwest Distribution Illinois)*
*Co-Counsel for 10 Days, Inc. (d/b/a Pod Juice), and Safa Goods LLC*
*Co-Counsel for Defendants Magellan Technology, Inc., Ecto World, LLC (d/b/a Demand Vape)*

/s/ Robert Buschel

Robert C. Buschel
BUSCHEL GIBBONS, P.A.
*Co-Counsel for Defendants Magellan Technology, Inc. and Ecto World, LLC*

/s/ Michael J. McMullen

Michael J. McMullen
COHEN & MCMULLEN, P.A.
*Co-Counsel for Defendants Magellan Technology, Inc. and Ecto World, LLC*

/s/ Zoe Aron

Zoe Aron
Zoe Aron Law, P.C.

*Co-Counsel for Defendants Magellan Technology, Inc. and Ecto World, LLC*

/s/ Mark Peters

Mark Peters
PETERS BROVNER LLP
*Co-Counsel for Defendant Safa Goods LLC*

/s/ Mary G. Bielaska

Mary G. Bielaska
ZANICORN LEGAL PLLC
*Counsel for Puff Bar, Evo Brands, LLC, and PVG2, LLC (d/b/a Puff Bar)*

/s/ Eric Gotting

Eric P. Gotting (admitted *pro hac vice*)
KELLER AND HECKMAN LLP
*Co-Counsel for Defendants YLSN Distribution, Inc., d/b/a Happy Distro*

/s/ Dov Seewald

Dov Seewald (admitted *pro hac vice*)
TVC Law Group
*Counsel for Defendants YLSN Distribution, Inc., Price Point Distributors, Inc., Hamza Jalili, Weis Khwaja, and Mohammed Jalili*

/s/ Manny Zayrov

Manny Zayrov
ZAYROV LAW, P.C.
*Counsel for Myle Vape Inc. and MVH I, Inc.*