**Office of the New York State Attorney General**

**Letitia James Attorney General**

October 13, 2026

<u>VIA ECF</u>
Hon. Valerie Figueredo
United States Magistrate Judge
Southern District of New York
500 Pearl Street, Room 1660
New York, New York 10007

*Re: State of New York v. Puff Bar, et al.,* Case No. 25-cv-01445 (MMG)*;*
*City of New York v. Puff Bar, et al.*, Case No. 25-cv-2850 (MMG)

Dear Judge Figueredo:

This Office represents the State of New York (the "State") and submits this letter in compliance with this Court's Order, dated August 19, 2026 (ECF No. 217), directing the parties to file on ECF a joint letter prior to the October 20, 2026 discovery conference outlining the outstanding discovery issues and each party's respective positions. The State respectfully submits this letter together with all Defendants, as well as the City, in both cases captioned above.

**<u>State's Position</u>**

A. *<u>Midwest Goods Continues to Violate this Court's Discovery Orders</u>*. Midwest Goods was directed to "provide sufficient documentation to Plaintiffs to show lack of financial resources by October 2, 2026." *See* September 26, 2026 Order (ECF No. 239). The State has not received anything more since this Court's last conference. Midwest Goods neither provided the documentation nor contacted the State to advise that the documentation would not be provided. Furthermore, Midwest Goods continues to violate the Court's August 19, 2026 Order directing it to confirm by August 24, 2026 "whether it has produced from 2020-2026 documents to demonstrate its net income or profits during that period." ECF No. 217. As the State reported in the September 17, 2026 Joint Letter, the spreadsheet provided by Midwest Goods in January purportedly reports gross and net revenue from its New York sales. It does not demonstrate its net income or profits. ECF No. 234, at 6. Midwest Goods provided a profit and loss statement for the period of January 1, 2026 to July 31, 2026 on September 23, 2026. It has not provided a profit and loss statement for any other period. The State respectfully seeks permission to move for sanctions. On October 9, 2026, Midwest Goods filed a Notice of Consent to Entry of Default Judgment, but expressly reserved its right to contest the amount and scope of any default judgment. *See* ECF No. 243.

B. *Myle Defendants' Continued Lack of Understanding of their Own Documents and Communications Continues to Impede Meaningful Discussion on Search Terms and Slows the Pace of Discovery*. Conferrals and discovery continue to be frustrated by Myle Defendants' lack of understanding of their own documents and communications. Myle Defendants allege "burden" in reviewing all communications for responsiveness and insist that search terms must be finalized before they can even begin a review of their communications. However, they are unable to have a meaningful discussion on search terms because they have no idea what terms will yield responsive hits because they have not looked at any of their communications. Instead, they simply want the State to propose search terms for them. However, creating effective search terms is an iterative process that is based, in part, on how Myle Defendants maintain their documents and specific terms and language used to conduct their business. Myle Defendants' counsel, after consultation with the clients, is best situated to know the categories of documents and types of communications that are responsive to the State's requests. Myle Defendants' failure to understand their own documents persisted as recently as the October 6 conferral in which counsel could not describe communications or the quality of the hits from their most recent search term reports of emails and phones (which indicated 55,774 email hits and 40,977 phone hits). Moreover, questions remain regarding the email collections. At some point during the relevant time period, Myle Defendants changed their email domain from @mylevapor.com to @mylevape.com. Myle Defendants represented that the collection of @mylevape.com email addresses captured all @mylevapor.com emails, but when asked to provide clarification about the timing of the domain change and how @mylevapor.com emails were maintained and captured in the @mylevape.com collection, they could not. Moreover, the State learned during the October 6 conferral that Myle Defendants have not collected emails for the entire relevant time period, which begins on January 1, 2020, and instead collected emails only as early as May 2020. Myle Defendants stated they believed the relevant time period began in May 2020, which raises concerns about their collection of go-gets they are preparing for review and production. Although they agreed to make the additional collection, this failure will result in further delays. Myle Defendants appear to be raising again a "New York Only" limiter argument and appear to be unwilling to remove New York limiters from search terms (*see* Myle Defendants' Position, *infra*), despite several orders making clear that Defendants' discovery obligations are not limited to documents with a New York nexus. *See* April 27, 2026 Order (ECF No. 155) (ordering the State to amend eight RFPs and sustaining the remaining 24 RFPs in dispute in response to the State's Motion to Compel (ECF No. 131))[1]; August 16, 2026 Order (ECF No. 217) ("[T]he Court's July 6 ruling addressed only the scope of discovery as it pertains to damages under the PACT Act. And Plaintiffs have asserted non-PACT Act claims for which discovery with no New York nexus may be relevant."). Myle Defendants' "New York Only" limiter argument, including any claims of burden, have already been addressed. Lastly, Myle Defendants have also failed to fully comply with the October 9 deadline to review its confidentiality designations and provide an overlay production with metadata of the 837 documents referenced in the September 17 Joint Letter. Myle Defendants made a production of overlay designations on October 8 related to their first two productions totaling 828 documents.

[1] Myle Defendants objected to only three State RFPs on the grounds that a "New York Only" limiter should be applied. *See* ECF No. 131-2. The Court's April 27, 2026 Order resolved Myle Defendants' "New York Only" limiter objections. To the extent Myle Defendants now raise the same objection to other State RFPs, they have waived the objection by failing to raise it in response to the State's March 30, 2026 motion to compel.

The overlay production failed to include metadata related to their designations despite being ordered to do so.

C. *The State's Concerns with Puff Defendants' Collections and Spoliation of Relevant and Responsive Documents and Communications Remain*. Unfortunately, Puff Defendants' September 30, 2026 Letter to the Court (ECF No. 240, hereinafter "Puff Letter") did not alleviate the State's concerns. First, Puff Defendants were on notice of the need to preserve potentially relevant records and information when the State served them with investigatory subpoenas in November 2024. Puff Defendants' representation that Thompson Hine "did in fact preserve much of the documentation of the Puff Defendants" does not provide any comfort to the State, and, on the contrary, raises more questions than answers, as the transfer of "key documents" to Thompson Hine for the trademark litigations is not preservation. Second, the timing of the sale of the six or seven computers is inconsistent with prior representations that the computers were disposed of in January 2024 and not between the end of 2024 and the beginning of 2025 as represented in the Puff Letter. The State served the investigatory subpoenas on Puff Defendants in November 2024, presumably before the sale of the computers. Third, although Puff Defendants maintain that "company documentation was kept and saved on a Google Drive", the Puff Letter provides no update as to the collection of texts and messages from applications such as WhatsApp and WeChat from the phones of the two co-owners. The Puff Letter provides no clarity as to what happened to the data/texts/messages when they "changed phones over time" or what they mean when they represented in the September 17, 2026 Joint Letter that "the availability of older devices and records was either nonexistent or consequentially limited." ECF No. 234, at 30; *see also* 9/24/26 Tr. 72:8-20 ("if the device was disposed of, I would like to know of when they disposed of it. And then to answer this question about whether if they changed phones, the WhatsApp or whatever other app they were using to conduct business, if the information was transferred over to the new phone or if it was retained in some other way."). Lastly, the Puff Defendants' representation that they produced materials responsive to the State's investigatory subpoenas is inaccurate. *See* ECF No. 240, at 2. Puff Defendants did not respond to the investigatory subpoenas. They did provide 23 documents on March 21, 2025 as part of settlement discussions.

D. *Price Point Defendants Have Failed to Comply with This Court's Order Regarding Collection of All Outstanding Electronic Devices and Email Accounts by October 9, 2026*. Price Point Defendants were required to collect all electronic devices and email accounts to be imaged by October 9. ECF No. 239. Price Point Defendants admit that they have not collected all email accounts, and that they are still investigating email accounts related to two individuals, Nasim Jalili and Isa Khwaja. Price Point Defendants' assertion that the State only recently requested collection of these email addresses is incorrect. The State first identified these individuals as potential custodians on May 11, and despite Price Point Defendants' representation that the individuals did not have company emails, the State advised them on August 14 of a company email address for Nasim Jalili that the State had found in Price Point Defendants' own document production. Counsel for Price Point Defendants confirmed during a September 2 conferral that to the extent Nasim Jalili and Isa Khwaja had email accounts, that they would be collected. Price Point Defendants provide no explanation as to why the two outstanding email accounts "are not currently available to it". *See* Price Point Defendants' Position, *infra*.

E. *YLSN's Collection of All Electronic Devices and Email Accounts Remains Incomplete*. YLSN was required to collect all electronic devices and email accounts to be imaged by October 9. ECF No. 239. YLSN advised the State on October 2 that two former employees used personal laptops for business purposes and that they are uncertain as to a third employee. None of those devices have been collected. YLSN reported that former employee Juan Carlos Portillo is refusing to cooperate with YLSN counsel's requests to collect data from his personal laptop purchased by YLSN. YLSN reported that former employee Simeon Adan used a personal laptop for business purposes but that the laptop is "no longer available" and provided no further information. Regarding the collection of the three outstanding mobile phones discussed during September 24 discovery conference (*see* 9/24/26 Tr. 41-42), YLSN has informed the State that it has made unsuccessful efforts to image one of the mobile phones, and has not made any progress on the remaining two phones. The State respectfully requests Court intervention in seeking responsive documents and communications in the possession of the former employees.

F. *Foreign Language Issue*. The State has raised with Defendants the issue of documents and communications conducted in a foreign language. In particular, the State has seen evidence of internal Defendant communications in a foreign language as well as communications with foreign suppliers in a foreign language. Defendants' productions also include documents containing foreign language phrases. The State has sought clarification from Defendants regarding which custodians, if any, conducted business in a foreign language; which foreign languages were used; the total volume of foreign language communications; and how search terms are being applied to such communications. Puff Defendants, Price Point Defendants, SV3, Safa, Demand Vape, Magellan, and 10 Days have advised that they do not conduct business in any foreign language, and that there are no foreign language communications. The State seeks clarification on Myle Defendants representation to the State on October 13 that they conduct business only in English. Midwest Goods did not respond to the State's inquiry. YLSN has foreign language communications, and we are working to resolve whether and how to collect and produce such communications. While this is not a live dispute nor ripe for adjudication at this time, the States raises it for the Court's awareness.

G. *AEO/Confidential Designations*. All Defendants except Midwest Goods filed letters via ECF and/or emailed letters and supporting documents to Chambers regarding their AEO and Confidential designations. Pursuant to the Court's September 25, 2026 Order, the State will respond to the letters by October 16, 2026. *See* ECF No. 239.

H. *State's Response to Demand Vape and Magellan Position*. Demand Defendants' requested relief as to Demand Defendants' RFPs 13, 14, 15, 29, and 30 is moot. The State produced documents in response to RFPs 14, 15, 29 and 30 (and identified the bates of responsive documents), and reiterated during the October 9, 2026 conferral with Demand Defendants that the State is not withholding any non-privileged documents in response to RFPs 13, 14, 15, 29, and 30. As for documents the State received from third party agencies DTF, DOH, and DOE in response to the State's subpoenas, the State reiterated during the September 24, 2026 Discovery Conference

that it has turned over those documents to Defendants. *See* 9/24/26 Tr. 125:14-18.[2] Demand Defendants reiterate the same "possession, custody, or control" argument that they raised and discussed during the September 24, 2026 Discovery Conference that the State is required to identify by bates documents produced by a third party in response to the State's subpoena that may be responsive to an RFP. However, as noted by this Court, "that is not the way 'possession, custody, or control' is interpreted" and documents produced by third parties in response to a subpoena are "not in their possession, custody, or control. That is a third party's document." 9/24/26 Tr. 127:10-20; *see also* Tr. 129:4-9 ("it is not surprising that some of these documents that may be responsive to these RFPs are in the possession of agencies, and the AG's office wouldn't be in the possession, custody, or control of those documents."). To the extent Demand Defendants seek non-subpoenaed documents and communications that the AG's office received from third parties as part of its law enforcement work, they cannot use discovery as a fishing expedition into the AG's investigative files.

The two cases cited by Demand Defendants do not support the relief they seek as neither case involves the issue of whether subpoenaed documents are within the possession, custody or control of the party who issued the subpoena. *See Golden Trade, S.r.L. v. Lee Apparel Co.*, 143 F.R.D. 514 (S.D.N.Y. 1992) (defendants moved to compel communications between a non-party Italian corporation and foreign patent agents assisting the Italian corporation in the prosecution of patents as well as the files retained by the foreign patent agents*); S.E.C. v. Collins & Aikman Corp.*, 256 F.R.D. 403 (S.D.N.Y. 2009) (discovery dispute challenging the SEC's responses to defendant's requests for production). To the extent that Demand Defendants are relying on the *Golden Trade* court's discussion of Rule 34(a) and when a party can be compelled to produce documents that it has "the legal right to obtain . . . on demand", unlike the sub-license agreement between third party IGD and plaintiff Greater Texas in *Golden Trade*, there is no agreement between the AG's office and third party agencies under which the former has the right "on demand" to request documents from the latter. 143 F.R.D. at 525-26 (discussing sub-license agreement between third party IGD and plaintiff Greater Texas giving the latter "the right to cooperation by IGD" and the history of prior cooperation and assistance by IGD in discovery). Indeed, Executive Law § 63(18) explicitly provides that "neither the attorney-general nor the department of law has, or shall be deemed to have, possession, custody, or control of, or the right, authority, or practical ability to obtain documents, communications, other information, or personnel of any agency, entity, or authority other than the department of law." N.Y. Exec. Law § 63(18).

As for the documents Demand Defendants produced to the State in response to the State's investigatory subpoenas, Demand Defendants ask this Court for an order directing the State to: (1) reproduce back to Demand Defendants their own documents; and (2) identify by bates, Demand Defendants' own documents that are responsive to their requests. The Court should deny Demand Defendants' request. As discussed during the September 24 Discovery Conference, the State initially requested Defendants' consent to reproduce in discovery the documents each Defendant produced to the State in response to the investigatory subpoenas. We needed Defendants' consent

[2] Demand Defendants' assertion, *see infra*, that the State took the position during the October 9 conferral that "it has no obligation to produce to Defendants documents it received from the third-party governmental agencies in response to subpoenas" is incorrect. The State turned over to all Defendants the documents the State received in response to the State subpoenas on July 30, 2026.

because all Defendants applied confidentiality and FOIL exempt designations to their productions. All Defendants denied the State's request, and the State served Defendants with State RFP 179 on March 13 which seeks "All Documents You produced in response to the investigatory subpoena issued by the Attorney General of the State of New York in 2024, including but not limited to responses to the Requests for Information." Demand Defendants raised various objections to the request, including that it was duplicative and not proportional to the needs of the case. Subject to and without waiving these and other objections, Demand Defendants responded that they had "produced responsive, non-privileged documents responsive to this Request or in response to other Requests . . . [and] will not reproduce them again as responsive to this Request." As noted by the Court in *S.E.C. v. Collins & Aikman Corp.,* relied upon by Demand Defendants, under Rule 34(b)(2)(E), "a party has two options for the production of documents in response to a discovery request . . . [and] may either produce documents 'as they are kept in the usual course of business or must organize or label them to correspond to the categories in the request.'" 256 F.R.D. at 409 (*quoting* Fed.R.Civ.Pro. 34). Demand Defendants did neither, yet now ask this Court to direct the State to identify the bates numbers of their own documents that are responsive to their own requests. Demand Defendants should not be permitted to seek from the State what they themselves have failed to do.

I. *State's Response to Safa Position*. Safa's inflammatory and accusatory Position regarding its requests for production to the State, *see infra*, is both factually inaccurate and entirely mischaracterizes the general nature of discovery writ large. Safa raised during the October 7 conferral the very same arguments it raised during the September 24 Discovery Conference during which, without any showing of a deficiency, it requested from the Court an order directing the State to provide hit counts and the search terms used to search for responsive documents and communications. *See* 9/24/26 Tr. 119:21-25, 120:1-6. The Court did not issue such an order noting "[i]f you want me to dig into why or what the process was behind collecting e-mails, there has to be a showing that there was some deficiency, because otherwise the party's entitled to collect and go about in the process they think is, you know, reasonably likely to get everything that is responsive. The difference is that with the State and the defendants' collection, there were showings that some of these things weren't even collected or imaged. But I don't think there has been a showing so far here with the State and the e-mail communications." Tr. 120:25; 121:1-9. Indeed, in Safa's own case cite, *S.E.C. v. Collins & Aikman Corp.*, 256 F.R.D. 403 (S.D.N.Y. 2009), there was such a showing of the requisite deficiency where the SEC refused to conduct manual searches of large collections of paper records and refused to search its own emails for responsive documents, which necessitated the judicial relief there. No such deficiency has been established here.

Moreover, contrary to Safa's unfair contention, at no point did the State refuse to meaningfully participate in a conferral with Safa. The State tried, exhaustively—and repeatedly—during the October 7 conferral to provide clarifications on several of its responses. Safa discussed during the October 7 conferral the State's responses to RFPs 13, 15, 17, and 30 which were previously discussed during the September 11 conferral and addressed by the State in the

September 17 Joint Letter. *See* ECF No. 234, State Position I.2.[3] The October 7 conferral was nothing more than a repeated refrain of the prior conferrals on the very same topics. The State also confirmed during the October 7 conferral that additional responsive documents to RFP 30 were forthcoming. Safa also discussed during the October 7 conferral the State's responses to RFPs 32 and 33, which were previously addressed by the State in the September 17 Joint Letter. *Id*. The State explained during the October 7 conferral that the State's responses to these requests remain unchanged.[4] It is this refusal to change our responses to which Safa appears to object and recasts as refusal to cooperate and obstinance. Safa did not raise the State's response to RFP 14 during the October 7 conferral. Regardless, as discussed in the September 17 Joint Letter, the State produced documents responsive to RFP 14.[5] Safa did not seek a conferral on RFPs 16 and 18, which seek documents supporting or relating to amounts the State spent or expects to spend counteracting or abating the public nuisance.[6] Nevertheless, the State's objections to these RFPs included that the requests are "premature in that [they call] for expert witness disclosure or materials that are properly the subject of expert discovery" and responded that the State "is continuing an ongoing diligent search for responsive documents . . ." Safa also did not seek a conferral on RFP 19 which seeks "[a]ll documents supporting or relating to any fines or penalties that the State seeks as against Safa." Nevertheless, the State explained during the October 7 conferral that fines and penalties are statutory and, as a result, responsive documents are Safa's own records, and specifically identified Safa's (i) sales documents, (ii) sales invoices, and (iii) PACT Act reports, which document their sales and shipments into New York, as the kinds of responsive records in Safa's possession, custody, and control. Safa said during the conferral that they believe there are documents other than their own records that are responsive to RFP 19. The State asked what that belief was based on. Safa refused to provide a response. Safa further said during the conferral that RFP 19 also seeks any interpretation of statutory violations. The State explained that RFP 19 does not request documents within the State's possession, custody or control concerning any interpretation of the statutes that govern penalties and fines, but that RFP 32 requests such interpretation and the State produced documents in response to RFP 32. The only RFP discussed in Safa's Position for which the State responded that there are no responsive documents is RFP 13. While the State appreciates Safa counsel's "many years" of State service at the AG's office and "substantial experience conducting governmental investigations", that Safa's counsels believe there should be documents responsive to RFP 13 is not evidence that the State's production is deficient.

As for the privilege log, the State has told Safa it is forthcoming, as we expect theirs is. As for Safa's request for an order directing the State to provide a date certain for the State's privilege

[3] Contrary to Safa's assertion, the State never represented that it has "no responsive communications with third parties or other agencies." As indicated in the September 17 Joint Letter, the State responded to RFP 15 that there are no non-privileged responsive documents within the State's possession, custody, or control.

[4] There are no responsive documents to RFP 13 within the State's possession, custody, or control. There are no non-privileged responsive documents within the State's possession, custody, or control to RFP 15. The State responded to Safa's previous misstatements regarding the State's response to RFP 17 in the September 17 Joint Letter. *See* ECF No. 234, State Position I.5. The State produced documents responsive to RFPs 32 and 33.

[5] Responsive documents were produced as part of the State's March 11 and July 24 productions. The written response to RFP 14 included the link to the actual pdf of the DOH guidance that can be found on the DOH website.

[6] Safa once again prematurely seeks judicial intervention concerning purported "disputes" with the Court without first complying with the Court's Individual Rules, as well as the general practice of litigants in this district to first meet and confer in good faith prior to seeking judicial relief. *See* ECF No. 234, n 18.

log, the State has no objection to the Court providing a date certain for the exchange of privilege logs by all parties.

As for Safa's repeated claim that the documents produced by the State are overinclusive, the State awaits the Court's ruling on Safa's request during the September 24 Discovery Conference for an order directing the State to redesignate what documents are responsive to Safa's requests. 9/24/26 Tr.128:19-23. Regardless, there is no actual dispute. The State's identification by bates of the documents responsive to each RFP did not identify a range of documents, for instance, documents bates stamped 1 through 2000. Instead, the State painstakingly identified the bates of all responsive documents. For example, in response to Safa's RFP 3 which seeks "[a]ll documents supporting or relating to the Third Cause of Action in the Complaint for 'Common-Law Public Nuisance' as alleged against Safa", the State identified the following bates documents:

> NYAG0000001-NYAG0001138; NYAG0001155-NYAG0001471; NYAG0001479-NYAG0001497; NYAG0001503-NYAG0002428; NYAG0002431; NYAG0002952-NYAG0002968; NYAG0002973-NYAG0003001; NYAG0003006-NYAG0003172; NYAG0003178-NYAG0003218; NYAG0003221-NYAG0003528; NYAG0003531-NYAG0003653; NYAG0003740-NYAG0003755; NYAG0003781-NYAG0003800; NYAG0003808-NYAG0003846; NYAG0003853-NYAG0003962; NYAG0003997; NYAG0004001-NYAG0004005; NYAG0005159-NYAG0005172; NYAG0005445-NYAG0005532; NYAG0005846-NYAG0005870; NYAG0006070-NYAG0006083; NYAG0006089-NYAG0006102; NYAG0006107-NYAG0006141; NYAG0006146-NYAG0006154; NYAG0006197-NYAG0006241; NYAG0006248-NYAG0006523; NYAG0006526-NYAG0006544; NYAG0006548-NYAG0006638; NYAG0006644-NYAG0006645; NYAG0006649-NYAG0006713; NYAG0006719-NYAG0006844; NYAG0006903-NYAG0006905; NYAG0006917-NYAG0006935; NYAG0007404; NYAG0007711-NYAG0007717; NYAG0007774; NYAG0007803-NYAG0007896; NYAG0008045-NYAG0008130; NYAG0008380-NYAG0008387; NYAG0008401-NYAG0008405; NYAG0008992-NYAG0009010; NYAG0009207-NYAG0009239; NYAG0009409-NYAG0009417; NYAG0009420-NYAG0009425; NYAG0009755-NYAG0009758; NYAG0009763-NYAG0009773; NYAG0009777; NYAG0010065-NYAG0010104; NYAG0010111-NYAG0010134; NYAG0010141-NYAG0010180; NYAG0010249-NYAG0010259; NYAG0010268-NYAG0010272; NYAG0010276-NYAG0010278; NYAG0010285-NYAG0010295; NYAG0011973-NYAG0011980; NYAG0012049-NYAG0012050; NYAG0012057-NYAG0012063; NYAG0012065-NYAG0012068; NYAG0015454; NYAG0015713; NYAG0016186-NYAG0016196; NYAG0016304-NYAG0016355; NYAG0016359-NYAG0016468; NYAG0016775-NYAG0016782; NYAG0016791-NYAG0016904; NYAG0017069-NYAG0017074; NYAG0017076-NYAG0017077; NYAG0017090-NYAG0017099; NYAG0017101-NYAG0017104; NYAG0017110-NYAG0017143; NYAG0017148-NYAG0017151; NYAG0017155-NYAG0017185; NYAG0017189-NYAG0017223; NYAG0017230-NYAG0017234; NYAG0017238-NYAG0017260; NYAG0017264-NYAG0017284; NYAG0017299-NYAG0017470; NYAG0017473-NYAG0017479; NYAG0017482-NYAG0017485; NYAG0017488-NYAG0017597; NYAG0017600-NYAG0017620; NYAG0017622-NYAG0017633; NYAG0017637-NYAG0017651; NYAG0017653-NYAG0017666; NYAG0017673-NYAG0017675

While there are ranges of responsive bates provided in the document responses, the ranges are not blanket ranges of every document—but instead represent a responsive cataloging of document bates numbers. That these same documents are responsive to other requests is not surprising given the overlap of the State's claims, and the overly broad nature of Safa's various requests. Safa is not entitled to a document by document explanation of each document the State has produced, and Safa cites to no case that requires such an explanation. If Safa disputes a document's relevance, it can disregard it.

Regarding Safa's request for an order directing the State to reproduce to Safa the documents Safa produced to the State in response to the State's investigatory subpoenas, the State respectfully refers the Court to the State's response to the Demand Defendants' same request. Similar to the Demand Defendants, Safa raised various objections to the State's RFP 179, including that it was duplicative and not proportional to the needs of the case. Subject to and without waiving these and other objections, Safa responded that "the materials responsive to this Request were included in Safa's first tranche of discovery production in this action . . . [and] will not reproduce them again." Like Demand Defendants, Safa neither produced documents "as they are kept in the usual course of business" nor "organize[d] or label[ed] them to correspond to the categories in the request, yet now ask this Court to direct the State to identify the bates numbers of Safa's own production that is responsive to their own request. *See* Fed.R.Civ.Pro. 34. Safa should not be permitted to seek from the State what they themselves have failed to do.

**<u>City's Position</u>**

The City continues to attend meet and confers with the State and Defendants. The City agrees with the State as to the discovery issues described herein regarding Midwest, the Myle Defendants, and the Puff Defendants. The City has no additional issues to raise at this time.

**<u>Demand Vape and Magellan Position</u>**

**Demand Vape and Magellan's Requests for Production to the State**

As the Court directed on September 24, 2026, Demand Vape and Magellan (the "Demand Defendants") met and conferred with the State on October 9, 2026 regarding the State's July 24, 2026, Second Supplemental Responses and Objections to their First Requests for Production. Two issues remain at an impasse and are presented for the Court's guidance.

**1. Documents in OAG's possession that it received from other agencies and entities (Request Nos. 13, 14, 15, 29 and 30)**

Request Nos. 13, 14, 15, 29 and 30 of the Demand Defendants' Requests for Production ("RFPs") seek documents and communications concerning Department of Taxation and Finance ("DTF") and Department of Health ("DOH") guidance and vapor-product restrictions, the interpretation of related provisions of the New York State Health Law, and the State's communications with other government entities regarding Demand Vape and Magellan. The State's July 24 responses

identified no documents in response to Request No. 13 (citing only a public website), three pages in response to Request No. 14, one page (Demand Vape) or two pages (Magellan) in response to Request No. 15, and the same thirteen pages in response to both Request Nos. 29 and 30.

The State relies in part on N.Y. Exec. Law § 63(18), which provides that the Attorney General and the Department of Law are not "deemed to have, possession, custody, or control of, or the right, authority, or practical ability to obtain documents, communications, other information, or personnel of any agency, entity, or authority other than the department of law." The Demand Defendants do not ask the State to obtain anything from another agency. Their request concerns documents that OAG itself holds. In investigating and bringing this case, the State received documents from other agencies and entities, and those documents are now in OAG's actual possession. *See* ECF No. 201 at 3 (State's July 24, 2026 letter describing materials "that third-party State agencies (Department of Health; Department of Tax and Finance; and State Education Department) produced . . . in response to the OAG's requests") (footnote omitted).

At the October 9 meet and confer, the State stated that it has produced the non-privileged documents responsive to the identified requests but took the position that it has no obligation to produce to Defendants documents it received from the third-party government agencies in response to subpoenas. The State did not cite authority for such a brightline rule.

The State's position cannot be squared with Rule 34. Rule 34(a)(1) reaches documents in a responding party's "possession, custody, or control," and it is framed in the disjunctive. *See Golden Trade, S.r.L. v. Lee Apparel Co.*, 143 F.R.D. 514, 525 (S.D.N.Y. 1992) (framing the Rule 34(a) inquiry as whether a party has "either possession of the documents or 'control' of them"). Section 63(18) addresses whether OAG is deemed to have possession, custody, or control of documents "of" other agencies. It does not address documents that are, in fact, in the Department of Law's own files following receipt of these documents from an outside source. A document OAG received from DTF, DOH, or another entity and keeps in its files is in OAG's actual possession, wherever it originated. Every document a party holds came from somewhere. That OAG obtained these documents through subpoenas to other agencies, rather than creating them itself, does not change whether they are in its possession. By holding this position, the State asks the Court to adopt a categorical exception for documents received from third party agencies via a subpoena, but it identified no authority for such a rule, and the Demand Defendants are aware of none. To the contrary, a government plaintiff "must abide by the Federal Rules of Civil Procedure" and "is not entitled to special consideration concerning the scope of discovery, especially when it voluntarily initiates an action." *S.E.C. v. Collins & Aikman Corp.*, 256 F.R.D. 403, 414 (S.D.N.Y. 2009).
The source of a document is not a basis for withholding it or declining to say that it is responsive. The Demand Defendants respectfully request that the Court direct the State to (1) produce, and identify by Bates range, any documents the State received from other agencies and entities responsive to Request Nos. 13, 14, 15, 29 or 30, or state there are none; and (2) state whether any responsive documents are being withheld, and, if so identify them on a privilege log.

**2. Documents the State received from Defendants in response to its pre-suit subpoenas (all requests)**

This issue is limited to documents the State originally received from Defendants in response to its pre-suit investigatory subpoenas. The Court addressed the issue at the September 24, 2026 hearing, and indicated in its Order dated September 25, 2026 (ECF No. 239) that it would issue a separate order on the topic.[7] No order has been issued as of the date of this letter. At the October 9, 2026 meet and confer, the State indicated that it does not intend to act on this issue until it receives direction from the Court.

The Demand Defendants ask the Court to require the State to (1) produce those documents back to Defendants, and (2) identify, request by request, the Bates ranges that respond to each specific request, rather than returning the material as a whole. Rule 34(b)(2)(E)(i) requires a party either to produce documents as they are kept in the usual course of business or to organize and label them to correspond to the categories in the request. Records gathered in an investigation do not qualify for the first option: "conducting an investigation—which is by its very nature not routine or repetitive—cannot fall within the scope of the 'usual course of business,'" and such documents "can only be provided in a useful manner if the agency organizes or labels them to correspond to each demand." *S.E.C. v. Collins & Aikman Corp.*, 256 F.R.D. 403, 413 (S.D.N.Y. 2009). The same court addressed the question presented here:

> "Although a complaint includes some amount of legal theory and strategy, Rule 11 of the Federal Rules of Civil Procedure [requires] all parties to have 'evidentiary support' for the factual contentions in their pleadings. Given [that] requirement, producing the compilations of documents that support the factual allegations of a complaint reveals no more than that already revealed by the filing of the complaint. Thus [it is] no surprise that in one recent case outside the Circuit, a court required plaintiffs to provide the location of documents [that] were already in defendants' possession in an omnibus production similar to the one in this case."

*S.E.C. v. Collins & Aikman Corp.*, 256 F.R.D. 403, 410 (S.D.N.Y. 2009) (citing *Plumbers & Pipefitters Local 572 Pension Fund v. Cisco Sys., Inc.*, No. C01-20418, 2005 WL 1459555, at *6 (N.D. Cal. June 21, 2005)).

Demand Vape and Magellan therefore respectfully request that the Court enter the order described above, consistent with its comments at the September 24 conference.

**Myle Defendants' Position**

The State's characterization of Myle Defendants' discovery efforts is inaccurate. All Myle mailboxes have been collected. Email was initially searched from May 1, 2020 because Myle Defendants' e-discovery vendor, Avalon, mirrored the date range that prior counsel and its vendor, Cimplifi, had applied in the existing review workspace. Myle Defendants have directed Avalon to collect the remaining emails dating back to January 1, 2020, and that collection is

[7] See ECF No. 239 at p. 4. ("By separate order, the Court will address the issue discussed at the conference concerning compelling discovery from non-compliant former employees, and Plaintiffs' bates designations in their RFP productions to Defendants.")

underway and nearly complete. Mobile phone data was collected without any date restriction and covers the entire relevant period, so the phone collection presents no comparable issue. On October 8, one day before the Court's deadline, Myle Defendants served the overlay production of their confidentiality designations, and the parties are working through the technical issues the State has reported in accessing those files. Myle Defendants anticipate producing the remaining go-get documents next week. Review of the collected data is underway. Given the volume of the current search term hits (55,774 email hits and 40,977 phone hits), Myle Defendants are threading and sampling the hit sets to remove duplicative and non-responsive documents, so that review is directed at relevant material rather than unnecessary volume. Search term negotiations with the State are ongoing. The State's latest proposals, however, would remove the New York parameters from the search terms, which would substantially increase the hit count and the very burden the State now attributes to Myle Defendants. Myle Defendants remain willing to continue conferring on targeted search terms consistent with the proportionality requirements of Rule 26(b)(1).

As to the State's foreign-language inquiry, the State's initial request was circulated without Myle Defendants' counsel copied, and counsel did not receive it until later. Myle Defendants are now running a language identification search across their collected communications and will provide a response once that search is complete.

**Safa’s Position Regarding Its Requests For Production to the State**

As directed by the Court on September 24, 2026, Safa met with the State on October 7, 2026, regarding the State’s July 24, 2026, Second Supplemental Responses and Objections to Safa’s Requests for Production. Three issues remain unresolved.

Although the State appeared for the October 7 conference, it did not “confer” in any meaningful sense. For virtually every RFP discussed, the State responded that the issue had already been addressed, that its position had already been provided, and that its position would not change. It declined to reconsider its responses, explain the searches underlying its representations that documents do not exist, or engage substantively with the specific deficiencies Safa identified. Counsel for the State also repeatedly raised their voices and spoke over Safa’s counsel and, at one point, asserted that discovery is not a two-way street because OAG is the “regulator” and Safa is the “bad actor.” Such conduct does not meet the good-faith requirements of a meet-and-confer and is not acceptable.

Safa raises that statement not merely as a matter of tone, but because it reflects the mistaken premise underlying the State’s discovery positions. Whatever authority OAG may exercise in a regulatory capacity in other circumstances, here it is the plaintiff in a federal civil action. “The Government as a litigant is, of course, subject to the rules of discovery.” *United States v. Procter & Gamble Co.*, 356 U.S. 677, 681 (1958); see also *G&H Diversified Mfg. LP v. United States*, Court No. 22-00130, Slip Op. 26-35, at 5 (Ct. Int’l Trade Apr. 15, 2026) (quoting *Procter & Gamble* and applying the discovery rules to governmental agencies); *SEC v. Collins & Aikman Corp.*, 256 F.R.D. 403, 414–15 (S.D.N.Y. 2009) (“Like any ordinary litigant, the Government must abide by the Federal Rules of Civil Procedure.”). The State’s characterization of Safa as a

"bad actor"—which Safa vigorously disputes—does not diminish those obligations. The allegations in the Complaint are not adjudicated facts, and discovery is the mechanism through which Safa is entitled to test them.

**1. RFPs for Which the State Claims That No—or Virtually No—Responsive Documents Exist**

Several of Safa's RFPs seek narrowly defined categories of documents that would ordinarily be generated or collected during an investigation of this nature. Nevertheless, the State claims that no—or virtually no—responsive documents exist:

- **RFP 13** seeks all documents and communications relating to DTF's October 18, 2019 Technical Memorandum addressing vapor-product dealer registration and filing requirements. The State identified no document and referred Safa only to a general DTF webpage.
- **RFP 14** seeks all documents and communications relating to DOH's guidance concerning restrictions on the shipment of vapor products. The State identified only three pages and referred Safa to the publicly available guidance itself.
- **RFP 15** seeks communications between OAG and third parties—including DOJ, ATF, FDA, and other state attorneys general—regarding Safa. The State represents that no nonprivileged responsive communication exists in OAG's possession, custody, or control.
- **RFPs 16, 18, and 19** seek existing documents concerning the abatement costs, monetary relief, fines, and penalties the State seeks in this action, including any Safa-specific allocation or apportionment. The State identified no documents responsive to these requests and, as to RFPs 16 and 18, stated only that an "ongoing diligent search" was continuing. At the meet-and-confer, the State could not provide any timeframe for completing that search or explain what the search entailed, including which custodians, repositories, or sources were being searched.
- **RFP 17** seeks documents sufficient to identify other persons or entities that contributed to the alleged public nuisance and their relative contributions. The State refused to produce any documents, asserting that responsive materials are expected to be in the possession of Defendants or third parties. That response does not address responsive materials in OAG's own investigative or litigation files, which bear directly on causation, contribution, apportionment, and Safa's defenses.
- **RFP 30** seeks records of actual purchases of Safa products from retailers located within 1.5 miles of a school in New York, including purchase records, receipts, invoices, point-of-sale data, and communications identifying the retailer and location. The State identified only two pages and stated that its search remained ongoing.
- **RFP 32** seeks internal memoranda, guidance, policies, legal analyses, enforcement manuals, and interagency communications concerning the interpretation and enforcement of the New York Public Health Law provisions at issue in this action. **RFP 33** separately seeks documents and communications issued by DTF or DOH concerning New York's vapor-product restrictions, including its flavor, shipping, promotional-item, event, and price-reduction restrictions. The State identified the same approximately thirteen pages for both requests and otherwise referred Safa to public websites.

Two of Safa's undersigned counsel each spent many years at OAG and have substantial experience conducting government investigations. Based on that experience, the State's assertion that an investigation of this scope generated virtually no internal records or communications with third parties—including other government agencies—is highly anomalous and requires scrutiny. The State's position at the meet-and-confer appeared to be that its investigative file contains essentially nothing beyond documents provided by Safa and that OAG had no responsive communications with third parties or other agencies. Safa is entitled to test that extraordinary representation.

Safa does not ask the Court to assume that additional documents necessarily exist. It asks for the basic information needed to evaluate whether OAG conducted a reasonable search before representing that they do not. Given the anomalous representation that no documents exist and Safa's counsel's extensive experience to the contrary, some basic discovery testing this representation is appropriate. Specifically, Safa requested that the State identify the custodians, shared accounts, mailboxes, repositories, devices, messaging platforms, date ranges, and search terms used. The State refused to provide that information and could not explain the nature or anticipated completion date of its searches. Safa was required to disclose its custodians and search information to the State; OAG should be held to the same standard. See *Collins & Aikman*, 256 F.R.D. at 413–15 (directing a government plaintiff to develop an appropriate search protocol, including search terms and agency email).

As to the agency-related RFPs, Safa is not asking OAG to search another agency's servers. It is asking OAG to search its own files for communications, attachments, drafts, copies, investigative materials, and analyses that OAG received or maintained. Executive Law § 63(18) does not remove documents from OAG's actual possession merely because they originated with another agency.

Safa respectfully requests that the Court direct the State to: (1) complete its outstanding searches by a date certain; (2) identify the custodians, accounts, repositories, platforms, date ranges, search terms, and hit counts used; (3) confirm whether all responsive, nonprivileged documents in OAG's possession have been produced; and (4) supplement its response to RFP 17; (5) provide a date certain by which Defendant's will receive the State's privilege log.

**2. The State's Facially Overinclusive Bates Designations**

Safa recognizes that a document may respond to more than one RFP. The issue is that the State assigned specific documents to numerous materially different requests even where the documents have no apparent connection to the subject of the request. When Safa raised concrete examples at the meet-and-confer, the State insisted that all of its designations were appropriate and refused to reconsider any of them.

For example:

- **NYAG0001198** is an article about lithium batteries from disposable vaping products entering landfills. The State designated it as responsive to fourteen RFPs, including

requests concerning Safa's alleged fraud, its relative contribution to the alleged nuisance, potential benefits to adult smokers, New York consumers' interpretation of marketing, and the specific allegations against Safa.

- **NYAG0003831** is a generic Amazon article explaining dropshipping. The State designated it as responsive to twelve RFPs, including all three PACT Act requests, gross negligence, and the specific allegations against Safa.
- **NYAG0000001** is a study concerning minors' online purchases in North Carolina that does not appear to mention either Safa or New York. The State designated it as responsive to twelve RFPs, including requests concerning Safa's alleged fraud, market control, relative contribution to the alleged nuisance, and New York consumers' interpretation of marketing.

These are not isolated examples. The State assigned the identical 5,392-page collection to eight materially different RFPs, the same 103 pages to all three PACT Act requests, and the same 4,965 pages to RFP 26 concerning benefits to adult smokers and RFP 31 concerning health effects on New York consumers under twenty-one.

At the meet-and-confer, the State did not provide a request-specific explanation for these documents. It simply maintained that the documents were relevant, that all of its designations were proper, and that its position would not change. General relevance to vaping, however, does not make a document responsive to every RFP concerning Safa.

Safa does not ask the State to identify its trial exhibits, rank its evidence, or disclose counsel's mental impressions. It asks the State to identify the documents or reasonable groups of documents that actually respond to each request and remove facially unsupported designations.

Rule 34 requires documents to be produced as kept in the usual course of business or organized and labeled to correspond to the request categories. Fed. R. Civ. P. 34(b)(2)(E)(i). An investigative collection does not qualify as records maintained in a routine course of business and must be produced in a manner that is useful to the requesting party. *Collins & Aikman*, 256 F.R.D. at 409–13. Safa respectfully requests that the Court direct the State to revise its responses accordingly.

**3. Documents OAG Received from Defendants Pursuant to Pre-Suit Subpoenas**

Safa joins the position and requested relief set forth in Section 2 of Demand Vape and Magellan's submission concerning documents the State received from Defendants pursuant to pre-suit investigatory subpoenas.

It has come to Safa's attention that the State maintains that documents it received from Defendants pursuant to those subpoenas need not be produced back to Defendants in discovery. Safa shares the Demand Defendants' position that this purported categorical exception is inconsistent with Rule 34. Once received and retained by OAG, the documents are in OAG's actual possession. Their origin does not excuse OAG from producing responsive documents or identifying the documents that respond to each particular request.

Accordingly, Safa joins the Demand Defendants in requesting that the Court direct the State to produce those documents to the Defendants that originally produced them and identify, request by request, the Bates ranges responsive to each RFP, consistent with Rule 34(b)(2)(E)(i) and *Collins & Aikman*.

**YLSN Position**

Email Collection - YLSN has collected all available emails which have been searched and uploaded to Relativity.

Phone Collection - All phones have been collected and imaged and uploaded to Relativity with the exception of the 3 former employees discussed below.

Device Collection of Former Employees - With respect to the former employees, despite our efforts, 2 former employees Mr. Juan Carlos Portillo and Mr. Zupair Subate have thus far not agreed to cooperate. As discussed previously, Mr. Portillo has indicated that he will not be cooperating. Despite numerous attempts, Mr. Subate has not agreed to cooperate. We welcome the State's request for court intervention.

We have been in touch with Mr. Simeon Adan. Mr. Adan has only recently agreed to cooperate albeit begrudgingly. KLD has sent Mr. Adan an imaging kit. Due to the size of his device, KLD indicated that it will take approximately 8 hours to image his phone. KLD has since made 2 unsuccessful attempts to image Mr. Adan's phones (imaging process stopped before completion due to technical issues). Mr. Adan has become increasingly frustrated regarding the process to the point we are unsure if he will be willing to further cooperate. We are exploring additional options with KLD and with Mr. Adan to obtain his phone.

Personal Email Accounts of Former Employees - With respect to personal email accounts, other than Mr. Duo Zhong, we are not aware of any personal email accounts of former employees that were used for YLSN business (based on discussions with the former employees that have been cooperating).

Personal laptops used by former employees - as indicated above, Mr. Juan Carlos Portillo and Mr Subate have not been cooperating. Based on discussions with Mr. Adan, we understand that Mr. Adan indicated he has used his personal laptop on occasion for business purposes but that the laptop is no longer available. We are still gathering information from Mr. Adan regarding his personal use of his laptop.

An additional computer located at the Company's Arizona warehouse has been shipped to KLD for imaging.

Foreign Language Communications - YLSN raised the issue of Mandarin communications with the State back in June and the parties agreed to address at a later time. During our most recent Meet and Confer, YLSN again raised the issue and we agreed to request that KLD run a search of

the communications to assess how many are at issue and report back to the State prior to the November discovery conference.

YLSN will meet and confer with the State once we hear back from KLD.

**<u>Price Point Defendants' Position</u>**

Price Point has completed its collection of mobile phones for all current and former employees. All relevant personal and business email accounts that are available to Price Point have been collected by KLD.

The State recently requested collection of the email accounts of two additional individuals, Nasim Jalili and Isa Khwaja. Price Point has recently advised counsel that these accounts are not currently available to it. Counsel is investigating the circumstances, including the status and availability of the accounts and whether the content can be obtained from other sources, and will meet with the client this week.

Price Point will provide the State with a further update prior to the October 20th hearing date.

**<u>Puff Defendants' Response to State Position</u>**

While the State may remain concerned about the preservation of documentation, this concern must be put in perspective. The current Puff Defendants are *brand owners*. They did not buy the company which the prior owners ran, they started new companies which sold directly to the consumer (when that was allowable pursuant to federal and state regulations) and also sold primarily non-nicotine products once they took over the brand. Approximately fifteen thousand gross sales including shipping costs occurred in New York. Unlike the former owners, the Puff Defendants submitted a PMTA to the US Food and Drug Administration and when that PMTA was denied they only sold non-nicotine products. Thompson Hine preserved documentation when the Puff Defendants could no longer pay for third party storage all of which documentation is in the process of being reviewed now by counsel and unless any of those documents are clearly attorney client privileged documents they will be Bates numbered and turned over to the plaintiffs most likely before the end of this month of October or the first week in November. The Puff Defendants hope that not one of the other Defendants in this group of Defendants actually experiences what they went through during the end of 2024 and the beginning of 2025 but it was an extremely difficult period and absolutely nothing was done in the spirit or spoilation of documents, either intentionally or unintentionally. As far as WeChat and WhatsApp are concerned, if such applications were used at any time, the applications would have been moved to any new phone that the Puff owners were using over time. We will do a spreadsheet on the change of phone that will indicate clearly the timing of when those changes would have occurred. Insofar as the representation that the Puff Defendants responded to the State's investigatory subpoena, the subpoenas came in at a different time for Puffbar than for the other two Puff Defendants. Counsel will do a timeline on receipt of the subpoenas and the institution of litigation prior to the next hearing this October so that the Court understands the timing of receipt of the subpoenas, the move out of the last office location and the sale of the computers

used in the business of the Puff Defendants. Counsel will address all these points with Plaintiffs at a meet and confer scheduled for this coming Thursday, October 15.

Respectfully submitted,

/s/ Joy K. Mele

Joy K. Mele
Assistant Attorney General
*Counsel for Plaintiff* People of the State of New York

/s/ Elizabeth Slater
Assistant Corporation Counsel
*Counsel for Plaintiff City of New York*

/s/ Eric N. Heyer

Eric N. Heyer (admitted *pro hac vice*)
THOMPSON HINE LLP
*Counsel for Defendants SV3, LLC (d/b/a Mi-One Brands) and Midwest Goods Inc. (d/b/a Midwest Distribution Illinois)*
*Co-Counsel for 10 Days, Inc. (d/b/a Pod Juice), and Safa Goods LLC*
*Co-Counsel for Defendants Magellan Technology, Inc., Ecto World, LLC (d/b/a Demand Vape)*

/s/ Robert Buschel

Robert C. Buschel
BUSCHEL GIBBONS, P.A.
*Co-Counsel for Defendants Magellan Technology, Inc. and Ecto World, LLC*

/s/ Michael J. McMullen

Michael J. McMullen
COHEN & MCMULLEN, P.A.
*Co-Counsel for Defendants Magellan Technology, Inc. and Ecto World, LLC*

/s/ Zoe Aron

Zoe Aron
Zoe Aron Law, P.C.
*Co-Counsel for Defendants Magellan Technology, Inc. and Ecto World, LLC*

/s/ Mark Peters

Mark Peters
Lesley Brovner
Madison A. Kucker
PETERS BROVNER LLP
*Co-Counsel for Defendant Safa Goods LLC*

/s/ Mary G. Bielaska

Mary G. Bielaska
ZANICORN LEGAL PLLC
*Counsel for Puff Bar, Evo Brands, LLC, and PVG2, LLC (d/b/a Puff Bar)*

/s/ Eric Gotting

Eric P. Gotting (admitted *pro hac vice*)
KELLER AND HECKMAN LLP
*Co-Counsel for Defendants YLSN Distribution, Inc., d/b/a Happy Distro*

/s/ Dov Seewald

Dov Seewald (admitted *pro hac vice*)
TVC Law Group
*Counsel for Defendants YLSN Distribution, Inc., Price Point Distributors, Inc., Hamza Jalili, Weis Khwaja, and Mohammed Jalili*
*Co-Counsel for Puff Bar, Evo Brands, LLC, and PVG2, LLC (d/b/a Puff Bar)*

/s/ Manny Zayrov

Manny Zayrov
ZAYROV LAW, P.C.
*Counsel for Myle Vape Inc. and MVH I, Inc.*